# EXHIBIT A

**FILED**
**04-09-2026**
**Clerk of Circuit Court**
**Manitowoc County, WI**
**2026CV000151**

STATE OF WISCONSIN :   CIRCUIT COURT  :   MANITOWOC COUNTY

CITY OF MANITOWOC
900 Quay Steet
Manitowoc, WI 54220,

     Plaintiff,

  v.

NEWELL BRANDS INC. AND NEWELL
OPERATING COMPANY
221 River Street
Hoboken, NJ 07030,

     Defendants.

Case No.

Case Code: 30201

---

## SUMMONS

---

THE STATE OF WISCONSIN

To each person named above as a Defendant:

You are hereby notified that the Plaintiff named above has filed a lawsuit or other legal action against you. The Complaint, which is attached, states the nature and basis of the legal action.

Within twenty (20) days of receiving this Summons, you must respond with a written answer, as that term is used in Chapter 802 of the Wisconsin Statutes, to the Complaint. The Court may reject or disregard an answer that does not follow the requirements of the statutes. The answer must be sent or delivered to the Court, whose address is Manitowoc County Courthouse, 1010 S. 8th Street, 1st Floor, Room 105, Manitowoc, WI 54220, with a copy to Godfrey & Kahn, S.C., Attn: Daniel J. Blinka, 833 East Michigan Street, Suite 1800, Milwaukee, Wisconsin 53202-5615. You may have an attorney help or represent you.

If you do not provide an answer within twenty (20) days, the Court may grant judgment against you for the award of money or other legal action requested in the Complaint, and you may lose your right to object to anything that is or may be incorrect in the Complaint. A judgment may be enforced as provided by law. A judgment awarding money may become a lien against any real estate you own now or in the future, and may also be enforced by garnishment or seizure of property.

Dated this 9th day of April, 2026.

GODFREY & KAHN, S.C.

By: *Electronically signed by Daniel J. Blinka*
    Daniel J. Blinka
    State Bar No. 1074288
    Hayley Rich-Noble
    State Bar No. 1126707
    William J. Nelson
    State Bar No. 1092388

*Attorneys for Plaintiff City of Manitowoc*

P.O. ADDRESS:
833 East Michigan Street, Suite 1800
Milwaukee, WI 53202-5615
Phone:  414-273-3500
Fax:  414-273-5198
dblinka@gklaw.com
hrichnoble@gklaw.com
wnelson@gklaw.com

WITTE DAVIS LAW LLP


By: *Electronically signed by Edward B. Witte*
    Edward B. Witte
    State Bar No. 1017055

*Attorneys for Plaintiff City of Manitowoc*

P.O. ADDRESS:
9086 North Bayside Drive
Milwaukee, WI 53217
Phone: 414-305-2267
ned@wittedavis.com


CITY ATTORNEY'S OFFICE


By: *Electronically signed by Eric G. Nycz*
    Eric G. Nycz
    State Bar No. 1055471


*Attorneys for Plaintiff City of Manitowoc*

P.O. ADDRESS:
900 Quay Street
Manitowoc, WI 54220
Phone:  920-686-6990
enycz@manitowocwi.gov

38231997.3

3

**FILED**
**04-09-2026**
**Clerk of Circuit Court**
**Manitowoc County, WI**
**2026CV000151**

STATE OF WISCONSIN :   CIRCUIT COURT  :   MANITOWOC COUNTY

| | |
|---|---|
| CITY OF MANITOWOC<br>900 Quay Steet<br>Manitowoc, WI 54220,<br><br>        Plaintiff,<br><br>   v.<br><br>NEWELL BRANDS INC. AND NEWELL<br>OPERATING COMPANY<br>221 River Street<br>Hoboken, NJ 07030,<br><br>        Defendants. | Case No.<br><br>Case Code: 30201 |

## COMPLAINT

Plaintiff City of Manitowoc, Wisconsin (the "City"), by its undersigned counsel, for its Complaint against Defendants Newell Brands Inc. and Newell Operating Company, hereby alleges as follows:

### PARTIES

1. The City is a municipal corporation organized and existing under the laws of the State of Wisconsin, with its principal offices located at 900 Quay Street, Manitowoc, Wisconsin 54220.

2. Defendant Newell Brands Inc. is a corporation organized and existing under the laws of the State of Delaware, with its global corporate headquarters and principal place of business located at 221 River Street, Hoboken, New Jersey 07030. Defendant Newell Operating Company is a Delaware corporation and an indirect, wholly owned subsidiary of Newell Brands Inc. (collectively, "Newell").

## JURISDICTION AND VENUE

3.     This Court has personal jurisdiction over Newell pursuant to Wis. Stat. §§ 801.05(1)(c) and (d) due to its engagement in substantial and not isolated activities within the State of Wisconsin. Additionally, personal jurisdiction is conferred over Newell pursuant to Wis. Stat. § 801.05(3) because this action arises out of acts or omissions committed by Newell within the State of Wisconsin.

4.     Venue is proper in Manitowoc County pursuant to Wis. Stat. §§ 801.50(2)(a) and (b) because the claim arose in Manitowoc County, the real property that is the subject of this action is located in Manitowoc County, and the environmental contamination and discharge of hazardous substances occurred in Manitowoc County.

## FACTUAL ALLEGATIONS

### Mirro Plant: 1898-2003

5.     Newell is the successor in interest to Mirro Aluminum Company. Mirro Aluminum Company operated its headquarters at the Former Mirro Plant 9, 1512 Washington St, Manitowoc, Wisconsin (the "Property") and was one of world's largest manufacturers of aluminum products.

6.     The Property at one time encompassed approximately 980,000 square feet of manufacturing space and was comprised of approximately 17 buildings of various heights and ages, coupled together as one structure. The structures occupied an entire city block between Franklin Street, South 15th Street, Washington Street, and South 16th Street. Sidewalks and paved loading dock driveways made up the remainder of the Property.

7.     From 1898 to 2001, the Property operated as Mirro Aluminum Company ("Mirro"). Newell acquired the company in 1983.

8.     From 1898 to 1986, the Property was used to manufacture various aluminum products including aluminum cookware. These operations necessarily involved metal smelting,

2

casting, machining, degreasing, finishing, and waste handling activities typical of aluminum manufacturing during that era, including the use and on-site storage of fuels, solvents, oils, foundry sands, and other industrial materials. Such activities are widely recognized as resulting in releases of hazardous substances to soil and groundwater at legacy manufacturing sites. No other manufacturing occurred at the Property during this period or thereafter, and no other party introduced or brought hazardous substances to the Property apart from Newell's predecessor in interest, Mirro.

9.     Newell continued to maintain its corporate and engineering offices on the sixth and seventh floors of the structure until 2001, when the Property was fully vacated.

10.     For over a century, ending in 1986, Newell continuously operated at the Property and, during that time, caused and contributed to significant environmental impacts. These impacts arose solely from the historic operations of Newell's predecessor, Mirro, which exclusively manufactured at the Property and introduced hazardous substances in connection with those operations. As early as 2003, Newell retained environmental consultants to evaluate conditions at the Property, and those consultants provided reports confirming the existence of environmental impacts. Given the significant environmental issues with the Property, there are numerous reports commissioned by Newell and the City referenced from 2003 to present, including the reports discussed in the following sections.

### STS Consultants Phase I Environmental Site Assessment: June 2003

11.     STS Consultants, Ltd. ("STS"), retained by Newell, performed a Phase I Environmental Site Assessment (the "STS Phase I"), dated June 20, 2003, for the Property. The objective was to identify recognized environmental conditions ("RECs") in connection with the Property.

3

12.     The American Society for Testing and Materials (ASTM) Standard E1527-05 has

defined a REC as:

> "The presence or likely presence of any hazardous substances or petroleum products on a property under conditions that indicate an existing release, a past release, or a material threat of a release of any hazardous substances or petroleum products into structures on the property or into the ground, groundwater or surface water of the property. The term includes hazardous substances or petroleum products even under conditions in compliance with laws. The term is not intended to include *de minimis* conditions that generally do not present a threat to human health or the environment and that generally would not be the subject of an enforcement action if brought to the attention of appropriate governmental agencies. Conditions determined to be *de minimis* are not recognized environmental conditions."[1]

13.     As set forth in the "Findings and Conclusions" section of the STS Phase I, Newell's

environmental consultant identified RECs at the Property, including:

   a. A steam outlet in one of the buildings was used to clean heavily soiled tools and equipment, resulting in the release of oils and other hazardous substances to the subsurface through the cracked concrete floor, with a floor drain historically connected to a storm sewer discharging to Sherman Creek. (AECOM Phase I Report, p. 86.[2])

   b. Aluminum coils historically stored inside another building routinely dripped lubricating oil onto unpaved surfaces, resulting in petroleum and other hazardous substances impacting the subsurface in that area. (*Id.*)

   c. An automatic anodizing room used chromic, phosphoric, sulfuric, nitric, and hydrochloric acids to treat aluminum products, and the stained, deteriorated floors

---

[1] This historical definition of a REC is substantially similar to updates to this ASTM standard.

[2] Plaintiff is not attaching the AECOM Phase I Report due to its size; however, specific pin-cite references are included herein for the parties' convenience.

4

and orange-discolored soil observed through subsurface access ports demonstrate that hazardous substances impacted the subsurface beneath the room. (*Id*.)

d.  Petroleum products and other hazardous substances saturated the press room floors and subsurface areas, impacting the soil and compacted fill beneath the concrete slab. (*Id*. at 87.)

e.  A former ethylene glycol heating coil system remained beneath the concrete walkway adjacent to the main entrance off Washington Street, and aging cast iron pipes containing residual ethylene glycol resulted in hazardous substances impacting the subsurface of the Property. (*Id*.)

f.  Hydraulically operated elevators within the industrial structure exhibited standing water and an oil sheen in at least one shaft, indicating that petroleum products and other hazardous substances impacted the subsurface adjacent to the elevators. (*Id*.) Hydraulic elevator systems of this type and vintage commonly utilize hydraulic fluids that historically contained polychlorinated biphenyls ("PCBs") or became commingled with PCB-containing oils, and releases from such systems are a well-documented source of PCB contamination to surrounding soils and groundwater. (*Id*.)

g.  Concrete press pits within the industrial structure were used to collect hydraulic oil leaking from manufacturing equipment, and historical use and employee reports of chronic leaks demonstrate that petroleum products and other hazardous substances impacted the subsurface in these areas. (*Id*.)

5

***Earth Science & Technology, LLC Phase II Environmental Site Assessment: March 2005***

14.    The Property was purchased from Newell by Union Street Partners, LLC on March 26, 2004, who subsequently sold the property to Kenneth J. Lemberger, Sr., on November 18, 2005.

15.    Mr. Lemberger retained Earth Science & Technology, LLC to complete a Phase II Environmental Site Assessment ("Earth Phase II"), dated March 10, 2005, with the objective of determining if the RECs identified in the STS Phase I, or subsequent recognized environmental conditions, represented releases to the environment. (AECOM Phase I Report, p. 126.)

16.    Less than one year after Newell sold and finally vacated the former Mirro facility, and without any intervening manufacturing activity or disturbance of the building, the Earth Phase II investigation confirmed that volatile and semi-volatile organic compounds ("VOCs" and "SVOCs") and PCBs were released to and present in the subsurface at multiple locations within the northern two-thirds of the building complex. (*Id.*)

17.    Because the buildings restricted access to subsurface areas, a full Phase II assessment could not be completed, and Earth Phase II concluded that contaminant concentrations at the tested locations likely underrepresent the full degree and extent of contamination. (*Id.* at 148.)

18.    Contamination extended beyond the building, as Wisconsin Department of Natural Resources ("WDNR") records document groundwater standard exceedances on both the east and west sides of the site, and a prior leaking underground diesel fuel tank case involved exceedances of soil standards. (*Id.*)

6

19. The Earth Phase II determined that the underground storage tank releases and interior areas of the block required further investigation to define the full extent of contamination. (*Id*.)

20. The Property was transferred to Mirro Building, LLC on March 23, 2006, and was then purchased by EJ Spirtas Manitowoc, LLC on June 2, 2006. (*Id*. at 6.)

21. Given the Property's prominence and scale, the City was required to intervene to prevent further blight and to protect the future of its downtown district.

### *AECOM Phase I Environmental Site Assessment: January 2009*

22. In late 2008, due to the blighted condition of the Property, the City retained AECOM, Inc. ("AECOM") to perform a Phase I Environmental Site Assessment (the "AECOM Phase I").

23. The objective of the AECOM Phase I, dated January 19, 2009, was to identify RECs and historical RECs in connection with the Property. (AECOM Phase I Report, p. 2.)

24. The AECOM Phase I, consistent with the STS Phase I and the Earth Phase II, confirmed earlier-identified RECs and added several additional RECs, including:

    a. Soil collected beneath the drainage channels in the building where the steam outlet was located contained VOCs and PCBs (*Id*. at 6);

    b. A soil sample collected beneath the anodizing room contained elevated levels of aluminum (*Id*.);

    c. Petroleum products and other hazardous substances contaminated the compacted fill and subsurface beneath the concrete slab in the press room (*Id*. at 6-7);

    d. AECOM concluded that further investigation was necessary to evaluate the former ethylene glycol heating coil system and potential subsurface releases (*Id*. at 7);

7

e. Areas adjacent to the concrete press and air compressor pits exhibited potential subsurface impacts from petroleum products and other hazardous substances (*Id.*);

f. Assessment of the two leaking underground storage tank ("LUST") sites detected cis-1,2-dichloroethene in groundwater on the east side of the Property and trichloroethylene ("TCE") on the west side, and the undefined extent of these chlorinated solvent impacts continued to contribute to ongoing subsurface contamination (*Id.*);

g. A second-floor electrical transformer labeled as containing PCB oils was connected to two 55-gallon drums filled with oil requiring immediate disposal, presenting an additional source of hazardous substances at the Property (*Id.* at 7-8); and

h. PCBs were detected in a sump beneath Building C, and because the extent of subsurface impacts and any drain discharge pathway were unknown, AECOM recommended cleaning the sump and conducting additional investigation. (*Id.* at 8.)

***AECOM Phase II Subsurface Assessment: June 2009***

25.     On behalf of the City, AECOM conducted a Phase II Subsurface Assessment (the "AECOM Phase II"), dated June 4, 2009, which provided results of environmental sampling completed at the Property. (AECOM Phase II Report, p. 2.[3])

26.     The objective of the AECOM Phase II was to assess and document soil and groundwater quality of the Property relative to the RECs and environmental issues identified during the AECOM Phase I. (*Id.*)

27.     PCBs, petroleum, and chlorinated compounds were detected in the subsurface of the Property at concentrations exceeding state standards. (*Id.*)

---

[3] Plaintiff is not attaching the AECOM Phase II Report due to its size; however, specific pin-cite references are included herein for the parties' convenience.

28.     In addition to the PCBs, petroleum, and chlorinated compounds that the AECOM Phase II detected, only five years after Newell sold and finally vacated the former Mirro facility, and without any intervening manufacturing activity that would have introduced hazardous substances to the property, the AECOM Phase II confirmed hazardous substance releases associated with the RECs identified in the Phase I and concluded as follows:

    a.  A monitoring well near the former hydraulic press exhibited a sheen of free product, likely hydraulic oil, and polyaromatic hydrocarbon compounds were detected above regulatory limits, requiring additional wells and sampling to delineate the contamination. (*Id*. at 16.)

    b.  Soil samples from the central portion of the Property contained tetrachloroethene (PCE) and TCE, indicating multiple solvent releases and necessitating further groundwater monitoring to define the extent of impacts. (*Id*.)

    c.  Groundwater sampling detected TCE above state standards at a downgradient location, indicating contamination that may extend off the Property and requiring further investigation to determine its full extent. (*Id*.)

    d.  PCBs exceeding EPA limits were identified in soils within the former PCB drum storage area, triggering remedial action and disposal requirements under the Toxic Substances Control Act. (*Id*.)

    e.  Groundwater near the Heat Treat Room contained benzene at concentrations nearing enforcement standards, necessitating further sampling to determine the extent and persistence of contamination. (*Id*.)

### *City Acquisition of the Property & Stantec Phase I Environmental Site Assessment: June 2016*

29.     In 2015, a Raze Order was issued for the Property. Under Manitowoc Municipal Code § 16.070, razing is authorized where building conditions create health and safety hazards, aggravate blight, diminish surrounding property values, and interfere with the safety and welfare of the public. The Raze Order was issued based on documented conditions at the Property that endangered human health and the environment, including structural deterioration and the presence of hazardous substances, and were necessary to protect the public and prevent further harm.

30.     In 2016, the City acquired the Property's city-block parcel through a Chapter 32 condemnation action and immediately began the clean-up and demolition tasks in preparation for future development.

31.     The City determined that the Property was blighted pursuant to Wis. Stat. § 66.1333, thereby exercising its redevelopment authority and qualifying as a "local governmental unit" under Wis. Stat. § 292.11(9)(e)1.

32.     Environmental contamination and structural disrepair at the Property prevented redevelopment, requiring demolition costs, extensive lead and asbestos abatement, remediation of confirmed PCB contamination, and substantial on- and off-site environmental testing and monitoring.

33.     The City retained Stantec Consulting Services Inc. ("Stantec") to complete a Phase I Environmental Site Assessment (the "Stantec Phase I"), dated June 28, 2016, with the objective of identifying RECs in connection with the Property. (Stantec Phase I Report, p. 7.[4]) The Stantec Phase I identified RECs as follows:

---

[4] Plaintiff is not attaching the Stantec Phase I Report due to its size; however, specific pin-cite references are included herein for the parties' convenience.

10

a. The Property was used for heavy industrial aluminum manufacturing beginning between 1894 and 1900, expanded significantly during the first quarter of the twentieth century, and continued operating through at least 1986. These operations constituted a REC and resulted in the Property being listed on multiple environmental databases associated with historic industrial activity. As a result, further investigation into potential source areas was required following demolition of the buildings. (*Id.*)

b. The Property contained residual hazardous substance contamination in soil, groundwater, and building materials—including two PCB release areas and light non-aqueous phase liquids-impacted soil—constituting RECs requiring further investigation and remedial action. (*Id.*)

c. Past tannery and metalworks operations left abandoned vats, pits, LUSTs, and other hazardous material storage features that had not been fully assessed, constituting a broad REC and warranting further evaluation, including geophysical survey and potential removal during demolition to assess possible releases. (*Id.* at 8.)

d. Lead-based paint and asbestos were likely released from building materials into the structures, soil, and surrounding areas, constituting a REC and requiring an updated hazardous materials inspection prior to demolition. (*Id.*)

e. Staining observed inside the buildings indicated petroleum and other hazardous substance releases to building materials, constituting an additional REC and requiring characterization and a materials management plan prior to demolition. (*Id.*)

f. The Property's subsurface utility tunnel network, associated with reported hazardous material and petroleum releases, constituted a REC due to its potential

11

to serve as a source area and migration pathway, requiring geophysical mapping and further evaluation prior to demolition. (*Id*.)

g.  Hazardous materials and petroleum were potentially discharged to the Property's sewer system, including a buried stream, leaving potentially contaminated sludge in pipes and catch basins, constituting a REC and warranting evaluation and sludge characterization. (*Id*.)

***Newell Responsible Party Letter***

34.  On September 24, 2018, AECOM notified the WDNR that PFAS contamination had been detected at the Property, adding to the extensive hazardous substance contamination already present and significantly expanding the scope of investigation and remediation required. (*See* WDNR Responsible Party Letter (**Ex. A**).)

35.  In its September 24, 2018, correspondence to Newell, the WDNR identified Newell as a responsible party for the discharge of hazardous substances, including PFAS, to the environment at the Property under Wis. Stat. ch. 292 and Wis. Admin. Code chs. NR 700–754 for investigating and restoring the environment at the Property. (*Id*., p. 1.)

36.  The WDNR's letter advised Newell of its legal responsibilities under Wisconsin law to investigate and remediate contamination at the Property and provided information regarding required cleanup obligations, use of environmental consultants, and potential financial assistance. (*Id*.)

37.  The WDNR further advised that, because the City "acquired the Property through a method authorized under Wis. Stat. § 292.11(9)(e)(1m), the City is exempt from environmental liability *and may recover costs from responsible parties who possessed or controlled the hazardous substance that was discharged on the site or who caused the discharge of the hazardous substance on the site under Wis. Stat. § 292.33"* at the Property. (*Id*., p. 2 (emphasis added).)

12

38.     The WDNR directed Newell to submit written verification, within 30 days of its September 24, 2018, letter, as to whether Newell would coordinate with the City and its consultant, Stantec. (*Id.*)

***WDNR Stepped Enforcement: Notice of Noncompliance and Notice of Violation***

39.     On February 20, 2019, the WDNR issued a Notice of Noncompliance ("NON") to Newell for violating Wis. Stat. ch. 292 and Wis. Admin. Code chs. NR 700–754 ("Wisconsin cleanup laws") by failing to provide required information concerning solid waste handling and disposal at the Property and failing to timely coordinate investigation and cleanup efforts with the City. (*See* WDNR NON to Newell (**Ex. B**).)

40.     The letter noted that despite two granted extensions, WDNR had not received the requested Site Investigation Work Plan and therefore deemed Newell to be in noncompliance with Wisconsin cleanup laws. (*Id.*, p. 1.)

41.     The WDNR further advised that, as a Responsible Party, Newell's obligations are governed by Wis. Stat. ch. 292, including Wis. Stat. § 292.11(3), which provides that "[a] person who possesses or controls a hazardous substance which is discharged or who causes the discharge of a hazardous substance shall take the actions necessary to restore the environment to the extent practicable and minimize the harmful effects from the discharge to the air, lands, or waters of the state." (*Id.*, p. 1-2.)

42.     The WDNR advised that Newell would remain in noncompliance with Wisconsin cleanup laws until it fulfilled all statutory requirements and that failure to take the required actions to address the contamination could result in enforcement proceedings. (*Id.*, p. 2.)

43.     On June 16, 2020, the WDNR took the next measure of "stepped enforcement" and issued a Notice of Violation ("NOV") letter to Newell informing it that it was in violation of state

13

hazardous substance discharge laws at the Property. (*See* WDNR NOV to Newell (**Ex. C**).) These findings were based on a review of departmental records. (*Id.*, p. 2.)

44.     WDNR determined that Newell violated: (a) Wis. Stat. § 292.11(3) by failing to take necessary actions to restore the environment and minimize the harmful effects of hazardous substance discharges; (b) Wis. Admin. Code § NR 700.11(1)(a) by failing to submit required progress reports summarizing completed and planned response actions; and (c) Wis. Admin. Code § NR 716.09(1) by failing to submit the required Site Investigation Work Plan. (*Id.*)

45.     The WDNR scheduled an enforcement conference for June 29, 2020, to discuss the alleged violations and requested Newell's attendance, emphasizing that failure to participate could result in enforcement action based on the available information. (*Id.*, p. 3.)

46.     Following WDNR's stepped enforcement actions, response activities at the Property continued under the oversight of the City and its environmental consultant, Stantec, which directed and implemented investigation and remediation efforts on behalf of the City. During this same period, Newell retained Ramboll Americas Engineering Solutions, Inc. to perform and address site response activities on Newell's behalf.

47.     Despite its extensive operational history at the Property, Newell has not requested, proposed, nor performed any interim or remedial actions necessary to restore the environment to the extent practicable or to minimize the harmful effects of hazardous substance discharges caused by Mirro, as required under Wisconsin cleanup laws. Rather, the City alone has undertaken such response actions.

### *Redeveloping Property for Housing Project*

48.     The City has long planned for redevelopment of the property as mixed use residential housing. The Property has been zoned mixed use since 2009.

14

49. In 2021, the City approved an offer to purchase the south half of the Property from a development group.

50. The developer presented the offer with the intent of redeveloping the Property into an affordable housing project ("Housing Project").

51. In 2022, the developer applied for and, in 2023, received the Housing Tax Credit approval from the Wisconsin Housing and Economic Development Agency.

52. In 2024, the developer returned the Housing Tax Credit award due to the costs associated with the necessary cleanup of the site.

53. In 2024, the City applied for an EPA Cleanup Grant to support the Property preparation for the Housing Project. The grant was to address environmental contamination at the Property, including the hazardous substances caused by Newell operations, including metals, PAHs, VOCs, SVOCs, and PCBs. Grant funded activities included groundwater monitoring, demolition of remaining structural elements, excavation and off-site disposal of contaminated soil, and other remedial actions necessary to make the Property suitable for residential redevelopment. The necessity of securing federal cleanup funding for these activities underscores the extent of contamination caused by historic industrial operations at the Property and the resulting burden placed on the City to undertake response actions.

54. In 2025, the developer brought on a senior development partner with a background of working on brownfield properties.

55. In 2025, the City received the EPA Cleanup Grant to support the Property preparation for the Housing Project.

56. In 2025, the developers reapplied for and received a new Housing Tax Credit approval from the Wisconsin Housing and Economic Development Agency.

***Recoverable Costs***

15

57. As a local governmental unit authorized to undertake and recover response costs under Wis. Stat. §§ 292.11 and 292.33, and as recognized by the WDNR in its September 24, 2018, Responsible Party letter identifying Newell's obligations and the City's role in addressing contamination at the Property, the City is entitled to recover its necessary and reasonable response costs.

58. To date, the City has incurred **at least $5,899,904.89** in necessary and reasonable costs related to investigating contamination, planning and implementing remedial actions, conducting remediation to restore the Property for its intended future use, and engineering fees for administering these tasks. Since at least 2022, the City has made reasonable and repeated requests that Newell reimburse the City for these response costs, but Newell has failed and refused to reimburse any of the City's incurred costs.

59. The City retained Valbridge Property Advisors to conduct an appraisal of the Property. As of December 22, 2025, the Appraisal Report states that the fair market value of the Property as vacant land is $190,000. (*See* Valbridge Appraisal Report (**Ex. D**).)

60. From 2008 to 2010, the City contracted with AECOM/STS to conduct site assessments for the Property, incurring costs totaling $28,485.66.

61. From 2013 to 2016, the City contracted with Symbiont to perform site assessment and project administration for the Property, incurring costs totaling $109,583.09.

62. From 2015 to 2025, the City contracted with the WDNR to perform a review of fees associated with site assessment and remedial planning reports for the Property, incurring costs totaling $3,500.00.

63. Since 2016, the City has engaged Stantec, the City's primary environmental consultant, to conduct site investigation activities, remedial action planning, and engineering fees administering those activities for the Property, incurring costs that currently total $1,056,299.83.

16

64.    In 2016, the City engaged Schenck to perform the project administration task of conducting a financial audit for the Property, incurring costs totaling $350.00.

65.    In 2016, the City engaged National Construction and incurred costs associated with fencing and site security as part of conducting and administering the remedial activities on the Property, totaling $5,563.08.

66.    From 2016 to 2017, the City engaged E.F. Becker & Sons, Inc. and incurred costs associated with fencing and site security as part of conducting and administering the remedial activities on the Property, totaling $28,060.00.

67.    From 2016 to 2017, the City engaged Holian Environmental Cleaning Company to perform remedial activities at the Property related to asbestos abatement, incurring costs totaling $586,224.52.

68.    In 2017, the City contracted with Wisconsin Media to carry out the project administration task of publishing public notices related to the Property, incurring costs totaling $263.61.

69.    From 2017 to 2022, the City engaged with Manitowoc Public Utilities for the remediation task of installing a hydrant for access to water during the asbestos abatement, incurring costs totaling $2,145.51.

70.    In 2017, the City contracted with Camera Corner to perform the project administration task of installing security cameras at the Property, incurring costs totaling $912.00.

71.    Since 2017, the City has engaged Waste Management of Wisconsin, Inc. for landfill tipping fees associated with proper disposal of excavated materials from the Property, as well as for remedial activities and project administration costs related to the transport and disposal of PCB-impacted soil removed from the Property, incurring costs totaling $1,824,618.38.

17

72.     In 2017, the City contracted with Brandenburg Industrial Service Company for the removal of lead-painted demolition debris and removal of PCB waste associated with the remediation of the Property, incurring costs totaling $1,426,114.37.

73.     From 2020 through 2021, the City contracted with Veolia for the removal of hazardous waste and lead-impacted soil associated with the remediation of the Property, incurring costs totaling $10,463.80.

74.     In 2021, the City engaged American Engineering Testing, Inc. to conduct soil borings for a geotechnical study associated with the redevelopment of the Property, incurring costs totaling $21,054.20.

75.     From 2025 to 2026, the City incurred $553,750.00 in remedial activity costs to retain Horizon to seal monitoring wells and remove PCB-impacted soil at the Property.

76.     In addition, $242,516.84 remains available to the City under its brownfield cleanup grant for remediation work anticipated to be performed in the spring and summer, which constitutes potential additional recoverable response costs.

## COUNT I: LOCAL GOVERNMENT COST RECOVERY CAUSE OF ACTION

77.     The City realleges the allegations set forth in the paragraphs above as if fully set forth herein.

78.     The City is a "local governmental unit" as defined in Wis. Stat. § 292.11(9)(e)1.

79.     None of the State of Wisconsin agencies with direct or possible oversight of the environmental conditions at the Property, including the Department of Natural Resources, the Department of Safety and Professional Services, and the Department of Agriculture, Trade and Consumer Protection has indicated that no further remedial activities are necessary on the Property or portion of the Property. *See* Wis. Stat. § 292.33(6).

18

80.    The City seeks to recover reasonable and necessary costs associated with investigating the environmental contamination on the Property, planning and conducting remedial activities to restore the Property for its intended future use as residential mixed-use property, administering these activities, as allowed under Wis. Stat. § 292.33.

81.    The City seeks to recover these costs from Newell, which caused the discharge of hazardous substances on the Property. Newell meets the definition of a "responsible person" in Wis. Stat. § 292.33(3)(a)2.

82.    As set forth in Wis. Stat. § 292.33(2), and as emphasized directly to Newell by the WDNR in its September 24, 2018 Responsible Party letter to Newell, because the City "acquired the Property through a method authorized under Wis. Stat. § 292.11(9)(e)(1m), the City is exempt from environmental liability and may recover costs from responsible parties who possessed or controlled the hazardous substance that was discharged on the site or who caused the discharge of the hazardous substance on the site under Wis. Stat. § 292.33." The City is unable to recover costs from any other responsible parties who may have caused the discharge of hazardous substances or environmental pollution on the Property.

83.    These costs were incurred in connection with the Property, on which a hazardous substance had been discharged, and the Property was acquired by the City in a condemnation action, qualifying the City as an exempt local government unit as provided in Wis. Stat. § 292.11(9)(e)1m.

84.    The fair market value of the Property is $190,000 and the City's costs are ineligible for a fair market value reduction as contemplated in Wis. Stat. § 292.33(b).

85.    On January 30, 2026, the City completed the activities under Wis. Stat. § 292.33(4)(a)1.-3., as identified herein, and has six years to commence this action.

19

## COUNT II: DECLARATORY JUDGMENT

86.    An actual controversy exists between the City and Newell regarding Newell's responsibility for hazardous substance discharges at the Property and for response costs incurred and to be incurred by the City under Wis. Stat. ch. 292, including Wis. Stat. §§ 292.11 and 292.33.

87.    The City has incurred substantial response costs, including costs associated with ongoing investigation, remediation, monitoring, and vapor intrusion mitigation.

88.    Pursuant to Wis. Stat. § 806.04, the City is entitled to a declaration that Newell is a responsible person under Wis. Stat. ch. 292 and is liable for all past and future response costs incurred by the City in connection with the investigation, remediation, and monitoring of hazardous substance discharges at the Property.

## PRAYER FOR RELIEF

**WHEREFORE**, the City requests judgment against Newell as follows:

A.  Award Plaintiff damages in an amount to be proven at trial, but not less than $5,899,904.89;

B.  Awarding the City its future response costs, to be paid directly by Newell to the City, including all costs of investigation, monitoring, remediation, and redevelopment-related response activities incurred after the filing of this action, including, without limitation, costs associated with vapor intrusion assessment and mitigation, installation and maintenance of vapor mitigation systems, and any additional cleanup actions necessary to address hazardous substances at the Property and make the Property suitable for its intended residential mixed-use use;

20

C.  Entering a declaratory judgment that Newell is responsible for all response costs incurred and to be incurred by the City in connection with the Property;

D.  Awarding the City its costs of suit, including reasonable attorney fees, expert fees, and engineering and consulting fees, as allowed by law;

E.  Awarding pre-judgment and post-judgment interest as permitted by law; and

F.  Grant such other and further relief as the Court deems just and equitable.

Dated this 9th day of April, 2026.

GODFREY & KAHN, S.C.

By: *Electronically signed by Daniel J. Blinka*
    Daniel J. Blinka
    State Bar No. 1074288
    Hayley Rich-Noble
    State Bar No. 1126707
    William J. Nelson
    State Bar No. 1092388

*Attorneys for Plaintiff City of Manitowoc*

P.O. ADDRESS:
833 East Michigan Street, Suite 1800
Milwaukee, WI 53202-5615
Phone:  414-273-3500
Fax:  414-273-5198
dblinka@gklaw.com
hrichnoble@gklaw.com
wnelson@gklaw.com

21

WITTE DAVIS LAW LLP

By: *Electronically signed by Edward B. Witte*
    Edward B. Witte
    State Bar No. 1017055

*Attorneys for Plaintiff City of Manitowoc*

P.O. ADDRESS:
9086 North Bayside Drive
Milwaukee, WI 53217
Phone: 414-305-2267
ned@wittedavis.com

CITY ATTORNEY'S OFFICE

By: *Electronically signed by Eric G. Nycz*
    Eric G. Nycz
    State Bar No. 1055471

*Attorneys for Plaintiff City of Manitowoc*

P.O. ADDRESS:
900 Quay Street
Manitowoc, WI 54220
Phone:  920-686-6990
enycz@manitowocwi.gov

36407570

22

# EXHIBIT A

**State of Wisconsin**
**DEPARTMENT OF NATURAL RESOURCES**
**2984 Shawano Avenue**
**Green Bay WI  54313-6727**

**Scott Walker, Governor**
**Daniel L. Meyer, Secretary**
Telephone 608-266-2621
Toll Free 1-888-936-7463
TTY Access via relay - 711



September 24, 2018

Newell Brands Inc.
Corporation Service Company
Attn: Kristin Holloway Jones
Director of Environmental Affairs
40 Technology Parkway South
Suite 300, Gwinnett
Norcross, GA 30092

Newell Brands Inc.
Global Corporate Headquarters
221 River Street
Hoboken, NJ 07030

Subject:    Reported Contamination at Mirro Plt 9 (Former) – Responsibilities of Newell Brands, Inc. at 1512 Washington Street, Manitowoc, WI
BRRTS Activity # 02-36-545108

Dear Ms. Holloway Jones:

On September 24, 2018, AECOM notified the Wisconsin Department of Natural Resources (DNR) that per- and polyfluoroalkyl substance (PFAS) contamination has been detected at the former Mirro property (the Site) located at 1512 Washington Street. This contamination is in addition to the polychlorinated biphenyl (PCB), volatile organic compound (VOC), Resource Conservation and Recovery Act (RCRA) metals, and polyaromatic hydrocarbon (PAH) contamination that have previously been detected at the Site described above.

Based on the information that has been submitted to the DNR regarding this Site, we believe Newell Brands, Inc. (Newell) is responsible for investigating and restoring the environment at the above-described site as a responsible party under Wis. Stat. ch. 292 and Wis. Admin. Code chs. NR 700 - 754. Mirro Aluminum Co. (Mirro) operated at the Site and several others in Manitowoc from 1909 to 2003. As Newell is aware, Newell purchased and operated the Mirro manufacturing facility from 1983 to 2003. This letter describes the legal responsibilities of a person who is responsible under Wisconsin law and explains what Newell needs to do to investigate and clean up all the identified contamination at the Site and provides Newell with information about cleanups, environmental consultants, possible financial assistance, and working cooperatively with the DNR.

**Legal Responsibilities:**

Within 30 days of receiving this letter, Newell shall provide the DNR with any information in its possession or control regarding any person who generated, transported, treated, stored or disposed of solid or hazardous waste, including hazardous substances or environmental pollution, which may have been disposed of at the Site under investigation which relate to:

dnr.wi.gov
wisconsin.gov

*Naturally* **WISCONSIN**



September 24, 2018                                                     Page 2 of 3
Newell Brands, Inc.
Responsible Party Letter
Mirro Plt 9 (Former) - LGU, BRRTS # 02-36-545108

  1. The type and quantity of waste generated, transported, treated or stored which was disposed of at the site or facility and the dates of these activities.
  2. The identity of persons who generated, transported, treated or stored waste which was disposed of at the site or facility.
  3. The identity of subsidiary or parent corporations, as defined in Wis. Stat. § 292.31(8)(a)(3), of persons who generated, transported, treated or stored waste which was disposed of at the site or facility.

The DNR's authority to require such information is found in Wis. Stat. § 292.31(1)(d).

To date the City of Manitowoc Community Development Authority (CDA) has been voluntarily investigating and remediating the site as an exempt local government unit (LGU). As a causer, Newell is required to investigate and remediate the site. It is highly recommended Newell coordinates their response actions with the CDA since they have extensive background knowledge of the site and have been actively conducting a site investigation. The steps to take for investigation and remediation are outlined in Wis. Stat. § 292.11, and the Wis. Admin. Code ch. NR 700 rules series.

Under the requirements of Wis. Admin. Code § NR 716.14, notification must be provided to property owners when someone else is conducting the sampling, to occupants of property belonging to the responsible person, and to owners and occupants of property that does not belong to the responsible person but has been affected by contamination arising on his or her property. Notification is required within 10 business days of receiving the sample results.

Since the site was acquired by the CDA through a method in Wis. Stat. § 292.11(9)(e)(1m), the City is exempt from environmental liability and may recover costs from responsible parties who possessed or controlled the hazardous substance that was discharged on the site or who caused the discharge of the hazardous substance on the site under Wis. Stat. § 292.33. Within 30 days, by October 24, 2018, Newell should submit written verification as to whether Newell will coordinate with the City and their current consultant, Stantec. The contact for the CDA is:

  Paul Braun
  City Planner – Community Development
  900 Quay Street
  Manitowoc, WI 54220
  920-686-6930
  pbraun@manitowoc.org

If Newell wants a formal written response from the DNR on a specific submittal, please be aware that a review fee is required in accordance with Wis. Admin. Code ch. NR 749. If a fee is not submitted with Newell's reports, Newell must complete the site investigation and cleanup to maintain Newell's compliance with the spills law and chapters NR 700 through NR 754. **The timeframes specified above are required by rule, so do not delay the investigation of the site.** We have provided detailed technical guidance to environmental consultants. Newell's consultant is expected to know our technical procedures and administrative rules and should be able to answer Newell's questions on meeting cleanup requirements.

September 24, 2018                                                      Page 3 of 3
Newell Brands, Inc.
Responsible Party Letter
Mirro Plt 9 (Former) - LGU, BRRTS # 02-36-545108

All correspondence regarding this site should be sent to:

> Tauren R. Beggs
> Remediation and Redevelopment Program
> Wisconsin Department of Natural Resources
> 2984 Shawano Avenue
> Green Bay, WI 54313
> Tauren.Beggs@wisconsin.gov

Unless otherwise directed, submit one paper copy and one electronic copy of plans and reports. To speed processing, correspondence should reference the BRRTS Activity number shown at the top of this letter.

Sites where discharges of hazardous substances and/or environmental pollution to the environment have been reported are entered into the Bureau for Remediation and Redevelopment Tracking System (BRRTS), a version of which appears on the DNR's internet site. Newell may view the information related to this site at any time (http://**dnr.wi.gov/botw**/SetUpBasicSearchForm.do) and use the feedback system to alert us to any errors in the data.

If you have questions, please contact the DNR Project Manager Tauren Beggs at 920-662-5178 or at Tauren.Beggs@wisconsin.gov for more information or visit the RR web site at the address above.

Thank you for your cooperation.

Sincerely,

Roxanne N. Chronert
Team Supervisor, Northeast Region
Remediation & Redevelopment Program

ec:    Tauren Beggs, DNR (Tauren.Beggs@wisconsin.gov)
       William J. Nelson, DNR (William.Nelson@wisconsin.gov)
       Kathleen McDaniel, City of Manitowoc (kmcdaniel@manitowoc.org)
       Paul Braun, City of Manitowoc (pbraun@manitowoc.org)
       Gabriel Rodriguez, Schiff Hardin LLP (grodriguez@schiffhardin.com)

# EXHIBIT B

**State of Wisconsin**
**DEPARTMENT OF NATURAL RESOURCES**
**2984 Shawano Avenue**
**Green Bay WI 54313-6727**

**Tony Evers, Governor**
**Preston D. Cole, Secretary**
Telephone 608-266-2621
Toll Free 1-888-936-7463
TTY Access via relay - 711



February 20, 2019

**CERTIFIED MAIL**

Schiff Hardin LLP
Attn: Mr. Gabriel Rodriguez
233 South Wacker Drive
Suite 7100
Chicago, IL 60606

Newell Brands Inc.
Global Corporate Headquarters
221 River Street
Hoboken, NJ 07030

      Subject:      Notice of Non-Compliance: Action Requested by March 8, 2019
                    Mirro Plt 9 (Former) - LGU
                    BRRTS Activity # 02-36-545108

Dear Mr. Rodriguez:

This letter is to notify you that Newell Brands Inc. (Newell) is out of compliance with Wisconsin Statutes (Wis. Stat.) chapter 292 and Wisconsin Administrative Code (Wis. Admin. Code) chapters NR 700 through NR 754. On September 24, 2018, the Wisconsin Department of Natural Resources ("Department") notified Newell of their responsibilities to investigate the degree and extent of contamination and clean up the above-referenced site. That letter is attached for Newell's reference.

The Responsible Party (RP) letter required Newell to submit information regarding handling and disposal of solid and/or hazardous waste at the site and to indicate whether Newell would coordinate with the City of Manitowoc (City) for investigation and cleanup by October 24, 2018. It is also required a Site Investigation Work Plan be submitted within 60 days of receiving a RP letter per Wis. Admin. Code § 716.09. A response to the RP letter was received by the Department on October 26, 2018. The response included information on waste handling and disposal and that Newell intended to explore coordinating with the City. Based on communications with you, on behalf of Newell, and the City in November 2018, both parties were continuing to coordinate efforts to provide a Site Investigation Work Plan. DNR provided a 30-day extension on November 28, 2018. On December 19, 2018, the DNR had a conference call with you and the City's outside council Ned Witte. A second extension was provided by the DNR for Newell and the City to coordinate efforts to provide a Site Investigation Work Plan. The new deadline was January 31, 2019. This deadline has passed and the DNR has still not received a Site Investigation Work Plan. Therefore, Newell is in non-compliance.

Please be aware that the Department may initiate enforcement action against Newell for failure to comply with Wis. Stat. chapter 292. Newell's legal responsibilities are defined both in Wis. Stat. chapter 292 and Wis. Admin. Code chapters NR 700 through 754 and are also described in the September 24, 2018 Responsible Party letter. In particular, Wis. Stat. § 292.11(3), states:

      RESPONSIBILITY. A person who possesses or controls a hazardous substance which is
      discharged or who causes the discharge of a hazardous substance shall take the actions necessary

dnr.wi.gov
wisconsin.gov

*Naturally* **WISCONSIN**


PRINTED ON RECYCLED PAPER

February 20, 2019                                                                 Page 2 of 2
Mr. Gabriel Rodriguez, Attorney for Newell Brands Inc.
Notice of Non-Compliance
Mirro Plt 9 (Former) – LGU, BRRTS # 02-36-545108

to restore the environment to the extent practicable and minimize the harmful effects from the discharge to the air, lands, or waters of the state.

Wis. Admin. Code chapters NR 700 through NR 754 establish requirements for emergency and interim actions, public information, site investigations, design and operation of remedial action systems, and case closure. Chapter NR 708 includes provisions for immediate actions in response to limited contamination. Wis. Admin. Code chapter NR 140 establishes groundwater quality standards for contaminants that reach groundwater. The Department is requesting that by March 8, 2019, Newell provides a Site Investigation Work Plan.

Please understand that Newell is in noncompliance and will remain in noncompliance until Newell fulfills all requirements of the statute. Failure to take the actions required by Wis. Stat. § 292.11 to address this contamination will cause the Department to review this case for enforcement actions. Additionally, please be advised that the Department is authorized under Wis. Stat. § 292.94 to assess non-reimbursable fees for any reports Newell is required to submit as part of additional enforcement actions.

If Newell has any questions concerning the cleanup process, please do not hesitate to write or call DNR Project Manager Tauren Beggs at 920-662-5178 or at Tauren.Beggs@wisconsin.gov. Thank you for your attention to this matter.

Sincerely,

Roxanne N. Chronert
Team Supervisor, Northeast Region
Remediation & Redevelopment Program

Encl:    RP Letter

cc:      Kathleen McDaniel, City of Manitowoc (kmcdaniel@manitowoc.org)
         April Kroner, City of Manitowoc (akroner@manitowoc.org)
         Edward Witte, Godfrey & Kahn (nwitte@gklaw.com)
         William Nelson, DNR (William.Nelson@wisconsin.gov)

**State of Wisconsin**
**DEPARTMENT OF NATURAL RESOURCES**
**2984 Shawano Avenue**
**Green Bay WI  54313-6727**

**Scott Walker, Governor**
**Daniel L. Meyer, Secretary**
Telephone 608-266-2621
Toll Free 1-888-936-7463
TTY Access via relay - 711



September 24, 2018

Newell Brands Inc.
Corporation Service Company
Attn: Kristin Holloway Jones
Director of Environmental Affairs
40 Technology Parkway South
Suite 300, Gwinnett
Norcross, GA 30092

Newell Brands Inc.
Global Corporate Headquarters
221 River Street
Hoboken, NJ 07030

      Subject:    Reported Contamination at Mirro Plt 9 (Former) – Responsibilities of Newell Brands,
                Inc. at 1512 Washington Street, Manitowoc, WI
                BRRTS Activity # 02-36-545108

Dear Ms. Holloway Jones:

On September 24, 2018, AECOM notified the Wisconsin Department of Natural Resources (DNR) that per- and polyfluoroalkyl substance (PFAS) contamination has been detected at the former Mirro property (the Site) located at 1512 Washington Street. This contamination is in addition to the polychlorinated biphenyl (PCB), volatile organic compound (VOC), Resource Conservation and Recovery Act (RCRA) metals, and polyaromatic hydrocarbon (PAH) contamination that have previously been detected at the Site described above.

Based on the information that has been submitted to the DNR regarding this Site, we believe Newell Brands, Inc. (Newell) is responsible for investigating and restoring the environment at the above-described site as a responsible party under Wis. Stat. ch. 292 and Wis. Admin. Code chs. NR 700 - 754. Mirro Aluminum Co. (Mirro) operated at the Site and several others in Manitowoc from 1909 to 2003. As Newell is aware, Newell purchased and operated the Mirro manufacturing facility from 1983 to 2003. This letter describes the legal responsibilities of a person who is responsible under Wisconsin law and explains what Newell needs to do to investigate and clean up all the identified contamination at the Site and provides Newell with information about cleanups, environmental consultants, possible financial assistance, and working cooperatively with the DNR.

**Legal Responsibilities:**

Within 30 days of receiving this letter, Newell shall provide the DNR with any information in its possession or control regarding any person who generated, transported, treated, stored or disposed of solid or hazardous waste, including hazardous substances or environmental pollution, which may have been disposed of at the Site under investigation which relate to:

---

dnr.wi.gov
wisconsin.gov

*Naturally* **WISCONSIN**



September 24, 2018                                                                Page 2 of 3
Newell Brands, Inc.
Responsible Party Letter
Mirro Plt 9 (Former) - LGU, BRRTS # 02-36-545108

    1. The type and quantity of waste generated, transported, treated or stored which was disposed of at the site or facility and the dates of these activities.
    2. The identity of persons who generated, transported, treated or stored waste which was disposed of at the site or facility.
    3. The identity of subsidiary or parent corporations, as defined in Wis. Stat. § 292.31(8)(a)(3), of persons who generated, transported, treated or stored waste which was disposed of at the site or facility.

The DNR's authority to require such information is found in Wis. Stat. § 292.31(1)(d).

To date the City of Manitowoc Community Development Authority (CDA) has been voluntarily investigating and remediating the site as an exempt local government unit (LGU). As a causer, Newell is required to investigate and remediate the site. It is highly recommended Newell coordinates their response actions with the CDA since they have extensive background knowledge of the site and have been actively conducting a site investigation. The steps to take for investigation and remediation are outlined in Wis. Stat. § 292.11, and the Wis. Admin. Code ch. NR 700 rules series.

Under the requirements of Wis. Admin. Code § NR 716.14, notification must be provided to property owners when someone else is conducting the sampling, to occupants of property belonging to the responsible person, and to owners and occupants of property that does not belong to the responsible person but has been affected by contamination arising on his or her property. Notification is required within 10 business days of receiving the sample results.

Since the site was acquired by the CDA through a method in Wis. Stat. § 292.11(9)(e)(1m), the City is exempt from environmental liability and may recover costs from responsible parties who possessed or controlled the hazardous substance that was discharged on the site or who caused the discharge of the hazardous substance on the site under Wis. Stat. § 292.33. Within 30 days, by October 24, 2018, Newell should submit written verification as to whether Newell will coordinate with the City and their current consultant, Stantec. The contact for the CDA is:

    Paul Braun
    City Planner – Community Development
    900 Quay Street
    Manitowoc, WI 54220
    920-686-6930
    pbraun@manitowoc.org

If Newell wants a formal written response from the DNR on a specific submittal, please be aware that a review fee is required in accordance with Wis. Admin. Code ch. NR 749. If a fee is not submitted with Newell's reports, Newell must complete the site investigation and cleanup to maintain Newell's compliance with the spills law and chapters NR 700 through NR 754. **The timeframes specified above are required by rule, so do not delay the investigation of the site.** We have provided detailed technical guidance to environmental consultants. Newell's consultant is expected to know our technical procedures and administrative rules and should be able to answer Newell's questions on meeting cleanup requirements.

September 24, 2018                                                                 Page 3 of 3
Newell Brands, Inc.
Responsible Party Letter
Mirro Plt 9 (Former) - LGU, BRRTS # 02-36-545108

All correspondence regarding this site should be sent to:

  Tauren R. Beggs
  Remediation and Redevelopment Program
  Wisconsin Department of Natural Resources
  2984 Shawano Avenue
  Green Bay, WI 54313
  Tauren.Beggs@wisconsin.gov

Unless otherwise directed, submit one paper copy and one electronic copy of plans and reports. To speed processing, correspondence should reference the BRRTS Activity number shown at the top of this letter.

Sites where discharges of hazardous substances and/or environmental pollution to the environment have been reported are entered into the Bureau for Remediation and Redevelopment Tracking System (BRRTS), a version of which appears on the DNR's internet site. Newell may view the information related to this site at any time (http://**dnr.wi.gov/botw**/SetUpBasicSearchForm.do) and use the feedback system to alert us to any errors in the data.

If you have questions, please contact the DNR Project Manager Tauren Beggs at 920-662-5178 or at Tauren.Beggs@wisconsin.gov for more information or visit the RR web site at the address above.

Thank you for your cooperation.

Sincerely,

Roxanne N. Chronert
Team Supervisor, Northeast Region
Remediation & Redevelopment Program

ec: Tauren Beggs, DNR (Tauren.Beggs@wisconsin.gov)
  William J. Nelson, DNR (William.Nelson@wisconsin.gov)
  Kathleen McDaniel, City of Manitowoc (kmcdaniel@manitowoc.org)
  Paul Braun, City of Manitowoc (pbraun@manitowoc.org)
  Gabriel Rodriguez, Schiff Hardin LLP (grodriguez@schiffhardin.com)

# EXHIBIT C

| From: | Gruen, Andrea M - DNR |
|---|---|
| Sent: | Tuesday, June 16, 2020 10:48 AM |
| To: | Kristin Holloway Jones (kristin.jones@newellco.com); Gabriel Rodriguez (grodriguez@schiffhardin.com) |
| Cc: | Beggs, Tauren R - DNR; Nelson, William J - DNR; Chronert, Roxanne N - DNR |
| Subject: | Newell Brands, Inc.: Notices of Violation |
| Attachments: | Newell-Mirro_2020-06-16_NOV_Complete.pdf; Newell-Gravel_2020-06-16_NOV_Complete.pdf |

Good morning,

Please see attached Notices of Violation that are being issued to Newell Brands, Inc., for alleged violations of state hazardous substance discharge laws at the sites listed below:

- "Manitowoc City / Former Newton Tn Gravel Pit" site (BRRTS Activity # 02-36-000268)
- "Former Mirro Plt 9" site (BRRTS Activity # 02-36-545108)

Contained within the Notices of Violation are a scheduled date for an enforcement conference to be held via teleconference on June 29, 2020 to discuss the alleged violations.  The enforcement conferences have been scheduled to discuss the Manitowoc City / Former Newton Tn Gravel Pit site at 1:00 p.m., and the Former Mirro Plt 9 site at 2:30 p.m.

Please feel free to contact me with any questions that you have regarding the Notices of Violation or the department's enforcement actions.  The department looks forward to working with you to return to compliance with applicable state regulations.

Thank you,
Andrea Gruen

**We are committed to service excellence.**
Visit our survey at http://dnr.wi.gov/customersurvey to evaluate how I did.

Andrea Gruen
Environmental Enforcement Specialist – Bureau of Law Enforcement
Wisconsin Department of Natural Resources
2984 Shawano Ave.
Green Bay, WI  54313
Phone: (920) 366-1980
Andrea.Gruen@Wisconsin.gov

dnr.wi.gov



**State of Wisconsin**
DEPARTMENT OF NATURAL RESOURCES
2984 Shawano Avenue
Green Bay WI  54313-6727

**Tony Evers, Governor**
**Preston D. Cole, Secretary**
Telephone 608-266-2621
Toll Free 1-888-936-7463
TTY Access via relay - 711

WISCONSIN
DEPT. OF NATURAL RESOURCES

BRRTS Activity # 02-36-545108
Manitowoc County
**Electronic Delivery**

June 16, 2020

Kristin Holloway Jones, Dir. of Environmental Affairs
Newell Brands, Inc.
6655 Peachtree Dunwoody Road
Atlanta, GA  30328

Gabriel Rodriguez, Attorney
Schiff Hardin LLP
233 South Wacker Drive; Suite 7100
Chicago, IL  60606

SUBJECT:     <u>**NOTICE OF VIOLATION / ENFORCEMENT CONFERENCE – JUNE 29, 2020**</u>

Dear Ms. Holloway Jones and Mr. Rodriguez,

The Department of Natural Resources (department) has reason to believe that Newell Brands, Inc. (Newell) is in violation of state hazardous substance discharge laws at the property known as "Mirro Plt 9 (Former)" located at 1512 Washington Street, City of Manitowoc, Manitowoc County, Wisconsin (Site).   These violations were documented through a review of the department's records.

The department alleges the following violations:

- **Section 292.11(3), Wis. Stats., Hazardous substance spills.  Responsibility.**
**A person who possesses or controls a hazardous substance which is discharged or who causes the discharge of a hazardous substance shall take the actions necessary to restore the environment to the extent practicable and minimize the harmful effects from the discharge to the air, lands or waters of this state.**

- **Section NR 700.11, Wis. Adm. Code, Submittals.**
**(1) General.  Unless otherwise directed by the department, responsible parties shall comply with the following:**
**(a) Responsible parties shall submit site progress reports that summarize the completed work and additional work planned to adequately complete the response action at the site or facility to the department at 6 month intervals until case closure is granted by the department.**

- **Section NR 716.09, Wis. Adm. Code, Site investigation work plan.**
**(1) General.  Unless otherwise directed by the department, in cases where a site investigation is required under s. NR 716.05, responsible parties shall submit a work plan to the department within 60 days of receiving notification that a site investigation is required, describing the intended scope and conduct of a field investigation.**

dnr.wi.gov
wisconsin.gov

*Naturally* WISCONSIN


PRINTED ON RECYCLED PAPER

Newell Brands Inc.
Mirro Plt 9 (Former)
June 16, 2020

The department was notified of the presence of hazardous substances (per- and polyfluoroalkyl substances; "PFAS") at the Site on September 24, 2018.  This contamination was in addition to the polychlorinated biphenyl (PCB), volatile organic compound (VOC), Resource Conservation and Recovery Act (RCRA) metals, and polyaromatic hydrocarbon (PAH) contamination that was previously detected at the Site. A responsible party letter was issued to Newell on September 24, 2018, notifying Newell of its responsibilities under Chapter 292, Wis. Stats., and the NR 700, Wis. Adm. Code Rule Series, to investigate and remediate the Site.  This letter acknowledged the ongoing investigation work by the City of Manitowoc (a local government with the environmental liability exemption) at the Site and recommended the coordination of investigation efforts.

On October 26, 2018, Schiff Hardin LLP, on behalf of Newell, provided a response to the responsible party letter.  On November 16, 2018, the department requested that Newell provide additional information about its intent to coordinate remediation efforts with the City of Manitowoc or hire its own consultant and reiterated that the site investigation work plan was due by November 24, 2018 per s. NR 716.09, Wis. Adm. Code.  On November 19, 2018, Schiff Hardin LLP responded stating that Newell had retained its own consultant and acknowledged that the timeline proposed by the City of Manitowoc for submitting a site investigation work plan "after the holidays" was past the deadline imposed by the department; therefore, an extension was requested.

On November 28, 2018, the department granted a 30 day extension to Newell for the submittal of the site investigation work plan in an effort to allow Newell and the City of Manitowoc to coordinate efforts.  The new due date by which the site investigation work plan was to be submitted was December 28, 2018.  On December 19, 2018, a second extension was requested and granted for the submittal of the site investigation work plan until January 31, 2019.

On February 20, 2019, the department issued a Notice of Non-Compliance to Newell for failure to submit a site investigation work plan. On February 28, 2019, Schiff Hardin LLP provided a response to the Notice of Non-Compliance. Since that time, additional communications between the DNR, Schiff Hardin LLP, and Newell's consultant Ramboll occurred in March 2019 and May 2019 regarding submittal of a site investigation work plan and the City of Manitowoc has provided additional investigation documentation, which Newell has been notified of.

Therefore, the department believes that Newell has failed to submit a site investigation work plan, as required per s. NR 716.09, Wis. Adm. Code. Based on the investigation data submitted to date, the site investigation work plan needs to be submitted to define degree and extent of contamination and the municipal well closest to the site needs to be sampled for PFAS.

**We have scheduled an enforcement conference to discuss this matter in more detail:**

**Teleconference Date & Time:**    **June 29, 2020 at 2:30 p.m.**

**Teleconference Call Number:**    **1(866) 715-6499; Passcode: 5028568926#**

2

Newell Brands Inc.
Mirro Plt 9 (Former)
June 16, 2020

**With the changing circumstances surrounding the COVID-19 public health emergency, the department realizes this date and time may not work or that circumstances may change prior to the scheduled date. Please contact me at the number below and I will work with you to find a mutually acceptable date and time.**

The department requests Newell Brands to attend the enforcement conference, as it is an important opportunity to discuss the circumstances surrounding the alleged violations and to learn your perspective on this matter. Please note that to encourage a candid and productive conversation, attendance is limited to you, your legal counsel and others with the technical expertise necessary to understand, evaluate and correct the violations.

The department's enforcement decision will be based upon available information if you do not attend the enforcement conference.

Please be advised that the violations alleged above are enforced through Ch. 292, Wis. Stats., and may be referred to the Department of Justice to obtain court ordered compliance and penalties up to $5,000 per day of violation. In addition, please note that the department has the authority under s. 292.94, Wis. Stats., to assess non-reimbursable fees as specified in ch. NR 740, Wis. Adm. Code, to parties involved in enforcement actions.

If you have any questions regarding this notice or need to reschedule the enforcement conference, please call me at (920) 366-1980.


Sincerely,

Andrea Gruen
Environmental Enforcement Specialist


Enclosure:  Enforcement Conference Information Sheet

Cc:     Tauren Beggs, DNR – Green Bay
        Roxanne Chronert, DNR – Green Bay
        Kathleen McDaniel, City of Manitowoc
        William Nelson, DNR – GEF2

3



## Environmental Enforcement Conference

An Enforcement Conference (EC) is a meeting between Department of Natural Resources (Department) staff and representatives of a person or business that the Department believes has violated an environmental law.  The Department issues a Notice of Violation (NOV) when it has reason to believe that a violation of a permit condition, administrative rule or statutory requirement has occurred.  The NOV either offers or schedules an EC.

### Why Should I Attend?
The EC is an important opportunity to discuss the Department's basis for the alleged violation(s) and learn more about what happened, why it may have happened, and any factors you believe the Department should consider, such as steps that have been or will be taken to stop the violation, correct any effects of the violation, and prevent violations from occurring in the future.  It is also your opportunity to explain why you might disagree with the factual and legal conclusions underlying the NOV.

Historic data shows that most violations are resolved at the EC level, without the need for court ordered compliance and/or penalties.  In situations where the significance of the violation warrants further enforcement action, your cooperative efforts to resolve the violation and prevent future violations will help minimize your legal and financial liability.

### Who Should Attend the EC?
Department staff involved in the EC typically consists of an Environmental Enforcement Specialist and regulatory staff that are familiar with the issues identified in the NOV.

While not required, you may seek representation by legal counsel or the assistance of an environmental consultant to prepare for and/or attend the EC.  The EC is most productive when all involved are well-prepared to discuss the allegations and any corrective actions that may be necessary.

To ensure a productive candid discussion, participation in the EC is limited to the person or business involved and others with the legal or technical expertise necessary to understand, evaluate, mitigate and correct the violation.  The EC is not an open meeting under state law and the Department will limit participation to those directly involved in the resolution of the matter.

### What Happens if I don't Attend the EC?
If a party is unable to attend the EC, they should immediately contact the Environmental Enforcement Specialist at the phone number in the NOV to reschedule.  When a party refuses to attend the EC and provides no further information to the Department, the Department's enforcement decision will be based upon available information.

### What Happens Following the EC?
The EC is part of the Department's stepped enforcement process. At the EC, Department staff will explain the process and options available to address the alleged violation.  Generally, the options range from closing the matter with no further action to referral to the Wisconsin Department of Justice (DOJ) or to U.S. EPA, for further enforcement action. In limited circumstances, the Department can issue citations, which are handled in local court similar to traffic offenses.  If a case is referred to DOJ, the DOJ may initiate an action in court on behalf of the State.  The State typically asks the Court to impose financial penalties and order completion of any necessary corrective actions. In most of the Department's cases, a cooperative return to compliance with any necessary restoration results in close out of the case.  At close out, the Department will send a letter advising of no further enforcement action.

# EXHIBIT D



## Appraisal Report

Former Mirro Plant Site 9
1512 Washington Street
Manitowoc, Manitowoc County, Wisconsin 54220

Report Date: December 22, 2025



FOR:

City of Manitowoc
Community Development Authority
Mr. Adam Tegen - Executive Director
900 Quay Street
Manitowoc, Wisconsin 54220

**Valbridge Property Advisors | Milwaukee**

12660 W. North Avenue
Brookfield, WI 53005
262-782-7990 phone
*valbridge.com*

Valbridge File Number:
WI01-25-0537



**12660 W. North Avenue**
**Brookfield, WI 53005**
**262-782-7990 phone**
**valbridge.com**

December 22, 2025

Mr. Adam Tegen
Executive Director
Community Development Authority
City of Manitowoc
900 Quay Street
Manitowoc, Wisconsin 54220

RE:     Appraisal Report
        Former Mirro Plant Site 9
        1512 Washington Street
        Manitowoc, Manitowoc County, Wisconsin 54220

Dear Mr. Tegen:

In accordance with your request, an appraisal of the above referenced property was performed. This appraisal report sets forth the pertinent data gathered, the techniques employed, and the reasoning leading to the value opinions. This letter of transmittal does not constitute an appraisal report and the rationale behind the value opinion(s) reported cannot be adequately understood without the accompanying appraisal report.

The subject property, as referenced above, is located at 1512 Washington Street in the City of Manitowoc, Manitowoc County, Wisconsin 54220 and is further identified as tax parcel 052-000-246-000. The site totals 3.72 acres and is located near Downtown Manitowoc, spanning a full block between S. 16th Street and S. 15th Street and to the north and south of Highway 42 and Franklin Street, respectively. The subject site was previously improved with a 7-story, 1,000,000 square foot industrial loft building that was historically utilized as a tannery and later for aluminum manufacturing. As a result of the former industrial uses, the site hosts significant environmental contamination. As of the effective date of value, the City of Manitowoc had completed substantial remediation activities on the southern 2.30 acres of the site, where a 59-unit multi-family development has been approved. It is our understanding that the northern 1.40 acres still required remediation as of the effective date of value.

The purpose of this assignment is to provide an opinion of the current As Is fair market value in the subject property as of the effective date of value. The client in this assignment is the City of Manitowoc and the intended users of this report are the City of Manitowoc and Godfrey & Kahn Law Firm and no others. The intended use is for support in litigation.

© 2025 VALBRIDGE PROPERTY ADVISORS | MILWAUKEE



The analyses, opinions, and conclusions were developed, and this report was prepared in conformity with the Uniform Standards of Professional Appraisal Practice (USPAP) of the Appraisal Foundation; the Code of Professional Ethics and Standards of Professional Practice of the Appraisal Institute; and the requirements of our client.

The value opinions reported herein are subject to the definitions, assumptions, limiting conditions, and certifications contained in this report. The findings and conclusions are further contingent upon the following extraordinary assumptions and/or hypothetical conditions, the use of which might have affected the assignment results:

## Extraordinary Assumptions:

- The southern approximately 2.30 acres of the subject property has recently undergone significant remediation at the expense of the City of Manitowoc and with the support of federal funding. Currently, a four-story, 59-unit workforce housing development is proposed for the subject property. Due to the historic contamination on site, the development will require reuse of the existing foundation system in place and below-grade space will not be possible. According to our talks with the City of Manitowoc Community Development Authority, it is our understanding that the remedial activity completed is sufficient to allow for the development of the site as currently proposed. If this is found to be materially false, we reserve the right to modify our opinions accordingly.

- The northern approximately 1.40 acres of the subject property still contains significant environmental contamination and was yet to be remediated as of the effective date of value. We were provided an estimate of approximately $500,000 to complete a limited remediation that would involve capping the site for use as green space. We have relied upon this cost estimate for the purposes of our analysis. As such, if the actual cost to perform such activities materially differs from this amount, we reserve the right to modify our opinions accordingly.

## Hypothetical Conditions:

- None.

Based on the analysis contained in the following report, our value conclusion is summarized as follows:

### Value Conclusion

| Component | As Is |
| --- | --- |
| Value Type | Market Value |
| Real Property Interest | Fee Simple |
| Effective Date of Value | November 28, 2025 |
| **Value Conclusion** | **$190,000** |
| **Value Conclusion PSF** | **$1.17** |

© 2025 VALBRIDGE PROPERTY ADVISORS | MILWAUKEE



Respectfully submitted,
Valbridge Property Advisors | Milwaukee



S. Steven Vitale, MAI, SGA
Senior Managing Director
Wisconsin Certified General Appraiser
License #506-10, Expires 12-14-2027
svitale@valbridge.com

Russell Cooper
Appraiser
Wisconsin Certified General Appraiser
License #3100-10, Expires 12-14-2027
rcooper@valbridge.com

© 2025 VALBRIDGE PROPERTY ADVISORS | MILWAUKEE



# Table of Contents

Cover Page

Letter of Transmittal

Table of Contents ..................................................................................................................................5

Summary of Salient Facts ....................................................................................................................6

Aerial and Front Views.........................................................................................................................8

Location Map ........................................................................................................................................ 10

Introduction......................................................................................................................................... 11

Scope of Work...................................................................................................................................... 14

Regional and Market Area Analysis................................................................................................. 16

City and Neighborhood Analysis ..................................................................................................... 20

Site Description ................................................................................................................................... 27

Subject Photographs.......................................................................................................................... 47

Assessment and Tax Data ................................................................................................................. 49

Market Analysis................................................................................................................................... 50

Highest and Best Use Analysis ........................................................................................................ 56

Land Valuation..................................................................................................................................... 58

Reconciliation...................................................................................................................................... 82

    Exposure Time and Marketing Period ...................................................................................... 83

General Assumptions and Limiting Conditions ............................................................................ 84

Certification ......................................................................................................................................... 89

Addenda ............................................................................................................................................... 91

    Additional Subject Photographs................................................................................................ 92

    Maritime Flats Plans..................................................................................................................... 94

    R-6 Zoning Ordinance ................................................................................................................100

    Glossary .........................................................................................................................................102

    Qualifications ...............................................................................................................................109

    Valbridge Property Advisors Information and Office Locations.........................................113



# Summary of Salient Facts

## Summary of Salient Facts

### Property Identification

| | |
|---|---|
| Property Name | Former Mirro Plant Site 9 |
| Property Address | 1512 Washington Street |
| | Manitowoc, Manitowoc County, Wisconsin 54220 |
| Latitude & Longitude | 44.089577, -87.668272 |
| Census Tract | 6931.02 |
| Tax Parcel Number | 000246000 |
| Property Owner | Community Development Authority of the City of Manitowoc |

### Site

| | |
|---|---|
| Zoning | Residential - Multi Family (R-6), Heavy Industrial (I-2) |
| FEMA Flood Map No. | 55071C0308E |
| Flood Zone | Zone X |
| Percent Floodplain | 0.00% |
| Gross Land Area | 3.720 acres |
| Usable Land Area | 3.720 acres |

### Existing Improvements

Foundation System

Concrete slab (partial)

Miscellaneous Structures (concrete doorway, walls)

### Valuation Opinions

| | |
|---|---|
| Highest & Best Use - As Vacant | Mixed-use / Multi-family Development |
| Highest & Best Use - As Improved | N/A |
| Reasonable Exposure Time | 9 to 18 months |
| Reasonable Marketing Time | 9 to 18 months |



### Value Indications

| Approach to Value | As Is |
|---|---|
| Cost | Not Developed |
| Sales Comparison | $190,000 |
| Income Capitalization | Note Developed |

### Value Conclusion

| Component | As Is |
|---|---|
| Value Type | Market Value |
| Real Property Interest | Fee Simple |
| Effective Date of Value | November 28, 2025 |
| **Value Conclusion** | **$190,000** |
| **Value Conclusion PSF** | **$1.17** |



# Aerial and Front Views

**AERIAL VIEW**



**FRONT VIEW**





# Location Map



# Introduction

## Client and Intended Users of the Appraisal

The client in this assignment is the City of Manitowoc and the intended users of this report are the City of Manitowoc and Godfrey & Kahn Law Firm and no others. Under no circumstances shall any of the following parties be entitled to use or rely on the appraisal or this appraisal report:

i.　　　The borrower(s) on any loans or financing relating to or secured by the subject property,

ii.　　　Any guarantor(s) of such loans or financing; or

iii.　　　Principals, shareholders, investors, members or partners in such borrower(s) or guarantors.

## Intended Use of the Appraisal

The intended use is for support in litigation.

## Real Estate Identification

The subject property is located at 1512 Washington Street, Manitowoc, Manitowoc County, Wisconsin 54220. The subject property is further identified by the tax parcel number 052-000-246-000.

## Legal Description

 The following legal description was sourced from the subject's 2025 tax bill:

**Location of Property/Legal Description**
 **WASHINGTON ST**
Sec. 30, T19N, R24E
ALL OF BLK 246

　　　　　　　　　　3.720 ACRES

## Use of Real Estate as of the Effective Date of Value

As of the effective date of value, the subject was a mostly vacant redevelopment site. The former industrial building had been torn down with its foundation left intact and part of the concrete slab remaining on site. In addition, some partial concrete walls as well as a partial façade to the west entrance of the former building remained on site.

## Use of Real Estate as Reflected in this Appraisal

The as is opinion of value for the subject property reflects use congruent with the use of the real estate as of the effective date of value as described above.

## Ownership of the Property

According to public records, title to the subject property is vested in the Community Development Authority of the City of Manitowoc.



## History of the Property

Ownership of the subject property has not changed within the past three years. The last transfer of the subject was in June of 2016 when the City of Manitowoc took control of the property from the previous ownership.

It is our understanding that there is currently an option to purchase the southern 1.72-acre area of the subject property for $1.00 subject to a number of development-related stipulations. The option is held by Wire Capital Group, the junior developer working with Gorman & Company (principal developer). Per talks with the Executive Director of the Community Development Authority of the City of Manitowoc Adam Tegen, this option price is entangled with the city's interest in developing the site and is not a market-based price.

## Type and Definition of Value

The appraisal problem is to develop an opinion of the market value of the subject property. Market value is defined as the most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale with the buyer and seller each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

- *buyer and seller are typically motivated;*

- *both parties are well informed or well advised, and acting in what they consider their own best interest;*

- *a reasonable time is allowed for exposure in the open market;*

- *payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and*

- *the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale*[1]

Please refer to the Glossary in the Addenda section for additional definitions of terms used in this report.

## Valuation Scenarios, Property Rights Appraised, and Effective Dates of Value

Opinions of value for the subject property were developed under the following valuation scenarios:

| Valuation Scenario | Effective Date of Value |
|---|---|
| As Is Market Value of the Fee Simple Interest | November 28, 2025 |

## Date of Report

The date of this report is December 22, 2025.

---

[1] *FIRREA Code of Federal Regulations, Title 12, Part 34 Subpart C - 34.42, 1990; also Interagency Appraisal and Evaluation Guidelines, Federal Register / Vol.75, No. 237, 2010*

© 2025 VALBRIDGE PROPERTY ADVISORS | MILWAUKEE



## Assumptions and Conditions of the Appraisal

This appraisal assignment and the opinions reported herein are subject to the General Assumptions and Limiting Conditions contained in the report and the following extraordinary assumptions and/or hypothetical conditions, the use of which might have affected the assignment results.

### Extraordinary Assumptions

- The southern approximately 2.30 acres of the subject property has recently undergone significant remediation at the expense of the City of Manitowoc and with the support of federal funding. Currently, a four-story, 59-unit workforce housing development is proposed for the subject property. Due to the historic contamination on site, the development will require reuse of the existing foundation system in place and below-grade space will not be possible. According to our talks with the City of Manitowoc Community Development Authority, it is our understanding that the remedial activity completed is sufficient to allow for the development of the site as currently proposed. If this is found to be materially false, we reserve the right to modify our opinions accordingly.

- The northern approximately 1.40 acres of the subject property still contains significant environmental contamination and was yet to be remediated as of the effective date of value. We were provided an estimate of approximately $500,000 to complete a limited remediation that would involve capping the site for use as green space. We have relied upon this cost estimate for the purposes of our analysis. As such, if the actual cost to perform such activities materially differs from this amount, we reserve the right to modify our opinions accordingly.

### Hypothetical Conditions

- None.



# Scope of Work

The elements addressed in the Scope of Work are (1) the extent to which the subject property is identified, (2) the extent to which the subject property is inspected, (3) the type and extent of data researched, (4) the type and extent of analysis applied, (5) the type of appraisal report prepared, and (6) the inclusion or exclusion of items of non-realty in the development of the value opinion. These items are discussed as below.

## Extent to Which the Property Was Identified
The three components of the property identification are summarized as follows:

- <u>Legal Characteristics</u> - The subject was legally identified via public record and the information provided to us.
- <u>Economic Characteristics</u> - The subject property economic characteristics were identified via comparison to similar properties within the market and the information provided to us.
- <u>Physical Characteristics</u> - The subject property physical characteristics were identified via public record, the information provided to us and inspection of the property.

## Extent to Which the Property Was Inspected
Russell Cooper inspected the subject property on November 18, 2025. S. Steven Vitale, MAI, SGA inspected the subject property on November 28, 2025. Neither inspection was guided.

## Type and Extent of Data Researched
The following data was researched and analyzed: (1) market area data, (2) property-specific market data, (3) zoning and land-use data, and (4) current data on comparable listings and transactions. Professionals familiar with the subject market/property type were also interviewed.

## Type and Extent of Analysis Applied (Valuation Methodology)
Surrounding land use trends, the condition of any improvements, demand for the subject property, and relevant legal limitations were observed in the process of concluding a highest and best use for the subject property. The subject property was then valued based on the highest and best use conclusion.

There are four primary methods available to develop a land value estimate: (1) sales comparison, (2) land residual method, (3) ground rent capitalization, and (4) subdivision development method (discounted cash flow). While other methods, such as extraction and allocation, are applicable under limited conditions, one or more of these approaches are used in most circumstances to derive an indication of land value.

- <u>Sales Comparison Approach</u> - In the sales comparison approach, value is indicated by recent sales and/or listings of comparable properties in the market, with the appraiser analyzing the impact of material differences in both economic and physical elements between the subject and the comparables.



- <u>Direct Capitalization: Land Residual Method</u> - The land residual methodology involves estimating the residual net income to the land by deducting from total potential income the portion attributable to the improvements, assuming development of the site at its highest and best use. The residual income is capitalized at an appropriate rate, resulting in an indication of land value.

- <u>Direct Capitalization: Ground Rent Capitalization</u> – A market derived capitalization rate is applied to the net income resulting from a ground lease. This can represent the leased fee or fee simple interest, depending on whether the income potential is reflective of a lease in place or market rental rates.

- <u>Yield Capitalization: Subdivision Development Method</u> – Also known as discounted cash flow analysis (DCF), the methodology is most appropriate for land having multiple lot development in the near term as the highest and best use. The current site value is represented by discounting the anticipated cash flow to a present value, taking into consideration all necessary costs of development, maintenance, administration, and sales throughout the absorption period.

All of these approaches to value were considered. The availability of data and applicability of each approach to value within the context of the characteristics of the subject property, along with the needs and requirements of the client, were assessed. Based on this assessment, the sales comparison approach was developed. Given the subject is vacant land, the other approaches were not deemed appropriate. The specific methods and analysis of each approach are further discussed in the respective valuation sections.

## Appraisal Conformity and Report Type

The analyses, opinions, and conclusions were developed and this report was prepared in conformity with the Uniform Standards of Professional Appraisal Practice (USPAP) of the Appraisal Foundation; the Code of Professional Ethics and Standards of Professional Practice of the Appraisal Institute; and the requirements of our client. This is an Appraisal Report as defined by the Uniform Standards of Professional Appraisal Practice under Standards Rule 2-2a.

## Personal Property/FF&E

All items of non-realty are excluded from this analysis. The opinion of market value developed herein is reflective of real estate only.



# Regional and Market Area Analysis

**REGIONAL MAP**



## Overview

The subject is located in Manitowoc, in Manitowoc County, which is located in eastern Wisconsin between Milwaukee and Green Bay along Lake Michigan. The county is the only county that comprises the Manitowoc MiSA. The county covers 589 square miles and is characterized as largely rural in nature without any large population centers. Milwaukee is approximately one hour to the northeast, Janesville is approximately one half-hour to the south, and Madison is approximately one hour to the northwest. The area is well served by the interstate highway system, I-94, which links Milwaukee, Madison, and Chicago. The following table lists the distances from Manitowoc to major Midwestern cities.

| City | Distance from Manitowoc |
|---|---|
| Appleton | 45 |
| Chicago | 173 |
| Green Bay | 40 |
| Madison | 129 |
| Milwaukee | 81 |
| Minneapolis | 319 |

## Population

Manitowoc County's population growth has slowed significantly over the past several years. In recent decades, population growth rate has been well below that of the State of Wisconsin and the United States as a whole. Manitowoc County has a current population estimate of 81,359 and is expected to decrease 0.06% annually between 2025 and 2030. The City of Manitowoc, the largest community in Manitowoc County and the County seat, has a current population estimate of 34,639 and has seen nominally positive growth over the last five years. The City is expected to continue to increase at a rate of 0.09% per year, which compares favorably to the county and falls at about half the growth rate of the state. Historical population figures for the County and surrounding areas are summarized in the following table.

**Population**

| Area | Census Population (2020) | Current Population (2025) | Compound Annual Δ 2020 - 2025 | Projected Population (2030) | Compound Annual Δ 2025 - 2030 |
|---|---|---|---|---|---|
| United States | 331,449,520 | 335,707,897 | 0.26% | 343,238,675 | 0.44% |
| Wisconsin | 5,893,718 | 5,953,681 | 0.20% | 6,007,729 | 0.18% |
| Manitowoc, WI Micropolitan Statistical Area | 81,359 | 80,828 | -0.13% | 80,591 | -0.06% |
| Manitowoc County | 81,359 | 80,828 | -0.13% | 80,591 | -0.06% |
| Manitowoc city | 34,639 | 34,736 | 0.06% | 34,896 | 0.09% |

*Source: ESRI (ArcGIS)*

## Transportation

Regional access to the area is good with I-43 about three miles west of downtown Manitowoc. In addition, USHs 10 and 151 travel east-west and provide good access to neighboring communities. STHs 42, 310, and 147 also traverse the county. The nearest commercial airport is Austin Straubel Airport in Green Bay. Manitowoc County Airport, located on the City's north side, serves general aviation. The largest major airport is Mitchell International Airport, located in Milwaukee. Union Pacific rail service is available in the City and County of Manitowoc. Manitowoc is also the Wisconsin home to the S.S. Badger, which provides year-round car ferry service across Lake Michigan to Ludington, Michigan.

## Employment

Manitowoc County has an economy that primarily features service-related industries and manufacturing. The two largest employers in the County are Holy Family Memorial, a general medical and surgical hospital, and Manitowoc Cranes, a construction machinery manufacturer. Other major



employers include Nextera Energy Point Beach, Fisher Hamilton, Federal-Mogul Piston Rings, Lakeside Foods, and the Manitowoc Public School District. Employment by industry is broken down by percentage and presented in the following table.



*Employment by Industry for Manitowoc County  -  Source: ESRI (ArcGIS)*

## Unemployment

Employment levels in Manitowoc and Manitowoc County have been historically steady and slightly below the state and national level. We note that the elevated rates observed in 2020 can be attributed to the Covid-19 pandemic. The following table presents a summary of area unemployment trends.

**Unemployment Rates**

| Area | YE 2020 | YE 2021 | YE 2022 | YE 2023 | YE 2024 | 2025* |
|------|---------|---------|---------|---------|---------|-------|
| United States | 8.1% | 5.3% | 3.6% | 3.6% | 4.0% | 4.3% |
| Wisconsin | 6.4% | 3.8% | 2.8% | 2.8% | 3.0% | 3.2% |
| Manitowoc, WI (MiSA) | 4.9% | 2.8% | 3.0% | 2.3% | 2.8% | 2.4% |
| Manitowoc County, WI | 4.9% | 2.8% | 3.0% | 2.3% | 2.8% | 2.4% |
| Manitowoc city, WI | 5.4% | 1.9% | 2.6% | 2.9% | 2.8% | 2.6% |

*Source: www.bls.gov*        *data not seasonally adjusted; *Annual - most recent for US, others lag by 1-2 mos.*



## Personal Income

The strength of a particular economy can be assessed by looking at the per capita income available. The per capita income is the total income divided by the total number of residents. The per capita income as of 2025 for Manitowoc County was $42,249. The State of Wisconsin has a per capita income of $43,937 per person while the United States had $41,000. Another measure of income often analyzed is median household income. The City of Manitowoc and Manitowoc County both fall below state and national levels. A table of median household and per capital incomes is presented below.

**Income**

| Area | 2025 Median HH Income | 2025 Average HH Income | 2025 Per Capita Income |
|---|---|---|---|
| United States | $72,233 | $104,831 | $41,000 |
| Wisconsin | $78,651 | $104,222 | $43,937 |
| Manitowoc, WI Micropolitan Statistical Area | $70,518 | $95,766 | $42,249 |
| Manitowoc County | $70,518 | $95,766 | $42,249 |
| Manitowoc city | $62,596 | $88,051 | $39,535 |

*Source: ESRI (ArcGIS)*

## Conclusions

Manitowoc County is an area that has stabilized after a difficult post-recession transition period. The County continues to feel the effects of the manufacturing sector's relative decline and a slow recovery. Although per capita personal income and median household income are lower than state and national averages, overall quality of life in the county is considered good. The location about 40 miles outside of Green Bay allows its citizens easy access to a major airport and cultural scene. Manitowoc County is close enough to Green Bay to be considered a related community, but far enough to have its own character.



# City and Neighborhood Analysis

**NEIGHBORHOOD MAP**



## Overview

This section presents a discussion of the subject's immediate neighborhood. A neighborhood is defined in The Dictionary of Real Estate Appraisal as a "group of complementary land uses." A Neighborhood Map and Neighborhood Aerial are included at the beginning of this section for reference.

## Neighborhood Location and Boundaries

The subject neighborhood is located on the western outskirts of the Downtown Area of the City of Manitowoc, south of the Manitowoc River. The Downtown areas north and south of the river are well connected via Highways 42 and 10 and feature the most intensive land use within the City of Manitowoc. The subject is located on the western fringe of the southern downtown area and is located along the north side of what the City of Manitowoc planners consider to be an "Arrival Corridor" into the "Downtown Core" area. The following map is provided within the City of Manitowoc Downtown Master Plan, which shows the Downtown Core. Note, the subject is identified with a red arrow.

© 2025 VALBRIDGE PROPERTY ADVISORS | MILWAUKEE

**CITY OF MANITOWOC DOWNTOWN MAP**



*Subject location indicated by red arrow.*

As of the 2018 Downtown Masterplan, the riverwalk spanned along the north and south sides of the River within the Downtown Core area as shown by the dark green lines in the above exhibit. However, as called for within the Downtown Masterplan, expansion of the riverwalk was underway as of the effective date of value. The following exhibit shows the planned location of the riverwalk improvements:



**RIVERWALK EXPANSION PLAN MAP**



As of the effective date of value, the River Point District trail infrastructure was complete, which includes a bike path, boat docking and a kayak launch. At the same time, construction of the Bayshore Trail and Bridge was completed to the northeast of the Downtown Core, which connects the Mariners Trail to Lincoln Park along Little Manitowoc River. The River Point Improvements are part of a broader effort to revitalize the area, with the River Point area being a catalyst site as will be covered in the next section.

## Recent Development Activity

In 2019, the City of Manitowoc acquired the old rail yard bound to the north, south and west by the Manitowoc River and referred to as the CN Peninsula in the previous exhibit. That same year, the City of Manitowoc approved the River Point District Redevelopment Plan for the 20.1-acre peninsula. The site had an estimated 100,000 plus yards of contaminated soil that required significant remediation efforts by the City of Manitowoc in order to stem the redevelopment project that has been 20-years in the making.

In 2021, the first phase of the redevelopment received a Brownfield Site Assessment Grant (SAG) from the Wisconsin Economic Development Corporation (WEDC) to prepare a 7.7-acre section of the larger site. Construction began on the River North Apartments in 2021, an 87-unit apartment project that stands six stories and PetSkull Brewing opened for business that same year. River North Apartments were completed in 2023. These projects totaled more than $24.5 million in private investment for the River Point District. In 2024, Phase III of the project began, with a focus on site prep, infrastructure and utility extension for future projects. Talks with the Community Development Authority revealed that more development projects are in the works.

© 2025 VALBRIDGE PROPERTY ADVISORS | MILWAUKEE



To the south of the Manitowoc River, the former Mirro Plant property was acquired by the City of Manitowoc in 2016 and was subsequently demolished in 2017. Since then, the property has undergone significant environmental remediation by the City of Manitowoc as supported by a federal grant of just under $2 million. Currently, a 59-unit affordable housing development is planned for the southern area of the site with possibility for more development on the northern portion with more remedial efforts.

## Transportation Access

Within the immediate area of the subject property, transportation access helps define the character of its development. Access is considered adequate within the neighborhood, with the USH 151 corridor (converging with HWY 42 / Washington Street) connecting the Downtown Core with Interstate 43 further southwest (approximately 2.5-miles southwest) and the USH 10 system looping through the core and providing east and west access along the north side of the City as well as access to I-43 with a full interchange approximately 3 miles northwest. Highway R (N/S Rapids Road) connects USH 10 and USH 151. USH 151 connects downtown Manitowoc to Fond du Lac, Madison and points west. Interstate 43 provides regional links to Green Bay (northwest) and metropolitan Milwaukee (south). The following WisDOT map provides a picture of the road system within the City of Manitowoc:

**CITY OF MANITOWOC ROAD MAP**

*Subject location indicated by red arrow.*

---

© 2025 VALBRIDGE PROPERTY ADVISORS | MILWAUKEE

## Adjacent Land Use

The subject neighborhood is located in an area with primarily commercial, industrial and residential land uses. Land uses adjacent to the subject property are summarized in the following table, which is followed by an aerial map of the immediate area:

| | |
|---|---|
| East: | To the east is a mix industrial, commercial and high-density residential land uses after S. 15th Street, which carries through to Lake Michigan and the Manitowoc water treatment plant. |
| South: | To the south there are several commercial uses along Washington Street followed by predominantly single-family uses stretching to the southern limits of the city. |
| North: | To the north is Franklin Street followed by the Gaterman Manufacturing building and the Wisconsin Aluminum Foundry Company building and parking lot. Thereafter is Clark Street with a mix of commercial and single-family uses before Wollmer Street. After Wollmer Street is the City Centre LLC industrial property followed by the rail line and the Manitowoc River. |
| West: | To the west is a large, multi-tenant industrial building spanning nearly the entire block. This is followed by predominantly single-family residential land uses with commercial uses along Washington Street and Franklin Street. |

**IMMEDIATE AREA USES**



*Source: Google Maps*



## Land Use Trends

The neighborhood is seeing a change in land use that has been spurred by the activities of the City of Manitowoc and developers to revitalize contaminated industrial sites in critical areas of Downtown Manitowoc. As noted, the River Point redevelopment project is ongoing to the north of the Manitowoc River and the redevelopment of the subject property is another example of land use change. This shift from historic industrial uses to residential housing and retail uses indicates that the neighborhood is in the early stages of revitalization.

## Demographics

The following tables summarize population, household and income statistics surrounding the subject in one, three and five mile rings.

### Neighborhood Demographics

| Radius (Miles) | 1 Mile | 3 Mile | 5 Mile |
|---|---|---|---|
| Trade Area (Sq. Mi.) | 3.14 | 28.27 | 78.54 |
| Trade Density (Pop/Sq. Mi.) | 4,055 | 1,729 | 767 |
| **Population** | | | |
| Census Population (2010) | 11,421 | 33,005 | 37,478 |
| Census Population (2020) | 11,508 | 33,614 | 38,239 |
| Current Population (2025) | 11,532 | 33,762 | 38,319 |
| Projected Population (2030) | 11,601 | 33,910 | 38,455 |
| *Compound Annual Growth* | | | |
| 2010 - 2020 | 0.1% | 0.2% | 0.2% |
| 2020 - 2025 | 0.0% | 0.1% | 0.0% |
| 2025 - 2030 | 0.1% | 0.1% | 0.1% |
| **Households** | | | |
| Census Households (2010) | 4,883 | 14,395 | 16,176 |
| Census Households (2020) | 4,919 | 14,800 | 16,707 |
| Current Households (2025) | 5,039 | 15,204 | 17,144 |
| Projected Households (2030) | 5,110 | 15,434 | 17,393 |
| *Compound Annual Growth* | | | |
| 2010 - 2020 | 0.1% | 0.3% | 0.3% |
| 2020 - 2025 | 0.5% | 0.5% | 0.5% |
| 2025 - 2030 | 0.3% | 0.3% | 0.3% |
| Average Household Size (2025) | 2.23 | 2.18 | 2.19 |

*Source: ESRI (ArcGIS)*      *(Lat: 44.089577, Lon: -87.668272)*



**Neighborhood Demographics (cont.)**

| Radius (Miles) | 1 Mile | 3 Mile | 5 Mile |
|---|---|---|---|
| Trade Area (Sq. Mi.) | 3.14 | 28.27 | 78.54 |
| Trade Density (Pop/Sq. Mi.) | 4,055 | 1,729 | 767 |
| **2025 Housing Units** | | | |
| Median Home Value | $125,112 | $177,907 | $191,403 |
| Median Year Built | 1940 | 1957 | 1959 |
| Total Housing Units | 5,626 | 16,287 | 18,338 |
| Owner-Occupied Housing % | 47.6% | 59.5% | 60.8% |
| Renter-Occupied Housing % | 42.0% | 33.9% | 32.6% |
| Vacant Housing % | 10.4% | 6.6% | 6.5% |
| **2025 Employment** | | | |
| Total Establishments | 672 | 1,435 | 1,572 |
| Total Employees | 11,004 | 24,230 | 26,623 |
| Average Commute Time | n/a | n/a | n/a |
| % College Graduates | 18.9% | 24.0% | 25.3% |
| **2025 Income Summary** | | | |
| Median Household Income | $53,475 | $61,850 | $63,805 |
| Average Household Income | $71,764 | $85,654 | $89,830 |
| Avg Spending/Household | $21,188 | $25,537 | $26,699 |
| Per Capita Income | $31,317 | $38,661 | $40,309 |

*Source: ESRI (ArcGIS)*                              *(Lat: 44.089577, Lon: -87.668272)*

## Nuisances & External Obsolescence

Neighborhood properties have adequate levels of maintenance relative to what is typical in this neighborhood.

## Neighborhood Life Cycle

Most neighborhoods are classified as being in four stages: **growth**, **stability**, **decline**, and **renewal**. Overall, the subject neighborhood is in the renewal or revitalization stage of its life cycle.

## Analysis and Conclusions

The City of Manitowoc is uniquely positioned on Lake Michigan and has an additional water resource in the Manitowoc River, which runs through Downtown Manitowoc. The area is serviced by a good level of infrastructure and transportation support, including all utilities to most urban areas. Although the impacts of deindustrialization are still being felt by the city, revitalization activities provide for a positive outlook for the area on a greater time horizon.

© 2025 VALBRIDGE PROPERTY ADVISORS | MILWAUKEE



# Site Description

The subject site spans a full block just west of the Downtown Core area of the City of Manitowoc, just south of the Manitowoc River. The property is located at 1512 Washington Street in southwest Downtown Manitowoc. The characteristics of the site are summarized as follows:

## Site Characteristics

| | |
|---|---|
| Gross Land Area: | 3.720 Acres or 162,043 SF |
| Usable Land Area: | 3.720 Acres or 162,043 SF |
| Usable Land %: | 100.0% |
| Shape: | Mostly rectangular |
| Topography: | Level |
| Grade: | At street grade |
| Utilities: | S,W,E,T,G (all utilities) |
| Off-Site Improvements: | Typical municipal improvements |
| Interior or Corner: | Four Corners (full block) |
| Signalized Intersection: | No: |

## Street Frontage / Access

| Frontage Road | Street North | Street East | Street South | Street West |
|---|---|---|---|---|
| Street Name: | Franklin Street | S. 15th Street | W. Washington St (HWY 151/42) | S. 16h Street |
| Street Type: | Minor Arterial | Collector | Principal Arterial | Local |
| Frontage (Linear Ft.): | 300' | 540' | 300' | 540' |
| Traffic Count (Cars/Day): | 2,800 | 480 | 9,300 | N/A |

## Flood Zone Data

| | |
|---|---|
| Flood Map Panel/Number: | 55071C0308E |
| Flood Map Date: | February 23, 2023 |
| Portion in Flood Hazard Area: | 0.00% |
| Flood Zone: | Zone X |

## Other Site Conditions

| | |
|---|---|
| Soil Type: | According to USDA soil survey data, the subject is comprised of approximately equal proportions of Nichols very fine sandy loam (2 to 6 percent slopes) and Shiocton very fine sandy loam (0 to 3 percent slopes). |
| Environmental Issues: | The subject is known to contain significant environmental contamination due to its historic industrial use. It is our understanding that the southern approximately 2.30 acres has been remediated and the northern 1.40 acres is yet to be |

remediated. For more details on the subject's environmental issues, please see the Environmental Contamination Comments section at the end of this Site Description.

Easements/Encroachments:    We were not provided with a current title policy for the subject property. We assume that there are no other extraordinary easements affecting the site as a whole. We recommend that a current title insurance policy statement be reviewed by legal counsel.

## Adjacent Land Uses

East:    To the east is a mix industrial, commercial and high-density residential land uses after S. 15th Street, which carries through to Lake Michigan and the Manitowoc water treatment plant.

South:    To the south there are several commercial uses along Washington Street followed by predominantly single-family uses stretching to the southern limits of the city.

North:    To the north is Franklin Street followed by the Gaterman Manufacturing building and the Wisconsin Aluminum Foundry Company building and parking lot. Thereafter is Clark Street with a mix of commercial and single-family uses before Wollmer Street. After Wollmer Street is the City Centre LLC industrial property followed by the rail line and the Manitowoc River.

West:    To the west is a large, multi-tenant industrial building spanning nearly the entire block. This is followed by predominantly single-family residential land uses with commercial uses along Washington Street and Franklin Street.

## Site Ratings

Access:    Good

Visibility:    Good

## Zoning Summary

Zoning Jurisdiction:    City of Manitowoc

Zoning Classification:    R-6, Residential - Multi Family & I-2, Heavy Industrial

General Plan Designation:    Planned Mixed Use

## Zoning / Future Land Use Comments

The subject Property is zoned R-6, Residential – Multi-family and I-2, Heavy Industrial. The southern approximately 1.70 acres is zoned R-6 with the north area remaining in the Heavy Industrial district as shown in the following map:

**CITY OF MANITOWOC ZONING MAP**



The Heavy Industrial district allows a variety of heavy industrial uses, which are often objectionable to surrounding uses. With respect to our highest and best use conclusion, we focus primarily on the requirements of the R-6 District as we consider rezoning of the northern area of the subject to be probable with respect to the future land use designation and talks with the City of Manitowoc.

The intent of the R-6 zoning designation is laid out as follows within the City of Manitowoc Zoning Ordinance:

> This district is intended to provide for high density multiple housing of an apartment nature near the high service focal points of the City such as the Central Business District, industrial centers, shopping centers, or at any location where a limited amount of land is available and appropriate as a place of residence for a large number of persons.

Under this district, the following uses are permitted outright:
1. Single- and two-family dwellings;
2. Multi-family dwellings;
3. Rooming houses;
4. Adult day care facilities, and child day care centers for not more than 15 individuals;
5. Public parks, parkways, and other public recreational areas;
6. Community living arrangements for not more than 15 individuals;
7. Vacant lot residential garden; and
8. Bed and breakfasts and shore-term rentals



For conditional uses, please see the City of Manitowoc R-6 Zoning Ordinance included in the Addenda. The front yard setback is 25 feet, the side yard setbacks are 35 feet and the rear yard setback is 25 feet. The minimum lot area is 2,000 square feet per dwelling unit for 8 or fewer unit buildings. For buildings with more than 8 units, the following lot area requirements are stipulated:

Efficiency and one-bedroom apartments: 1,100 square feet of lot area per dwelling unit; two-bedroom apartments: 1,300 square feet of lot area per dwelling unit; three-bedroom and over apartments: 1,500 square feet of lot area per dwelling unit. It is further provided that apartment houses having nine or more dwelling units and four stories or more in height shall provide a minimum of 1,000 square feet of lot area per family for a four-story building; 800 square feet of lot area per family for a five-story building; and 600 square feet of lot area per family for a building six or more stories in height. The City Plan Commission may modify the requirements as to the number of off-street parking spaces required in specific cases where desirable or warranted owing to types of use or character of use and with due regard to the protection of adjacent property in the Residential District and the public interest.

In addition, all dwelling units shall be at least 14 feet wide and have a minimum area of 720 square feet after exclusion of attached or detached accessory buildings. The maximum building height is 60 feet within the R-6 district.

As noted earlier, the subject has a future land use plan designation of Planned Mixed Use, as shown within the following future land use plan map:

### FUTURE LAND USE MAP





The following excerpt from the Manitowoc Comprehensive Plan (adopted 2023) lays out the intent of the Planned Mixed Use designation:

> This future land use category is intended to facilitate a carefully curated mix of commercial and residential uses within currently undeveloped or large-scale redevelopment areas that are on public sewer, public water, as well as other urban services and infrastructure. "Planned Mixed Use" areas are intended to follow Smart Growth and Traditional Neighborhood Development principles to create vibrant urban places where commercial and residential uses are complementary to each other in both intensity and design. This category advises a carefully designed blend of community-oriented businesses including small-scale retail and service businesses, office, multi-family, light industrial, and select institutional uses.

In addition, the following policies and programs are outlined for this future land use designation with the comprehensive plan:

1. Actively pursue redevelopment of "Planned Mixed Use" areas over the planning period through public-private initiatives.
2. In redevelopment/infill locations close to residential areas and small-scale commercial such as Washington Street, light industrial is recommended only if it is compatible with surrounding development. In such instances, light industrial activities should occur primarily indoors, no outdoor storage should be present, and there should be little to no traffic and other impacts on adjacent residential or commercial uses.
3. Require the use of high-quality building materials and designs that are compatible with the surrounding are such as façade articulation, generous windows, defined customer entryways, screened outdoor storage, and high-quality and durable exterior building materials. Require high quality signage that is not excessive in height or total square footage.
4. Incorporate amenities such as benches, fountains, canopy shade trees, and public art wherever possible.
5. Design buildings and sites oriented toward pedestrians and not automobiles, locate parking in the rear or side of the building where possible.
6. Include facilities for bicyclists (bike storage racks, bike paths, etc.) in all development designs.
7. Encourage environmentally sustainable site and building design including stormwater best management practices, the use of passive solar energy, and the integration of alternative transportation networks and green spaces.
8. Develop conceptual plans for the other "Planned Mixed Use" areas as a starting point for individual redevelopment plans and actual redevelopment for each these areas.
9. Consider updating the City's Zoning Ordinance to establish a zoning district specifically designed to promote redevelopment. Such a district could include bulk standards favorable to redevelopment (such as increased maximum heights and reduced setbacks), provide design standards specific to mixed use, and permit "by right" desirable land uses and mixed use development.



## Analysis/Comments on Site

The subject site is a 3.72-acre vacant land property spanning a full block from S. 16th Street to S. 15th Street to the north and south of Washington Street (USH 151 / HWY 42) and Franklin Street, respectively, within the west fringe of the City of Manitowoc Downtown area. The southern 1.70 acres of the property is zoned R-6, Multi-family Residential and the northern remainder is zoned I-2, Heavy Industrial. The future land use plan calls for mixed use development on the entire site. Traffic is moderate on all of its fronting roads aside from Washington Street, which has a daily traffic count of 9,300 vehicles per day. None of the subject's four corners are signalized. The subject has access to municipal utilities and is well suited for redevelopment. However, the site is most limited by its historic environmental contamination as will be discussed further following the next paragraph.

The City is currently working with Gorman & Company (principal developer) and junior developer Wire Capital Group in order to redevelop the site with a 59-unit workforce housing project by the name of the Maritime Flats. The building would be comprised of a mix of 1-, 2- and 3-bedroom units across four stories and 77,400 square feet. The building footprint will be 20,400 square feet and the building will contain a community room, lobby and fitness center as well as an outdoor play area and a common patio. Currently, the developer has an option to purchase the southern 1.70-acres of the property for $1.00. This option was recently extended into the spring of 2026 according to Executive Director of the City of Manitowoc Community Development Authority Adam Tegen. Construction of the building is anticipated for the summer and fall of 2026 with delivery likely to be in 2027. A Proposed Site Plan for the development is provided at the end of this section. More detailed building plans area located within the Addenda.

## Environmental Contamination Comments

The subject site was previously improved with a 7-story, 1,000,000 square foot industrial loft building that was historically utilized as a tannery (Henry Vits) and later converted for aluminum manufacturing in 1898. In 1986, manufacturing was offshored under new ownership. In 2016, the Community Development Authority of the City of Manitowoc took control of the building under the purpose of blight elimination. Due to the former heavy industrial uses hosted by the subject property, the building and underlying lands were found to be significantly contaminated. The Community Development Authority removed the hazardous waste remaining within the building and subsequently razed the structure in 2017. It is our understanding that the site's soil and groundwater are known to be impacted by heavy metals, polycyclic aromatic hydrocarbons (PAHs), volatile organic compounds (VOCs) and polychlorinated biphenyls (PCBs). A number of maps showing the locations of these compounds on the subject property are included at the end of this section.

Since the razing of the former improvements, the City of Manitowoc has performed significant remediation activities on the subject property. The City obtained a $1,961,500 grant through the United States Environmental Protection Agency (USEPA) Fiscal Year (FY) 2024 Brownfield Grant Competition in the spring of 2024 to support the cleanup and preparation of the subject's southern 2.30-acres for redevelopment. It is our understanding that this southern portion had been sufficiently remediated to the extent required for multi-family development as of the effective date of value under Phase I of the redevelopment plan. According to Mr. Tegen, all but approximately $300,000 of the federal grant was spent in remediating this southern development area of the subject. A map showing the location of the Phase I redevelopment area is also provided at the end of this section.



As of the effective date of value, the northern component of the subject property had not yet been fully remediated. According to the Executive Director of the City of Manitowoc Community Development Authority Adam Tegen, there are two options for the northern area. This includes 1) full remediation of the site to the same standards as the southern portion or 2) capping the area for green space. The first option is estimated to cost close to that required for the southern area or approximately $1.6 million. Whereas the second option would be much less costly at an estimated $500,000 according to Mr. Tegen. In addition, the second option would not preclude future redevelopment.

As of the effective date of value, the city was working on plans to remediate the northern area of the site under the less costly option of capping the area for green space. Bidding for the work will be completed early next year (2026), which will yield a more accurate cost figure. According to Mr. Tegen, the current estimate is based on prior cost figures from the southern area remediation in proportion to the scope of work anticipated for the northern area. Although an educated guess, the cost may be larger than the estimate according to Mr. Tegen.

Although the southern area of the site has been remediated and is prepared for development, the property is still not restored to a typical development site. Remaining on the site is the foundation system of the former structure, some of the concrete floor slab as well as some of the concrete walls around the perimeter of the site. It is our understanding that the developer plans to utilize the existing foundation system as opposed to removing it, which will provide cost savings between $1,150,000 and $1,350,000 according to the developer. This is cost savings is compared to removal of the old system and installation of a new foundation system; as such, this is not reflective of cost savings over a typical development site. The ability to reuse the foundation system may have cost advantages over a site without a foundation system, but it also restricts a developer from building any space below grade and comes with increased difficulty on the engineering and construction execution side.

In addition, it was estimated that the cost savings of crushing the remaining concrete on site would be $688,800. The majority of the cost savings ($567,000) is in not having to dispose of the concrete. The cost to crush the concrete is estimated to be $16,800, which is far less than the cost to import the fill required to fill the below-grade tunnel systems ($138,600). It was not clear to the appraisers how much of the foundation had been crushed and how much of the property had been filled as of the effective date, but it was clear by inspection that there were still areas not filled and some of the concrete slab remained on the northern area of the site. Not only can the developer not build below grade due to the qualities of the site, but the developer will need to maintain the cap in place as well as adhere to groundwater restrictions.

© 2025 VALBRIDGE PROPERTY ADVISORS | MILWAUKEE



**TAX PLAT**





## PHASE I REDEVELOPMENT MAP





**PROPOSED SITE PLAN**



## PROPOSED SITE PLAN DETAILED*



*For more detail floor plans, please see the Maritime Flats Plans exhibits included within the Addenda.*



FORMER MIRRO PLANT SITE 9
SITE DESCRIPTION

## PBC IMPACTS MAP





## PAH IMPACTS MAP



© 2025 VALBRIDGE PROPERTY ADVISORS | MILWAUKEE



**VOCS IMPACTS MAP**





## HEAVY METALS IMPACTS MAP





## PCBS IMPACTS MAP





FORMER MIRRO PLANT SITE 9
SITE DESCRIPTION

## PAHS IMPACTS MAP



## PFAS IMPACTS MAP



© 2025 VALBRIDGE PROPERTY ADVISORS | MILWAUKEE



## TOPOGRAPHIC MAP





**FLOOD MAP**



© 2025 VALBRIDGE PROPERTY ADVISORS | MILWAUKEE



**TRAFFIC MAP**





# Subject Photographs



View south of southern area of site before north area



View north before northern area of site

**Valbridge**
PROPERTY ADVISORS



Exiting concrete wall remaining (subject at right)



View east of site from S. 16th Street

Additional photos are included in the Addenda.



## Assessment and Tax Data

The subject property is currently under the ownership of Community Development Authority of the City of Manitowoc and is tax exempt. As such, there is no tax data to analyze.

© 2025 VALBRIDGE PROPERTY ADVISORS | MILWAUKEE



# Market Analysis

Market analysis is a study of market conditions for a specific property type. With respect to the highest and best conclusion for the subject property, which is predominantly multi-family oriented, we have focused our market analysis on the multi-family market. We begin this analysis with a national overview as provided by Price Waterhouse Coopers (PwC). We then turn to some of the relevant findings of the 2021 housing study conducted on behalf of the City of Manitowoc and finish with our own analysis of CoStar Group, Inc. data, a leading provider of commercial property data.

## Investor Surveys

We first look to relevant data as published in the Third Quarter 2025 Price Waterhouse Coopers (PwC) Investor Survey. The following table summarizes U.S. construction spending from March 2024 to March of 2025, which reflects negative spending for new multi-family development as well as commercial development while positive growth was seen most in manufacturing, transportation, power and amusement and recreation.

**U.S. CONSTRUCTION SPENDING\***
March 2025 to March 2024

|  | Year-Over-Year Change |
|---|---|
| **Total Nonresidential** | + 1.6% |
| Manufacturing | + 3.6% |
| Transportation | + 10.2% |
| Lodging | − 1.0% |
| Office | + 2.7% |
| Power | + 7.0% |
| Amusement and Recreation | + 7.0% |
| Health care | − 5.2% |
| Communication | + 2.2% |
| Commercial | − 5.8% |
| Religious | + 16.4% |
| Education | − 4.2% |
| **Total Residential** | + 2.8% |
| New single family | − 0.8% |
| New multifamily | − 12.1% |
| **Total Private** | + 2.3% |

\* Private construction
Source: U.S. Census Bureau; seasonally adjusted

The following overview was provided for the Multi-family sector within the Real Estate Barometer section of the survey, which surveys participants on their placement of a given sector in the real estate cycle from expansion, contraction, recession to recovery:

> The U.S. multifamily sector is projected to follow an uneven trajectory over the next four years (…). In 2025, the 80 metros analyzed are distributed across the cycle, with nearly one-third in recession (31.0%) and another 29.0% in contraction, while 22.0%

© 2025 VALBRIDGE PROPERTY ADVISORS | MILWAUKEE



are in recovery and 18.0% in expansion. In 2027 and 2028, the recovery and expansion phases will lead this sector.

The investor survey also looks to changes in discount rates, capitalization rates, rental rates, expenses and marketing times for a given property category. The following rates were collected for the National Apartment Market as of the third quarter of 2025:

## NATIONAL APARTMENT MARKET
### Third Quarter 2025

| | CURRENT | LAST QUARTER | 1 YEAR AGO | 3 YEARS AGO | 5 YEARS AGO |
|---|---|---|---|---|---|
| **DISCOUNT RATE (IRR)[a]** | | | | | |
| Range | 6.00% – 9.00% | 6.00% – 9.00% | 6.00% – 9.00% | 4.75% – 10.00% | 5.00% – 10.00% |
| Average | 7.44% | 7.33% | 7.25% | 6.79% | 6.83% |
| Change (Basis Points) | | + 11 | + 19 | + 65 | + 61 |
| **OVERALL CAP RATE (OAR)[a]** | | | | | |
| Range | 4.00% – 7.00% | 4.00% – 6.25% | 4.00% – 7.50% | 3.00% – 8.00% | 3.50% – 8.00% |
| Average | 5.35% | 5.30% | 5.38% | 4.75% | 5.22% |
| Change (Basis Points) | | + 5 | − 3 | + 60 | + 13 |
| **RESIDUAL CAP RATE** | | | | | |
| Range | 4.00% – 6.75% | 4.50% – 6.75% | 4.25% – 8.00% | 3.50% – 8.00% | 4.00% – 8.00% |
| Average | 5.46% | 5.55% | 5.77% | 5.14% | 5.61% |
| Change (Basis Points) | | − 9 | − 31 | + 32 | − 15 |
| **MARKET RENT CHANGE[b]** | | | | | |
| Range | 0.00% – 4.00% | 0.00% – 4.00% | 0.00% – 4.00% | 0.00% – 10.00% | (5.00%) – 3.50% |
| Average | 2.58% | 2.40% | 2.33% | 3.83% | 0.58% |
| Change (Basis Points) | | + 18 | + 25 | − 125 | + 200 |
| **EXPENSE CHANGE[b]** | | | | | |
| Range | 3.00% – 5.00% | 3.00% – 5.00% | 3.00% – 6.00% | 0.00% – 8.00% | 0.00% – 8.00% |
| Average | 3.46% | 3.55% | 3.71% | 3.42% | 2.68% |
| Change (Basis Points) | | − 9 | − 25 | + 4 | + 78 |
| **MARKETING TIME[c]** | | | | | |
| Range | 3 – 15 | 3 – 15 | 3 – 15 | 1 – 12 | 1 – 12 |
| Average | 6.9 | 6.9 | 6.8 | 4.3 | 5.3 |
| Change (▼, ▲, =) | | = | ▲ | ▲ | ▲ |
| **FORECAST VALUE CHANGE[d]** | | | | | |
| Range | (2.0%) – 5.0% | (2.0%) – 5.0% | (10.0%) – 3.0% | (20.0%) – 12.0% | (10.0%) – 10.0% |
| Average | 1.2% | 1.2% | (1.0%) | (0.5%) | 0.6% |
| Change (▼, ▲, =) | | = | ▲ | ▲ | ▲ |

a. Rate on unleveraged, all-cash transactions; assumes stabilized occupancy
b. Year-one rate of change c. Months d. Over next 12 months
Source: PwC Investor Survey; survey conducted by PwC during July 2025

The above shows increased overall capitalization rates and positive rental rate growth (albeit slower paced than the fast pace seen 3 years ago). Whereas, the increase in expense expenses has slowed from the previous quarter but remains elevated over 3 and 5 years ago. Marketing time has been relative steady over the last year and is up significantly from 3 and 5 years ago. The change in value anticipated is still positive and outpaces that anticipated a year ago and even more so than 3 and 5 years ago. We next turn to the City of Manitowoc, WI 2021 Housing Study & Needs Assessment, which was published in early 2022.



City of Manitowoc, WI 2021 Housing Study & Needs Assessment

This study was prepared by MSA Professional Service, Inc. and provides valuable background for our understanding of the housing market within the City of Manitowoc. The following points highlight the key findings from the study:

- The 65+ cohort will grow disproportionately over the next two decades.
- There is a large number of low-income households relative to the region.
- Workforce housing (entry level) cannot support rental costs higher than $650 per month.
- Two-thirds of households own their housing, while half of households under 50% of median income rent.
- There are too few units on both ends of the rental market (over $1,300 and under $600).
- An estimated 678 renter households spend more than half of their income on housing.
- Renters making more than the median income rent lower than they could afford (1/3 of units affordable at between 51% and 80% of median income are rented by renters making more than median income).
- Vacancy has been plummeting (11% to under 5% in past 6 years).
- The size of existing rental units is favorable for families (nearly 2,000 3-bed rentals and only 400 efficiencies).
- High construction cost is a large factor in high rental rates.
- Single-family home ownership is affordable, with a majority of homes being affordable at less than 50% of the median income.
- Although single-family pricing is spiking, such is still affordable in this area.
- Starter homes are averaging under $100,000.
- Condominiums are very limited (3% of owned homes).
- Seniors are anticipated to be selling with 80-100 home sales per year.
- New unit construction has been steady for single family and duplex units and there have been units in buildings with 3+units each ear since 2012.
- Construction costs are still increasing.

We next look to multi-family rental rates, vacancy rates and construction activity within the City of Manitowoc and within Manitowoc County based on data provided by CoStar Group, Inc. We start by looking to rental rate trends within Manitowoc County and the City of Manitowoc, which follow one another closely:



### HISTORIC MULTI-FAMILY RENTAL RATES



As shown above, rental rates have increased substantially over the last 10 years, with a clear acceleration in growth starting between late 2020 and early 2021. This generally tracks with the acceleration in single-family home pricing at the outset of the pandemic. However, this elevated rate of growth has slumped over the course of 2025 as can be more easily discerned in the following rental rate growth chart.

### HISTORIC MULTI-FAMILY RENTAL RATE GROWTH



As shown above, rental rate growth was relatively level until approximately 5 years prior to the effective date of value. Rates spiked significantly starting in early 2021 and began to decrease steadily in 2022. Over the last year, rental rate growth has plummeted. That said, growth rates are still elevated over rates observed before the spike. We next turn to vacancy rates within the multi-family market.



**HISTORIC MULTI-FAMILY VACANCY RATES**



Aside from a short uptick experienced between the end of 2022 and the beginning of 2023, vacancy rates have trended reliably downward over the last 10 years. This would appear to have been a major factor in the accelerated rental rate growth observed amidst these historically lower vacancy rates. However, we have seen a stabilization of rates and slight reversal of the trend over the last year. This may help to explain the decrease in rental rate growth.

**HISTORIC MULTI-FAMILY CONSTRUCTION**



Given the sporadic nature of construction in a smaller market like the subject's, we have looked to a longer time horizon for our construction analysis. As shown above, the majority of construction within the county has been within the City of Manitowoc over the last several decades. Although sporadic, there appears to be a downward trend overall since 2000. We note that an additional 59 units are



anticipated to be under construction in 2026 on the subject property, which will still conform to an overall downward trend in construction levels over the last several decades.

## Market Analysis Conclusions

On the national level, the multi-family market has observed a slower pace of growth and a lesser extent spent on multi-family development as compared to the previous year. Increased capitalization rates reflect this overall trend. Looking to the City of Manitowoc and Manitowoc County, rental rate growth has also slowed but still remains elevated over historic levels. Vacancies continue to float near record lows and construction is still observing a downward trend on the longer timescale. While rental rates continue to increase, the City of Manitowoc has found that renting has become unaffordable for many households and there is a lack of inventory in both the affordable and higher-end rental market within the City of Manitowoc. As such, there is incentive for developers to alleviate low vacancy rates and high rents in this area. Further, the City of Manitowoc has identified this need and has recently offered significant incentives to fulfil it such as the assistance provided for the subject property development as well as the recent River North Apartments development. As such, although the overall multi-family market may be showing signs of contraction, locations such as the subject offer a unique opportunity in the affordable housing development market and possibly in providing higher-end housing to compete with the options further from the Downtown area.



# Highest and Best Use Analysis

The Highest and Best Use of a property is the use that is legally permissible, physically possible, and financially feasible which results in the highest value. An opinion of the highest and best use results from consideration of the criteria noted above under the market conditions or likely conditions as of the effective date of value. Determination of highest and best use results from the judgment and analytical skills of the appraiser. It represents an opinion, not a fact. In appraisal practice, the concept of highest and best use represents the premise upon which value is based.

## Highest and Best Use As Though Vacant

The primary determinants of the highest and best use as though vacant are (1) Legal permissibility, (2) Physical possibility, (3) Financial feasibility, and (4) Maximum productivity.

### Legally Permissible

The subject site is zoned R-6, Residential - Multi Family on the southern approximately 1.70 acres of the site and I-2, Heavy Industrial on the northern remainder of the site. The future land use plan calls for Planned Mixed Use and a change in zoning for the northern half of the site would be highly probable in the event a developer planned to improve it. In sum, a number of uses would be legal on the site outright by the existing zoning designations. On the southern area, multi-family development would be permitted. As noted, the southern area is currently approved for 59 units. Whereas the north area could be used for a number of industrial uses by right but would need to be rezoned for residential use such as that proposed for the southern area of the site. In accordance with the future land use plan, however, such would be very probable.

There are no known easements, encroachments, covenants or other use restrictions that would unduly limit or impede development.

### Physically Possible

The subject's southern area has been remediated and is understood to be capable of supporting a multi-family development as of the effective date of value. The northern area of the site still contains significant contamination elements and would require remediation in order to be developed. However, once remediated, it is assumed that the site could support development similar to that proposed on the south side. We note that there is an existing foundation in place that would be more costly to remove than to reuse in a development. Although this presents a challenge, as evidenced by the current plans for the southern area, such would not impede development other than restricting below-grade space.

### Financially Feasible

A review of published yield, rental and occupancy rates suggests that there is an undersupply of multifamily inventory and demand would support additional units. However, we must weigh this with the cost of development on the subject property due to the increased costs associated with the subject's contaminated state. The southern area has already been remediated and is understood to be prepared for redevelopment as of the effective date. As such, it is considered feasible to develop the southern area of the subject, whereas the northern area still requires remediation.



It is understood that there are two courses of action for the northern area of the subject property including full remediation on par with that performed on the south and a more minimal approach of capping the area for green space. The first option would cost somewhere in the area of $1.60 million while the second would be in the area of $500,000. As evidenced by our land sales presented later within this report, the larger remedial activity would far exceed the land value of the northern area of the subject and, as such, is not considered feasible without external assistance such as federal, state or municipal grants.

Talks with the City of Manitowoc revealed that funding on that level was not likely in the current grant environment and with respect to the amount of assistance expended on the southern area. Whereas, the City currently has sufficient funds to cover the cost to cap the area for green space through what remains of the recent federal grant and with a revolving EPA loan fund. As such, a prudent market participant would elect to develop the remediated area and to cap the northern area of the site. Of course, there is still the potential for further development in the long-term for the northern area.

<u>Maximally Productive</u>
Among the financially feasible uses, the use that results in the highest value (the maximally productive use) is the highest and best use. Considering these factors, the maximally productive use as though vacant is for mixed-use or multi-family development. We note that the northern area of the site would likely remain green space due to the environmental contamination and the infeasibility of full remediation on that area at the current moment.

<u>Highest and Best Use As Though Vacant Conclusion</u>
The conclusion of the highest and best use as though vacant is for mixed-use or multi-family development on the southern area with green space on the northern area with some potential to be developed in the longer-term.

## Most Probable Buyer
As of the date of value, the most probable buyer of the subject property is a multi-family / mixed-use developer.



# Land Valuation

## Methodology

Site Value is most often estimated using the sales comparison approach. This approach develops an indication of market value by analyzing closed sales, listings, or pending sales of properties similar to the subject, focusing on the difference between the subject and the comparables using all appropriate elements of comparison. This approach is based on the principles of supply and demand, balance, externalities, and substitution, or the premise that a buyer would pay no more for a specific property than the cost of obtaining a property with the same quality, utility, and perceived benefits of ownership.

### Unit of Comparison

The unit of comparison selected depends on the appraisal problem and nature of the property and is intended to explain or mirror market behavior. The primary unit of comparison in the market and applied in this analysis is price per gross square foot. In addition, we will look to a test of reasonableness of price per dwelling unit.

### Elements of Comparison

Elements of comparison are the characteristics or attributes of properties and transactions that cause the prices of real estate to vary. The primary elements of comparison considered in sales comparison analysis are as follows: (1) property rights conveyed, (2) financing terms, (3) conditions of sale, (4) expenditures made immediately after purchase, (5) market conditions, (6) location and (7) physical characteristics.

### Comparable Sales Data

The market was studied to identify sales and listings of comparable properties with a focus on those that appeal to the most probable buyer of the subject site. These properties typically have similar locations and physical characteristics. Of these transactions, sufficient sales data was available for the following sale comparables, which were analyzed to estimate a unit value for the subject property. We note that, due to the smaller size of the subject's immediate market, we were required to expand our geographic radius to include neighboring larger markets in eastern Wisconsin including that of Green Bay, Fon Du Lac, Sheboygan and Port Washington. In addition, we looked to a number of strictly commercial land sales as additional support as well as active listings directly within the City of Manitowoc.

The following table summarizes the sale comparables utilized and a map illustrating the location of each in relation to the subject property follows. Details of each comparable follow the location map.

## Land Sales Summary

| | Sale # 1 | Sale # 2 | Sale # 3 | Sale # 4 | Sale # 5 | Sale # 6 | Sale # 7 |
|---|---|---|---|---|---|---|---|
| Sale ID | 1830578 | 1821864 | 1830322 | 1830370 | 1792986 | 1792891 | 1755799 |
| Property Name | Manitowoc Dollar General Land | Woodridge Condominium Land | Ridgeway Drive Multi-family Land | W. Johnson Street Development Land | Malibu Apartments Site | Gateway Apartments | Multi-Family Land - Green Bay |
| Sale Status | Closed | Closed | Closed | Closed | Closed | Closed | Closed |
| Location | 2067 North Rapids Road | Woodridge Lane | Ridgeway Drive and Lebrun Street | 567 W. Johnson Street | S 7th Street | NEC of N. 13th Street & Erie Ave | 2500 University Avenue |
| | Manitowoc, Wisconsin | Port Washington, Wisconsin | De Pere, Wisconsin | Fond du Lac, Wisconsin | Sheboygan, Wisconsin | Sheboygan, Wisconsin | Green Bay, Wisconsin |
| Tax ID | 052-814-102-220.00 & 052-814-102-230.00 | 16-031-16-010.00 | ED-1164-R-32-2 | FDL-15-17-09-13-508-00 & FDL15-17-09-13-512-00 | 59281318390 & 59281303390 | 59281204581 | 21-1249-1-3 |
| **Sales Data** | | | | | | | |
| Date of Sale | 9/30/2025 | 6/27/2025 | 3/27/2025 | 10/7/2024 | 8/22/2024 | 7/1/2024 | 10/25/2023 |
| Sales Price | $159,000 | $299,900 | $325,000 | $250,000 | $1,025,000 | $239,000 | $455,000 |
| Price/Gross Square Foot | $1.41 | $4.26 | $1.31 | $2.99 | $5.91 | $8.82 | $5.69 |
| Price/Gross Acre | $61,437 | $185,697 | $57,279 | $130,344 | $257,244 | $384,244 | $247,686 |
| Grantor | Stanlea's III, LLC | Welton Development LLC | VHC, Inc. | Kailas Properties, LLC | Sheboygan Lakeview Property LLC | Urban Gateway LLC | Meter Family Investment Corp. |
| Grantee | DGI - Manitowoc 1, LLC | WDC Wisco Realty Investments 3 LLC | Gregg Slusarek | Howard Commons Holdings LLC | Malibu Apartments LLC | Gateway Apartments MM LLC | Bay City Lofts, LLC |
| Recording Number | 1288002 | 1172447 | 3090268 | 1200964 | 216779 | 2165626 | 3049375 |
| Property Rights Conveyed | Fee Simple | Fee Simple | Fee Simple | Fee Simple | Fee Simple | Fee Simple | Fee Simple |
| Financing | Conventional | Conventional | Conventional | Conventional | Conventional | Conventional | Conventional |
| Conditions of Sale | Typical | Typical | Typical | Typical | Typical | Typical | Typical |
| **Physical Characteristics** | | | | | | | |
| Usable Land Area (Acres) | 2.588 | 1.615 | 1.700 | 1.918 | 3.847 | 0.622 | 1.837 |
| Gross Land Area (Acres) | 2.588 | 1.615 | 5.674 | 1.918 | 3.985 | 0.622 | 1.837 |
| Proposed Units | N/A | 8 | 90 | N/A | 215 | 44 | 48 |
| Proposed Density (Acres/D.U.) | N/A | 5 | 16 | 13 | 53 | 71 | 22 |
| Zoning | B-3 | RM2 | RM-2, PUD | NMU | Mostly PUD (see comments) | Urban Industrial & Residential | NC |
| Flood Zone | Zone X | | Zone AE | Zone AE | | | Zone X |
| Topography | Level | | | Level | | Gently sloping | Level |
| Shape | Mostly rectangular | Irregular | Flag | Irregular | Irregular | Rectangular | Rectangular |
| Utilities | S,W,E,T,G | All utilities | S,W,E,T,G | S,W,E,T,G | All utilities | All utilities | S,W,G,E,T |
| Corner Exposure | Interior | Corner | Interior | Through Lot | Double Corner | Corner | Corner |



## COMPARABLE SALES MAP



## LAND COMPARABLE 1



### Property Identification

| | |
|---|---|
| **Property Name** | Manitowoc Dollar General Land |
| **Address** | 2067 North Rapids Road |
| **City County State Zip** | Manitowoc, Manitowoc County, Wisconsin 54220 |
| **MSA** | 0 |
| **Tax ID** | 052-814-102-220.00 & 052-814-102-230.00 |
| **VPA Property/Sale ID** | 11554741/1830578 |

### Transaction Data

| | |
|---|---|
| **Sale Status** | Closed |
| **Sale Date** | September 30, 2025 |
| **Grantor/Seller** | Stanlea's III, LLC |
| **Grantee/Buyer** | DGI - Manitowoc 1, LLC |
| **Recording Number** | 1288002 |
| **Property Rights** | Fee Simple |
| **Financing** | Conventional |
| **Conditions of Sale** | Typical |
| **Sales Price** | $159,000 |
| **Adjusted Sales Price** | $159,000 |

### Adjusted Sales Price Indicators

| | |
|---|---|
| **Price per Gross Acre** | $61,437 |
| **Price per Gross SF** | $1.41 |
| **Price per Usable Acre** | $61,437 |
| **Price per Usable SF** | $1.41 |

### Verification

| | |
|---|---|
| **Confirmed By** | Russell Cooper |
| **Confirmation Source** | Seller's Broker Jeffrey Check of Oak Park Realty, LLC |

### Property Description

| | |
|---|---|
| **Proposed Use** | Dollar General |
| **Gross Land Area** | 2.588 Acres/112,733 SF |
| **Usable Land Area** | 2.588 Acres/112,733 SF |
| **Visibility** | Good |
| **Corner/Interior** | Interior |
| **Shape** | Mostly rectangular |
| **Topography** | Level |
| **Utilities** | S,W,E,T,G |
| **Flood Hazard Zone** | Zone X |
| **% in Flood Hazard** | 0.00% |
| **Zoning Code** | B-3 |

### Remarks

Sale of two parcels totaling just under 2.60-acres, which were since combined, located along the east side of North Rapid Road in the northwest area of the City of Manitowoc for the development of a Dollar General. The development was approved shortly before the sale by the City of Manitowoc Common Council. The property is mostly rectangular in shape and had asphalt aprons in place for a double entrance at the time of sale within the right-of-way area.

© 2025 VALBRIDGE PROPERTY ADVISORS | MILWAUKEE



FORMER MIRRO PLANT SITE 9
LAND VALUATION

## LAND COMPARABLE 2



### Property Identification

| | |
|---|---|
| **Property Name** | Woodridge Condominium Land |
| **Address** | Woodridge Lane |
| **City County State Zip** | Port Washington, Ozaukee County, Wisconsin 53074 |
| **MSA** | Milwaukee-Waukesha |
| **Tax ID** | 16-031-16-010.00 |
| **VPA Property/Sale ID** | 11542089/1821864 |

### Transaction Data

| | |
|---|---|
| **Sale Status** | Closed |
| **Sale Date** | June 27, 2025 |
| **Grantor/Seller** | Welton Development LLC |
| **Grantee/Buyer** | WDC Wisco Realty Investments 3 LLC |
| **Recording Number** | 1172447 |
| **Property Rights** | Fee Simple |
| **Financing** | Conventional |
| **Conditions of Sale** | Typical |
| **Days on Market** | 23 |
| **Sales Price** | $299,900 |
| **Adjusted Sales Price** | $299,900 |

### Adjusted Sales Price Indicators

| | |
|---|---|
| **Price per Gross Acre** | $185,697 |
| **Price per Gross SF** | $4.26 |
| **Price per Usable Acre** | $185,697 |
| **Price per Usable SF** | $4.26 |
| **Price per Unit** | $37,488 |

### Verification

| | |
|---|---|
| **Confirmed By** | Matthew Gehrke |
| **Confirmation Source** | Listing Broker Tina Goodman of Re/Max |

### Property Description

| | |
|---|---|
| **Gross Land Area** | 1.615 Acres/70,349 SF |
| **Usable Land Area** | 1.615 Acres/70,349 SF |
| **Proposed Units** | 8 |
| **Density (Units/Acre)** | 4.95 |
| **Street Access** | Average |
| **Visibility** | Average |
| **Shape** | Irregular |
| **Utilities** | All utilities |
| **Zoning Code** | RM2 |

### Remarks

This parcel is located at the entrance to the Woodridge I Condominium development at the northeast intersection of E. Sauk Road and Woodridge Lane. The listing brokers comments in their listing included the following "Great Opportunity for development in a prime location in the City of Port Washington. This vacant lot with 1.615 acres is currently zoned for multi-family and can be changed to single family." An eight-unit CBRF development was proposed for the site. The building was designed to be similar to the residential buildings in the same development. Based on the discussion with the listing broker, there were prior plans in place for the lot to be developed with far more than eight units, but the exact number of units that the site could have supported and been approved for was unknown (but it was understood to be materially more than eight).

© 2025 VALBRIDGE PROPERTY ADVISORS | MILWAUKEE



## LAND COMPARABLE 3

### Property Identification

| | |
|---|---|
| **Property Name** | Ridgeway Drive Multi-family Land |
| **Address** | Ridgeway Drive and Lebrun Street |
| **City County State Zip** | De Pere, Brown County, Wisconsin 54115 |
| **MSA** | Green Bay |
| **Tax ID** | ED-1164-R-32-2 |
| **VPA Property/Sale ID** | 11554357/1830322 |

### Transaction Data

| | |
|---|---|
| **Sale Status** | Closed |
| **Sale Date** | March 27, 2025 |
| **Grantor/Seller** | VHC, Inc. |
| **Grantee/Buyer** | Gregg Slusarek |
| **Recording Number** | 3090268 |
| **Property Rights** | Fee Simple |
| **Financing** | Conventional |
| **Conditions of Sale** | Typical |
| **Days on Market** | 232 |
| **Sales Price** | $325,000 |
| **Adjusted Sales Price** | $325,000 |

### Adjusted Sales Price Indicators

| | |
|---|---|
| **Price per Gross Acre** | $57,279 |
| **Price per Gross SF** | $1.31 |
| **Price per Usable Acre** | $191,176 |
| **Price per Usable SF** | $4.39 |
| **Price per Unit** | $3,611 |

### Verification

| | |
|---|---|
| **Confirmed By** | Russell Cooper |
| **Confirmation Source** | Multiple Listing Service, Wisconsin Department of Revenue, Meeting Minutes |



### Property Description

| | |
|---|---|
| **Gross Land Area** | 5.674 Acres/247,159 SF |
| **Usable Land Area** | 1.700 Acres/74,052 SF |
| **Proposed Units** | 90 |
| **Density (Units/Acre)** | 15.86 |
| **Street Access** | Via Lebrun Street |
| **Corner/Interior** | Interior |
| **Shape** | Flag |
| **Utilities** | S,W,E,T,G |
| **Flood Hazard Zone** | Zone AE |
| **% in Flood Hazard** | 100.00% |
| **Zoning Code** | RM-2, PUD Multi- 7 + units |

### Remarks

Sale of a 5.67-acre multi-family development site located along the south side of Lebrun Street in the City of De Pere, Brown County. The property is located along the south side of Lebrun Street, between East River Drive and McCastlen Street, within the City of De Pere. Immediately south is the River Park Apartments and immediately east are the Charleston Pointe Apartments. The northern boundary of the city is located at Lebrun Street, with the Village of Allouez being immediately north. Access to the property is provided via easement from Ridgeway Drive to the south through a neighboring multi-family property and from Lebrun Street. However, Lebrun Street was not built to municipal road standards where the subject is located and substantial road improvement would be required in order to develop the property to it's maximum potential. The City of De Pere has been in discussions with the Village of Allouez since August of 2025 to extend LeBrun Street for the development proposed by the buyer. The City has proposed to extend the roadway, at their own expense, 500 feet east of McCastlen Street. As of the date of this write-up, the city was still in negotiations with the Village of Allouez. According to Village documents, the developer will need to extend a private drive if an agreement is not made.

© 2025 VALBRIDGE PROPERTY ADVISORS | MILWAUKEE



The buyer is Slusarek Construction, Inc., a well-established residential developer in the area that recently delivered the River Run Apartments just north in the Village of Bellevue. The proposed development, Norfield Apartments, is for 6, 2-story garden apartment buildings with a total of 90 units (15 units per building). All of the units will be 2 bedroom. Although the access element will likely be taken care of by the City of De Pere, there are still significant development issues due to the floodplain element of the subject. All but 1.70 acres of the site are within the 100-year floodplain while the remainder is in the 500-year floodplain. Per plans provided by the developer, the entire site will be used.

Shortly after sale, the property was rezoned from RM-2 with a PDD overlay to RM-2 (June of 2025). Record of a development agreement in place was not found prior to the date of sale. Despite multiple attempts, we were unable to reach the broker involved with this sale.

![Valbridge Property Advisors]

## LAND COMPARABLE 4



### Property Identification

| | |
|---|---|
| **Property Name** | W. Johnson Street Development Land |
| **Address** | 567 W. Johnson Street |
| **City County State Zip** | Fond du Lac, Fond du Lac County, Wisconsin 54935 |
| **MSA** | 0 |
| **Tax ID** | FDL-15-17-09-13-508-00 & FDL15-17-09-13-512-00 |
| **VPA Property/Sale ID** | 11554410/1830370 |

### Transaction Data

| | |
|---|---|
| **Sale Status** | Closed |
| **Sale Date** | October 7, 2024 |
| **Grantor/Seller** | Kailas Properties, LLC |
| **Grantee/Buyer** | Howard Commons Holdings LLC |
| **Recording Number** | 1200964 |
| **Property Rights** | Fee Simple |
| **Financing** | Conventional |
| **Conditions of Sale** | Typical |
| **Days on Market** | 559 |
| **Sales Price** | $250,000 |
| **Adjusted Sales Price** | $250,000 |

### Adjusted Sales Price Indicators

| | |
|---|---|
| **Price per Gross Acre** | $130,344 |
| **Price per Gross SF** | $2.99 |
| **Price per Usable Acre** | $130,344 |
| **Price per Usable SF** | $2.99 |

### Verification

| | |
|---|---|
| **Confirmed By** | Russell Cooper |
| **Confirmation Source** | Buyer / Seller Broker Steven Krueger of Adashun Jones, Inc. |

### Property Description

| | |
|---|---|
| **Gross Land Area** | 1.918 Acres/83,548 SF |
| **Usable Land Area** | 1.918 Acres/83,548 SF |
| **Visibility** | Good |
| **Corner/Interior** | Through Lot |
| **Shape** | Irregular |
| **Topography** | Level |
| **Utilities** | S,W,E,T,G |
| **Flood Hazard Zone** | Zone AE |
| **% in Flood Hazard** | 100.00% |
| **Zoning Code** | NMU Neighborhood Mixed Use |

### Remarks

Sale of two parcels located at the northwest corner of W. Johnson Street and N. Seymour Street in the City of Fond Du Lac, Fond Du Lac County. The property is comprised of a smaller parcel (0.285 acres) with direct frontage on W. Johnson Street (USH 45) with traffic counts between 24,600 and 26,000 vehicles per day and a larger, approximately 1.6330-acre abutting parcel to the north with narrow access from N. Seymour Street. The listing materials note that the seller will only sell both parcels and that double access is well suited for multi-family use. The property is zoned NMU (Neighborhood Mixed Use) and could support a mix of commercial and residential uses. Ultimately, the property was purchased for a restaurant with plans to use the rear land area for parking. The broker involved with the sale indicated that there were other interested parties for commercially-oriented uses. However, he also noted that the site would have been able to support 3 8-unit multi-family buildings. The property was listed for $349,000 and sold for a total of $375,000 after 559 days on the market. The property was purchased by Howard Commons Holdings LLC.



# LAND COMPARABLE 5

## Property Identification

| | |
|---|---|
| Property Name | Malibu Apartments Site |
| Address | S 7th Street |
| City County State Zip | Sheboygan, Sheboygan County, Wisconsin 53081 |
| MSA | Sheboygan |
| Tax ID | 59281318390 & 59281303390 |
| VPA Property/Sale ID | 11499712/1792986 |

## Transaction Data

| | |
|---|---|
| Sale Status | Closed |
| Sale Date | August 22, 2024 |
| Grantor/Seller | Sheboygan Lakeview Property LLC |
| Grantee/Buyer | Malibu Apartments LLC |
| Recording Number | 216779 |
| Property Rights | Fee Simple |
| Financing | Conventional |
| Conditions of Sale | Typical |
| Sales Price | $1,025,000 |
| Adjusted Sales Price | $1,025,000 |

## Adjusted Sales Price Indicators

| | |
|---|---|
| Price per Gross Acre | $257,244 |
| Price per Gross SF | $5.91 |
| Price per Usable Acre | $266,455 |
| Price per Usable SF | $6.12 |
| Price per Unit | $4,881 |

## Verification

| | |
|---|---|
| Confirmed By | Matthew Gehrke |
| Confirmation Source | Buyer's Broker Alicia Hurst Alexander of Forest Green Realty, City of Sheboygan, Sheboygan County & Published Reports |



## Property Description

| | |
|---|---|
| Gross Land Area | 3.985 Acres/173,567 SF |
| Usable Land Area | 3.847 Acres/167,567 SF |
| Proposed Units | 215 |
| Density (Units/Acre) | 53.96 |
| Street Access | Average |
| Visibility | Average |
| Corner/Interior | Double Corner |
| Shape | Irregular |
| Utilities | All utilities |
| Zoning Code | Mostly PUD (see comments) |

## Remarks

This site is located on the shore of Lake Michigan, at the southeast corner of Georgia Avenue and S 7th Street and the northeast corner of Clara Avenue and S. 7th Street. The development site is comprised of two parcels, with the smaller (6,000 SF) parcel being zoned Neighborhood Residential - 6 District and the larger (167,567 SF) parcel being zoned (planned) Unit Development. While the Sheboygan Kite Beach is located to the east of this property, the sale comp is generally considered to be located on Lake Michigan. The listing stated that the property had 450 feet of direct lake frontage and that the price lake frontage site had conceptual plans for market rate apartments. This property was purchased for the development of the Malibu Apartments, which published reports detail as the following:

© 2025 VALBRIDGE PROPERTY ADVISORS | MILWAUKEE



This site has been vacant since 2003 when Optenberg Iron Works closed their lakefront plant. According to plans submitted to the City of Sheboygan, the five-story building would have 210 apartment units and 3,758-square-feet of commercial restaurant space. Plans include a lakefront pool and a fitness center with lake views. Residents of the Malibu Apartments will have access to surf boards, paddle boards and kayaks according to the developer. This has been described as a $40 million development. The site was previously proposed to be developed with a lesser number of units, but those plans never moved forward. Additionally, there had been contaminated soil concerns in the past. Published reports stated that the developer was willing to clean up the polluted site & the listing broker stated that they had a case closure letter, which requires monitoring and when disturbing the site there were other requirements. The development includes two buildings, with the larger/southern building (157 units along with the commercial restaurant) planned to be constructed first and the northern building (58 units) to be constructed thereafter.

## LAND COMPARABLE 6

### Property Identification

| | |
|---|---|
| **Property Name** | Gateway Apartments |
| **Address** | NEC of N. 13th Street & Erie Ave |
| **City County State Zip** | Sheboygan, Sheboygan County, Wisconsin 53081 |
| **MSA** | Sheboygan |
| **Tax ID** | 59281204581 |
| **VPA Property/Sale ID** | 11499601/1792891 |

### Transaction Data

| | |
|---|---|
| **Sale Status** | Closed |
| **Sale Date** | July 1, 2024 |
| **Grantor/Seller** | Urban Gateway LLC |
| **Grantee/Buyer** | Gateway Apartments MM LLC |
| **Recording Number** | 2165626 |
| **Property Rights** | Fee Simple |
| **Financing** | Conventional |
| **Conditions of Sale** | Typical |
| **Sales Price** | $239,000 |
| **Adjusted Sales Price** | $239,000 |

### Adjusted Sales Price Indicators

| | |
|---|---|
| **Price per Gross Acre** | $384,244 |
| **Price per Gross SF** | $8.82 |
| **Price per Usable Acre** | $384,244 |
| **Price per Usable SF** | $8.82 |
| **Price per Unit** | $5,432 |

### Verification

| | |
|---|---|
| **Confirmed By** | Matthew Gehrke |
| **Confirmation Source** | Listing Broker Dane Checolinski of NAI Phefferle |



### Property Description

| | |
|---|---|
| **Gross Land Area** | 0.622 Acres/27,094 SF |
| **Usable Land Area** | 0.622 Acres/27,094 SF |
| **Proposed Units** | 44 |
| **Density (Units/Acre)** | 70.74 |
| **Street Access** | Average |
| **Visibility** | Average |
| **Corner/Interior** | Corner |
| **Shape** | Rectangular |
| **Topography** | Gently sloping |
| **Utilities** | All utilities |
| **Zoning Code** | Urban Industrial & Residential |

### Remarks

This site was marketed as a commercial, multi-family and/or mixed-use development site. The listing broker stated that there were two other very interested parties that would have developed the site with a commercial use. The buyer will construct a 44-unit Section 42 multi-family building on the site and is also receiving financial assistance from the City of Sheboygan. This site was previous improved with four residential properties, but they reached the end of their lives and were demoed to form this larger single (re)development site. The Sheboygan Sun provided the following information on the development:

The four-story complex, which is a project of Partners for Community Development, will consist of three floors of apartments with 35 one-bedroom, four two-bedroom and five three-bedroom units, along with a lower level parking garage. In all, the building will total 57,000 square feet. The indoor parking will consist of 32 stalls, with an additional 13 spaces located outside. The entrance to the indoor parking will be off of 13th Street near the alley, while the entrance to the outdoor parking will be directly off the alley. The construction budget is estimated at $9,850,000. Since this is designated as an affordable housing development, the City of Sheboygan will be contributing American Rescue Plan Act funds it received from the federal government toward the project.



## LAND COMPARABLE 7

### Property Identification

| | |
|---|---|
| **Property Name** | Multi-Family Land - Green Bay |
| **Address** | 2500 University Avenue |
| **City County State Zip** | Green Bay, Brown County, Wisconsin 54303 |
| **MSA** | Green Bay |
| **Tax ID** | 21-1249-1-3 |
| **VPA Property/Sale ID** | 11443461/1755799 |

### Transaction Data

| | |
|---|---|
| **Sale Status** | Closed |
| **Sale Date** | October 25, 2023 |
| **Grantor/Seller** | Meter Family Investment Corp. |
| **Grantee/Buyer** | Bay City Lofts, LLC |
| **Recording Number** | 3049375 |
| **Property Rights** | Fee Simple |
| **Financing** | Conventional |
| **Conditions of Sale** | Typical |
| **Sales Price** | $455,000 |
| **Adjusted Sales Price** | $455,000 |

### Adjusted Sales Price Indicators

| | |
|---|---|
| **Price per Gross Acre** | $247,686 |
| **Price per Gross SF** | $5.69 |
| **Price per Usable Acre** | $247,686 |
| **Price per Usable SF** | $5.69 |
| **Price per Unit** | $9,479 |

### Verification

| | |
|---|---|
| **Confirmed By** | Robert R. Gustafson |
| **Confirmation Source** | DOR, 3rd party sources (Appraiser, Greg Fenendael) |



### Property Description

| | |
|---|---|
| **Gross Land Area** | 1.837 Acres/80,020 SF |
| **Usable Land Area** | 1.837 Acres/80,020 SF |
| **Proposed Units** | 48 |
| **Density (Units/Acre)** | 26.13 |
| **Visibility** | Average |
| **Corner/Interior** | Corner |
| **Shape** | Rectangular |
| **Topography** | Level |
| **Utilities** | S,W,G,E,T |
| **Flood Hazard Zone** | Zone X |
| **Zoning Code** | NC Neighborhood Commercial |

### Remarks

Sale of a 1.84-acre parcel situated in the southeast corner of the intersection of University Avenue and Rothe Street in the south quadrant of the Interstate 43 and University Avenue interchange, about one mile east of downtown Green Bay, in north central Brown County, Wisconsin. The vacant property, which was previously part of the parking field for a closed Shopko store, is basically level and open. All municipal utilities are available to the property. A total of 48 units are planned by the buyer/developer, an entity related to Gorman & Associates, planned for a 4-story affordable apartment development. The project is planned for 40 apartments specifically for households that earn less than 60% of Brown County's median income, with some units affordable for households that earn poverty-level wages; 8 units would be available to anyone at market rate rents.

© 2025 VALBRIDGE PROPERTY ADVISORS | MILWAUKEE



## Land Sales Comparison Analysis

When necessary, adjustments were made for differences in various elements of comparison, including property rights conveyed, financing terms, conditions of sale, expenditures made immediately after purchase, market conditions, location, and other physical characteristics. If the element in comparison is considered superior to that of the subject, a negative adjustment was applied. Conversely, a positive adjustment was applied if inferior. A summary of the elements of comparison follows.

## Transaction Adjustments

Transaction adjustments include: (1) real property rights conveyed, (2) financing terms, (3) conditions of sale, and (4) expenditures made immediately after purchase. These items, which are applied prior to the market conditions and property adjustments, are discussed as follows:

### Real Property Rights Conveyed

Real property rights conveyed influence sales prices and must be considered when analyzing a sale comparable. The property rights appraised reflect the fee simple interest. All of the sale comparables conveyed the same interest; therefore, no adjustments were required.

### Financing Terms

The transaction price of one property may differ from that of an identical property due to different financial arrangements. Sales involving financing terms that are not at or near market terms require adjustments for cash equivalency to reflect typical market terms. A cash equivalency procedure discounts the atypical mortgage terms to provide an indication of value at cash equivalent terms. All of the sale comparables involved typical market terms by which the sellers received cash or its equivalent and the buyers paid cash or tendered typical down payments and obtained conventional financing at market terms for the balance. Therefore, no adjustments for this category were required.

### Conditions of Sale

When the conditions of sale are atypical, the result may be a price that is higher or lower than that of a normal transaction. Adjustments for conditions of sale usually reflect the motivations of either a buyer or a seller who is under duress to complete the transaction. Another more typical condition of sale involves the downward adjustment required to a comparable property's for-sale listing price, which usually reflects the upper limit of value. No adjustments for atypical conditions or for-sale listings were warranted.

### Expenditures Made Immediately After Purchase

A knowledgeable buyer considers expenditures required upon purchase of a property, as these costs affect the price the buyer agrees to pay. Such expenditures may include: costs to demolish and remove any portion of the improvements, costs to petition for a zoning change, and/or costs to remediate environmental contamination.

The relevant figure is not the actual cost incurred, but the cost anticipated by both the buyer and seller. Unless the sales involved expenditures anticipated upon the purchase date, no adjustments to the comparable sales are required for this element of comparison. The parties to these transactions did not anticipate expenditures were required immediately after purchase; therefore, no adjustments were warranted.



## Market Conditions Adjustment

Market conditions change over time because of inflation, deflation, fluctuations in supply and demand, or other factors. Changing market conditions may create a need for adjustment to comparable sale transactions completed during periods of dissimilar market conditions.

Discussions with market participants and a review of market data indicated overall market conditions for vacant land properties have been improving with recent transactions confirming this trend. With respect to the highest and best use conclusion for the subject property, we looked primarily to multi-family rental growth over the relevant time period.

The relevant time period is from the date of the oldest sale, October of 2023, through the effective date of value or the last 2.10 years. The average rental rate growth was 4.54% within the City of Manitowoc and 4.78% within Manitowoc County over the last 2 years. Accordingly, we consider a growth rate of 5.0% as reasonable for our analysis.

## Property Adjustments

Property adjustments are usually expressed quantitatively as percentages or dollar amounts that reflect the differences in value attributable to the various characteristics of the property. In some instances, however, qualitative adjustments are used. These adjustments are based on locational and physical characteristics and are applied after transaction and market conditions adjustments. The reasoning for the property adjustments made to each sale comparable follows. The discussion analyzes each adjustment category deemed applicable to the subject property.

### Location

Location adjustments may be required when the locational characteristics of a comparable are different from those of the subject. These characteristics can include general neighborhood characteristics, proximity to major thoroughfares, proximity to employments centers and amenities, neighboring properties, and accessibility.

The subject is located within the Downtown Area of the City of Manitowoc; regionally, the city is somewhat isolated from the major metropolitan areas and significant adjustments were required to most of the sales due to their locations within larger cities or proximity to larger cities. For our adjustments, we looked to average rental rates within each city as compared to the City of Manitowoc as a basis. This resulted in the following adjustments:

Sale 1
an upward adjustment of 10.0%
Sale 2
a downward adjustment of 20.0%
Sale 3
a downward adjustment of 15.0%
Sale 4
a downward adjustment of 10.0%
Sale 5
a downward adjustment of 15.0%
Sale 6
a downward adjustment of 15.0%

© 2025 VALBRIDGE PROPERTY ADVISORS | MILWAUKEE



Sale 7
a downward adjustment of 15.0%

<u>Size</u>

The size adjustment addresses variance in the physical size of the comparables and that of the subject, as a larger parcel typically commands a lower price per unit than a smaller parcel. This inverse relationship is due, in part, to the principle of "economies of scale."

The subject site consists of 3.720 acres of land and the comparables range from 0.622 to 5.674 acres. An approximate adjustment factor of 5.0% per doubling was applied to the comparables, resulting in adjustments ranging from -10.0% to 5.0%. These adjustments are summarized below:

Sale 1
no adjustment
Sale 2
a downward adjustment of 5.0%
Sale 3
an upward adjustment of 5.0%
Sale 4
a downward adjustment of 5.0%
Sale 5
no adjustment
Sale 6
a downward adjustment of 10.0%
Sale 7
a downward adjustment of 5.0%

<u>Shape/Depth</u>

Sites with an irregular shape may limit development options, including building placement and density. The subject site consists of a mostly rectangular-shaped tract, which is suitable for development. Sales 2 and 4 feature irregular shapes that reduce the functionality for development and required upward adjustments as follows:

Sale 1
no adjustment
Sale 2
an upward adjustment of 5.0%
Sale 3
no adjustment
Sale 4
an upward adjustment of 5.0%
Sale 5
no adjustment
Sale 6
no adjustment
Sale 7
no adjustment



## Corner Exposure

Tracts with major corner exposure typically command higher prices in the marketplace, as opposed to mid-block or interior locations. For retail users, the hard corner of an intersection may be marketed to a fairly large pool of small users (e.g. service stations, fast food restaurants, etc.) for sale.

The subject's location with four corners and significant exposure is a positive amenity for commercial uses (such as for a mixed use development) and increases functionality for multi-family development in terms of ingress and egress. Sales 1, 2 and 3 had lesser exposure and inferior ingress and egress for development and required the following adjustments:

Sale 1
an upward adjustment of 5.0%
Sale 2
an upward adjustment of 5.0%
Sale 3
an upward adjustment of 5.0%
Sale 4
no adjustment
Sale 5
no adjustment
Sale 6
no adjustment
Sale 7
 no adjustment

## Utilities

The subject site had public utilities available as did all the comparables at the time of sale. Therefore, no adjustments were warranted for this category.

## Topography

The sales featured similar topography to that of the subject with most being level and two having a slight slope. Accordingly, no adjustments were applied for this element of comparison.

## Floodplain

A property's location within flood zone areas is typically a negative factor due to the increased costs of raising improvements up out of the floodplain, as well as the potential for additional insurance costs associated with improvements. The subject site is not located within the floodplain and nor are the sales with the exception of Sales 3 and 4. These sales each included significant floodplain areas and required significant upward adjustments as summarized below. It is difficult to estimate the increased cost due to the floodplain as this depends highly on the attributes of each property (level below base flood elevation, regulatory standards, type of development, layout of floodplain, etc.). As such, we have considered the reliability of these adjustments in our overall reconciliation.

Sale 1
no adjustment
Sale 2
no adjustment
Sale 3



an upward adjustment of 25.0%
Sale 4
an upward adjustment of 25.0%
Sale 5
no adjustment
Sale 6
no adjustment
Sale 7
no adjustment

## Zoning

The highest and best use of sale comparables should be very similar to that of the subject property. When comparables with the same zoning as the subject are lacking or scarce, parcels with slightly different zoning, but a highest and use similar to that of the subject may be used as comparables. These comparables may require an adjustment for differences in utility if the market supports such adjustment. With respect to the subject's zoning and that of the sales, we do not consider there to be a material difference in zoning in terms of value and no adjustments were applied.

## Density

Density is a very significant factor in terms of price per square foot for development parcels such as the subject and the sales. The number of units per land area is often how developers will determine a reasonable price to pay for a development site as such is an input to the costs of a given development and therefore impacts profitability. We note that Sale 1 is a commercial site and we have not adjusted for density as this is not considered applicable. Sale 4 was purchased for commercial purposes, but an estimate of unit count that the site could support was provided by a broker involved with the sale and we have utilized this in our adjustment. For these adjustments, we looked to the sales prices per unit of the sales and adjusted the sales roughly on this basis. The density adjustments are summarized below:

Sale 1
no adjustment
Sale 2
an upward adjustment of 15.0%
Sale 3
no adjustment
Sale 4
an upward adjustment of 10.0%
Sale 5
a downward adjustment of 30.0%
Sale 6
a downward adjustment of 35.0%
Sale 7
a downward adjustment of 10.0%



Environmental Issues

The subject property has a history of environmental contamination as well as ongoing contamination issues that negatively impact market value. The southern area of the site has been remediated to the extent that it can be developed. However, this area still comes with additional developmental requirements such as continued monitoring and maintenance of the cap as well as monitoring / reporting obligations that are seen as burdensome to a developer / buyer. In addition, the contamination disallows the removal of the existing foundation system; although the system can be reused in a development, this complicates the process in terms of soft costs, increases risk and precludes the development of below-grade space. With respect to the availability of funds for the capping of the northern area of the subject site, we have treated the subject northern area as remediated for the purposes of our analysis and will apply a direct deduction from our As Remediated value conclusion to account for the costs, risks and anticipated reward for obtaining public funding for its remediation hereafter.

With respect to the above, we consider a downward adjustment of 25.0% to all of the sales, with the exception of Sale 5, to be reasonable for the limitations of the site due to the historic contamination as well as to account for the perceived risk and market hesitancy associated with contamination. Sale 5 featured a similar contamination issue as that on the subject; the site is understood to be remediated but does not have the same functional issues as the subject with respect to the foundation system and we have applied a lesser downward adjustment of 15.0% to Sale 5. The adjustments are summarized below:

Sale 1
a downward adjustment of 25.0%
Sale 2
a downward adjustment of 25.0%
Sale 3
a downward adjustment of 25.0%
Sale 4
a downward adjustment of 15.0%
Sale 5
a downward adjustment of 25.0%
Sale 6
a downward adjustment of 25.0%
Sale 7
a downward adjustment of 25.0%

## Summary of Adjustments

A summary of the adjustments made to the sale comparables is presented in the following table:



## LAND SALES ADJUSTMENT GRID

| | Subject | Sale # 1 | Sale # 2 | Sale # 3 | Sale # 4 | Sale # 5 | Sale # 6 | Sale # 7 |
|---|---|---|---|---|---|---|---|---|
| Sale ID | | 1830578 | 1821864 | 1830322 | 1830370 | 1792986 | 1792891 | 1755799 |
| Date of Value & Sale | November-25 | September-25 | June-25 | March-25 | October-24 | August-24 | July-24 | October-23 |
| Unadjusted Sales Price | | April-35 | $299,900 | $325,000 | $250,000 | $1,025,000 | $239,000 | $455,000 |
| Gross Acres | 3.720 | 2.588 | 1.615 | 5.674 | 1.918 | 3.985 | 0.622 | 1.837 |
| **Unadjusted Sales Price per Gross Sq. Ft.** | | **$1.41** | **$4.26** | **$1.31** | **$2.99** | **$5.91** | **$8.82** | **$5.69** |
| **Transactional Adjustments** | | | | | | | | |
| **Property Rights Conveyed** | *Fee Simple* | *Fee Simple* | *Fee Simple* | *Fee Simple* | *Fee Simple* | *Fee Simple* | *Fee Simple* | *Fee Simple* |
| Adjusted Sales Price | | $1.41 | $4.26 | $1.31 | $2.99 | $5.91 | $8.82 | $5.69 |
| **Financing Terms** | *Cash to Seller* | *Conventional* | *Conventional* | *Conventional* | *Conventional* | *Conventional* | *Conventional* | *Conventional* |
| Adjusted Sales Price | | $1.41 | $4.26 | $1.31 | $2.99 | $5.91 | $8.82 | $5.69 |
| **Conditions of Sale** | *Typical* | *Typical* | *Typical* | *Typical* | *Typical* | *Typical* | *Typical* | *Typical* |
| Adjusted Sales Price | | $1.41 | $4.26 | $1.31 | $2.99 | $5.91 | $8.82 | $5.69 |
| **Expenditures after Sale** | | | | | | | | |
| **Adjusted Sales Price** | | **$1.41** | **$4.26** | **$1.31** | **$2.99** | **$5.91** | **$8.82** | **$5.69** |
| **Market Conditions Adjustments** | | | | | | | | |
| **Elapsed Time from Date of Value** | | *0.16 years* | *0.42 years* | *0.67 years* | *1.14 years* | *1.27 years* | *1.41 years* | *2.10 years* |
| Market Trend Through | November-25 | 0.8% | 2.1% | 3.4% | 5.7% | 6.3% | 7.1% | 10.5% |
| **Analyzed Sales Price** | | **$1.42** | **$4.35** | **$1.36** | **$3.16** | **$6.28** | **$9.44** | **$6.28** |
| **Physical Adjustments** | | | | | | | | |
| **Location** | *1512 Washington Street* | *2067 North Rapids Road* | *Woodridge Lane* | *Ridgeway Drive and Lebrun Street* | *567 W. Johnson Street* | *S 7th Street* | *NEC of N. 13th Street & Erie Ave* | *2500 University Avenue* |
| | *Manitowoc, Wisconsin* | *Manitowoc, Wisconsin* | *Port Washington, Wisconsin* | *De Pere, Wisconsin* | *Fond du Lac, Wisconsin* | *Sheboygan, Wisconsin* | *Sheboygan, Wisconsin* | *Green Bay, Wisconsin* |
| Adjustment | | 10.0% | -20.0% | -15.0% | -10.0% | -15.0% | -15.0% | -15.0% |
| **Size** | *3.720 acres* | *2.588 acres* | *1.615 acres* | *5.674 acres* | *1.92 acres* | *3.985 acres* | *0.622 acres* | *1.837 acres* |
| Adjustment | | - | -5.0% | 5.0% | -5.0% | - | -10.0% | -5.0% |
| **Shape/Depth** | *Rectangular* | *Mostly rectangular* | *Irregular* | *Flag* | *Irregular* | *Irregular* | *Rectangular* | *Rectangular* |
| Adjustment | | - | 5.0% | - | 5.0% | - | - | - |
| **Corner Exposure** | *4-Corners* | *Interior* | *Corner* | *Interior* | *Through Lot* | *Double Corner* | *Corner* | *Corner* |
| Adjustment | | 5.0% | 5.0% | 5.0% | - | - | - | - |
| **Utilities** | *S,W,E,T,G* | *S,W,E,T,G* | *S,W,E,T,G* | *S,W,E,T,G* | *S,W,E,T,G* | *S,W,E,T,G* | *S,W,E,T,G* | *S,W,G,E,T* |
| Adjustment | | - | - | - | - | - | - | - |
| **Topography** | *Level* | *Level* | *Gently Sloping* | *Level* | *Level* | *Level* | *Gently sloping* | *Level* |
| Adjustment | | - | - | - | - | - | - | - |
| **Floodplain** | *Zone X* | *Zone X* | *Zone X* | *Zone AE* | *Zone AE* | *Zone X* | *Zone X* | *Zone X* |
| Adjustment | | - | - | 25.0% | 25.0% | - | - | - |
| **Zoning** | *R-6* | *B-3* | *RM2* | *RM-2, PUD* | *NMU* | *PUD (see comments)* | *:trial & Residential* | *NC* |
| Adjustment | | - | - | - | - | - | - | - |
| **Density** | *15.86 DU/Acre* | *N/A* | *4.97 DU/Acre* | *15.87 DU/Acre* | *12.57 DU/Acre* | *52.63 DU/Acre* | *70.74 DU/Acre* | *21.77 DU/Acre* |
| Adjustment | | - | 15.0% | - | 10.0% | -30.0% | -35.0% | -10.0% |
| **Environmental Issues** | *Contamination History* | *None* | *None* | *None* | *None* | *Contamination History* | *None* | *None* |
| Adjustment | | -25.0% | -25.0% | -25.0% | -25.0% | -15.0% | -25.0% | -25.0% |
| Net Physical Adjustment | | -10.0% | -25.0% | -5.0% | - | -60.0% | -85.0% | -55.0% |
| **Adjusted Sales Price per Gross Square Foot** | | **$1.28** | **$3.26** | **$1.29** | **$3.16** | **$2.51** | **$1.42** | **$2.83** |

© 2025 VALBRIDGE PROPERTY ADVISORS | MILWAUKEE



## Conclusion

The land comparables were adjusted based on pertinent elements of comparison with the unadjusted and adjusted unit sales prices presented in the following table:

### Land Sale Statistics

| Metric | Unadjusted | Analyzed | Adjusted |
|---|---|---|---|
| Min. Sales Price per Gross Square Foot | $1.31 | $1.36 | $1.29 |
| Max. Sales Price per Gross Square Foot | $8.82 | $9.44 | $3.26 |
| Median Sales Price per Gross Square Foot | $4.26 | $5.32 | $2.67 |
| Mean Sales Price per Gross Square Foot | $4.34 | $5.15 | $2.41 |

We note that, for the purposes of this analysis, we have first concluded to a price per square foot As Remediated, assuming the northern area of the site has been capped for green space. Thereafter, we will apply a deduction for the remediation outstanding to arrive at our As Is value conclusion.

Before adjustment, the sales range from $1.31 to $8.82 per square foot with a median of $4.26 per square foot and an average of $4.34 per square foot. After adjustments, the sales present a much tighter range from $1.29 to $3.26 per square foot with a median of $2.67 per square foot and an average of $2.41 per square foot.

We note that there is a relatively large spread between the adjusted unit prices, with Sales 1, 3 and 6 at the lower end of the range between $1.28 and $1.42 per square foot. Sale 1 is a commercial sale, located at the west outskirts of the City of Manitowoc in a more suburban location. Sale 3 involves a multi-family tract that is located entirely within the 100-year and 500-year floodplain and we may not have adjusted sufficiently for the additional cost of development on such a property. Sale 6 required a substantial amount of adjustment on a net basis and is deemed the least reliable of the sales due to this. Accordingly, we consider Sales 1 and 3 to indicate a lower bound for the subject between $1.28 and $1.29 per square foot.

On the other hand, Sales 2 and 4 represent the upper end of the range between $3.16 and $3.26 per square foot. Sale 2 is located in Port Washington, which is a far superior market with strong links to the City of Milwaukee. Sale 4 is a commercial site with nearly three times the traffic volume as that of the subject. Our location adjustment may not have fully accounted for these locational attributes and we consider these sales to indicate an upper bound for the subject. This provides a high-confidence range from $1.50 to $3.00 per square foot for the subject, the mid-point of which is $2.25 per square foot.

Whereas Sales 5 and 7 fall within this range with adjusted unit prices between $2.51 and $2.83 per square foot. However, these sales still required substantial adjustment on a net basis and are deemed less reliable. Although presenting a broad range, the sales requiring the least net adjustment were Sales 1, 2, 3 and 4, which range from $1.28 to $3.26 per square foot with a median and average of $2.23 per square foot and $2.25 per square foot, respectively.

© 2025 VALBRIDGE PROPERTY ADVISORS | MILWAUKEE



With consideration to the location of the subject property, being regionally inferior to all of the sales, aside from Sale 1, and having a history of contamination, we consider a price per square foot of $2.25 per square foot to be reasonable for the subject property. This falls slightly below the median and average of the adjusted sales and near the average of the sales requiring the least net adjustment.

However, before concluding to a final unit price, we look to the following additional data including similar-sized commercial land sales within the area of the subject and active listings within the City of Manitowoc. In addition, we look to a test of reasonableness utilizing price per proposed dwelling unit on the sales with proposed unit counts available.

### Additional Sales Data – Commercial Land Sales

The following commercial land sales were considered in our overall reconciliation. These sales are of a similar size to the subject property and were purchased for commercial use. We included two commercial sales in our primary sales data set due to their proximity in the case of Sale 1 and the potential for multi-family development in the case of Sale 4. These sales were not as proximate to the subject as Sale 1 and did not have a multi-family element like Sale 4:

**Additional Commercial Sales**

| Sold Date | Sold Price | Address | Municipality | Acres | $/SF |
|---|---|---|---|---|---|
| 11/26/2025 | $307,860 | 2350 Dickenson Road | Ledgeview | 2.03 | $3.48 |
| 10/17/2025 | $300,000 | Mid Valley Drive | Lawrence | 3.40 | $2.03 |
| 7/1/2025 | $126,847 | 1133 Province Terrace | Menasha | 1.46 | $1.99 |
| 2/26/2025 | $700,000 | S. Business Drive | Sheboygan | 1.97 | $8.16 |
| 11/1/2024 | $625,000 | Enterprise Dr | Sheboygan | 3.29 | $4.36 |
| 9/12/2024 | $325,000 | N. Main St | Sheboygan Falls | 4.73 | $1.58 |
| 8/17/2024 | $475,500 | 300 S. Taylor Street | Howard | 1.72 | $6.35 |
| 5/31/2024 | $150,000 | N. Rolling Meadows Drive | Fond Du Lac | 1.36 | $2.53 |
| 6/23/2023 | $175,000 | 605 Fond Du Lac Avenue | Fond Du Lac | 1.90 | $2.11 |
|  |  |  |  |  |  |
|  |  |  | Min: | 1.36 | $1.58 |
|  |  |  | Max: | 4.73 | $8.16 |
|  |  |  | Median: | 1.97 | $2.53 |
|  |  |  | Average: | 2.43 | $3.62 |

The above sales, although not as representative as our predominantly multi-family sale set, do provide additional support for our unit value conclusion as the subject does have commercial potential with respect to its mixed-use future land use designation and its location on a primary corridor running through Downtown Manitowoc. These sales range in size from 1.36 to 4.73 acres with a median and average size of 1.97 acres and 2.43 acres. The sales present a range from $1.58 to $8.16 per square foot with a median and average of $2.53 and $3.62 per square foot, respectively, bracketing our value conclusion.



## Active Listings

In addition, we note the following active listings deemed relevant to the valuation problem at hand. These listings are summarized below:

1.  Listing for a 0.82-acre site located along the west side of S. 30th Street and just south of Highway 42 in the City of Manitowoc that has been advertised as commercial land. The property is listed for $100,000 or $2.80 per square foot. The site is long and narrow and is zoned I-2. The property was listed on September 19, 2025.

2.  Listing for an outlot of Lowes immediately south of Crawford Boulevard on the west side of the City of Manitowoc near the interchange of Highway 42 and I-43. The lot is 3.03 acres and is advertised for $549,900 or $4.17 per square foot. The property was listed January 19, 2024.

3.  Listing by NAI Pfefferle for a 1.62-acre lot improved with an 84,484 square foot, 1924-vintage industrial building marketed as a redevelopment opportunity. The property is located at 1306-1310 Clark Street in the City of Manitowoc, only two blocks north and 2 blocks east of the subject property. The site is situated before the rail line and the Manitowoc River. The list price is $450,000 or $6.38 per square foot.

## Price per Developable Unit

As noted, purchasers of multi-family properties often look to land pricing on a price per developable unit basis. Accordingly, we have looked to price per developable / proposed unit as a test of reasonableness. Currently, 59 units are proposed for the subject property. At a unit price of $2.25 per square foot, the total rounded value indication for the subject is $360,000. This equates to $6,102 per unit ($360,000 ÷ 59 units).

The sales range from $3,611 to $37,488 per unit. Sale 2 sets the upper bound and has a smaller number of units than that which the site could support according to a party involved with the sale. As such, this price per unit is likely exaggerated. Excluding Sale 2 results in a range from $3,611 to $10,417 per unit with a median and average of $5,432 and $6,741 per unit, respectively.

Digging deeper, the two sales that set the lower bound have the highest unit counts, Sales 3 and 5, and range from $3,611 to $4,767 with unit counts between 90 and 210 units. Sales 4, 6 and 7 have lower unit counts from 24 to 44 units and range from $5,432 to $10,416 per unit with a median and average of $9,479 and $8,443 per unit, respectively. Typically, price per unit goes down as the total unit count increases and this conforms to the general pattern.

In terms of price per unit, the subject falls within the range of the sales and is considered reasonable by this test when considering the proposed unit count and the limited development potential of the northern area.



## As Remediated Value Conclusion

With respect to the above, we consider a unit price of $2.25 per square foot to be reasonable for the subject property. At the concluded unit price, the following As Remediated land value conclusion is presented:

| As Remediated Land Value Conclusion | | | | | |
|---|---|---|---|---|---|
| Reasonable Adjusted Comparable Range | | | | | |
| 3.720 acres | x | | $2.00 psf | = | $324,086 |
| 3.720 acres | x | | $2.50 psf | = | $405,108 |
| **As Remediated Market Value Opinion** | | | | | |
| 3.720 acres | x | | **$2.25 psf** | = | **$360,000** |

## As Is Value Conclusion

As noted, the above value conclusion assumes that the northern area of the subject property has been remediated to the point suitable for open space through capping the contamination. In order to complete this, the coordination of public funds is required as well as the shouldering of a material amount of risk. Any prudent buyer would account for these additional factors in their purchase price as compared to a remediated site.

Given the availability of funds through the remainder of the recent federal grant and the EPA Brownfield revolving loan fund available to the City of Manitowoc, a direct deduction for the costs involved to complete remediation on the site is not considered appropriate. However, a percentage deduction for the aforementioned soft costs in coordinating funding and in execution of the remediation in addition to the risk exposure is considered appropriate. For this, we have concluded to a percentage of 35.0% of the estimated cost to complete the remediation of $500,000. For this figure, we allocate approximately 15.0% for entrepreneurial incentive to cover the risk involved and an additional 10.0% for soft costs. The remaining 10.0% is a contingency allowance as the remediation cost estimate may be higher than estimated. At 35.0%, the following deduction is calculated for the outstanding remediation element:

| Remediation Soft Costs & Entrepreneurial Risk Deduction | | |
|---|---|---|
| Estimated Remediation Cost | | $500,000 |
| Soft Costs & Entrepreneurial Risk Percentage | x | 35% |
| **Estimated Deduction Rounded** | | **$175,000** |

After deduction of our remediation soft costs and entrepreneurial risk estimate, the As Is land value indication is summarized as follows:



### Final Land Value Conclusion

Reasonable Adjusted Comparable Range

| | | | | |
|---|---|---|---|---|
| 3.720 acres | x | $2.00 psf | = | $324,086 |
| 3.720 acres | x | $2.50 psf | = | $405,108 |

**As Remediated Market Value Opinion**

| | | | | |
|---|---|---|---|---|
| 3.720 acres | x | **$2.25 psf** | = | **$360,000** |

| | |
|---|---|
| Less Remediation Soft Costs & Entrepreneurial Risk Deduction : | $175,000 |
| As Is Market Value Opinion Indication : | $185,000 |

| | |
|---|---|
| **Final As Is Market Value Opinion Indication (Rounded)** | **$190,000** |
| **Final As Is Market Value Opinion Indication PSF** | **$1.17** |



# Reconciliation

## Summary of Value Indications

The indicated values from the approaches used and our concluded market values for the subject property are summarized in the following table.

| Value Indications | |
| --- | --- |
| **Approach to Value** | **As Is** |
| Cost | Not Developed |
| Sales Comparison | $190,000 |
| Income Capitalization | Note Developed |

| Value Conclusion | |
| --- | --- |
| **Component** | **As Is** |
| Value Type | Market Value |
| Real Property Interest | Fee Simple |
| Effective Date of Value | November 28, 2025 |
| **Value Conclusion** | **$190,000** |
| **Value Conclusion PSF** | **$1.17** |

To reach a final opinion of value, the reliability and relevance of each value indication was considered based upon the quality of the data and applicability of the assumptions underlying each approach. Given the availability and reliability of data within the Sales Comparison Approach, this approach was given primary weight in reconciling to the final value conclusions.

The findings and conclusions are further contingent upon the following extraordinary assumptions and/or hypothetical conditions, the use of which might have affected the assignment results:

## Extraordinary Assumptions:

- The southern approximately 2.30 acres of the subject property has recently undergone significant remediation at the expense of the City of Manitowoc and with the support of federal funding. Currently, a four-story, 59-unit workforce housing development is proposed for the subject property. Due to the historic contamination on site, the development will require reuse of the existing foundation system in place and below-grade space will not be possible. According to our talks with the City of Manitowoc Community Development Authority, it is our understanding that the remedial activity completed is sufficient to allow for the development of the site as currently proposed. If this is found to be materially false, we reserve the right to modify our opinions accordingly.

- The northern approximately 1.40 acres of the subject property still contains significant environmental contamination and was yet to be remediated as of the effective date of value. We were provided an estimate of approximately $500,000 to complete a limited remediation that would involve capping the site for use as green space. We have relied upon this cost

© 2025 VALBRIDGE PROPERTY ADVISORS | MILWAUKEE



estimate for the purposes of our analysis. As such, if the actual cost to perform such activities materially differs from this amount, we reserve the right to modify our opinions accordingly.

## Hypothetical Conditions:

- None.

## Exposure Time and Marketing Period

Based on statistical information about days on market, escrow length, and marketing times gathered through national investor surveys, sales verification, and interviews of market participants, marketing and exposure time estimates of 9 to 18 months and 9 to 18 months, respectively, are considered reasonable and appropriate for the subject property.



# General Assumptions and Limiting Conditions

This appraisal is subject to the following general assumptions and limiting conditions:

1. The legal description is assumed to be correct, but the appraiser makes no representations or guarantees as to its accuracy.

2. No responsibility is assumed for legal matters, questions of survey or title, soil or subsoil conditions, engineering, availability or capacity of utilities, or other similar technical matters. The appraisal does not constitute a survey of the property appraised. All existing liens and encumbrances have been disregarded and the property is appraised as though free and clear, under responsible ownership and competent management unless otherwise noted.

3. Unless otherwise noted, the appraisal will value the property as though free of contamination. Valbridge Property Advisors | Milwaukee will conduct no hazardous materials or contamination inspection of any kind. It is recommended that the Client hire an expert if the presence of hazardous materials or contamination is of concern to the Client. Client means the Client as defined in the appraisal report.

4. The stamps and/or consideration placed on deeds used to indicate sales are in correct relationship to the actual dollar amount of the transaction.

5. Unless otherwise noted, it is assumed there are no encroachments, zoning violations or restrictions existing in the subject property.

6. Unless expressly specified in the engagement letter, the fee for this appraisal does not include the attendance or giving of testimony by Appraiser at any court, regulatory or other proceedings, or any conferences or other work in preparation for such proceeding. If any partner, employee, agent, or independent contractor of Valbridge Property Advisors | Milwaukee is asked or required to appear and/or testify at any deposition, trial, or other proceeding about the preparation, conclusions or any other aspect of this assignment, Client shall compensate Appraiser for the time spent by the partner, employee, agent, or independent contractor in appearing and/or testifying and in preparing to testify according to the Appraiser's then current hourly rate plus reimbursement of expenses, regardless of whether the Client is the party seeking the appearance of testimony.

7. The values for land and/or improvements, as contained in this report, are constituent parts of the total value reported and neither is (or are) to be used in making a summation appraisal of a combination of values created by another appraiser. Either is invalidated if so used.

8. The dates of value to which the opinions expressed in this report apply are set forth in this report. The appraiser assumes no responsibility for economic or physical factors occurring at any other date(s), which may affect the opinions stated herein. The forecasts, projections, or operating estimates contained herein are based on current market conditions and anticipated short-term supply and demand factors and are subject to change with future conditions. Appraiser is not responsible for determining and makes no representations regarding whether the date(s) of value requested by Client is appropriate for Client's intended use.

9. The sketches, maps, plats and exhibits in this report are included to assist the reader in visualizing the property. The appraiser has made no survey of the property and assumed no responsibility in connection with such matters.

10. The information, estimates, and opinions, which were obtained from outside sources are considered reliable. However, the appraiser makes no representations regarding such sources, and no liability for them can be assumed by the appraiser.



11.    Possession of this report, or a copy thereof, does not carry with it the right of publication. Neither all, nor any part of the content of the report, or copy thereof (including conclusions as to property value, the identity of the appraisers, professional designations, reference to any professional appraisal organization or the firm with which the appraisers are connected), shall be disseminated to the public through advertising, public relations, news, sales, or other media without the appraiser's prior express written consent and approval.

12.    No claim is intended to be expressed for matters of expertise that would require specialized investigation or knowledge beyond that ordinarily employed by real estate appraisers. The appraiser claims no expertise and makes no representations in areas such as, but not limited to, legal, survey, structural, environmental, quality of construction, pest control, mechanical, etc. It is recommended that the Client hire an expert, such as a home inspector, if these areas are of concern to the Client.

13.    This appraisal was prepared for the sole and exclusive use of the Client for the function outlined herein. Any party who is not the Client or intended user, as identified in the appraisal, is not entitled to rely upon the contents of the appraisal without express written consent of Valbridge Property Advisors |   and Client. The Client shall not include partners, members, stockholders, shareholders, affiliates, or relatives of the Client. The appraiser makes no representations and assumes no obligation, liability or accountability to any third party.

14.    Distribution of this report is at the sole discretion of the Client, as identified in the appraisal, but the appraiser makes no representations to third parties not listed as an intended user on the face of the appraisal and such third parties may not rely upon the contents of the appraisal, including but not limited to the estimate of value. In no event shall the Client give a third-party a partial copy of the appraisal report. The appraiser will make no distribution of the report without the specific direction of the Client.

15.    This appraisal shall be used only for the function outlined herein, unless expressly authorized by Valbridge Property Advisors | Milwaukee.

16.    This appraisal shall be considered in its entirety. No part thereof shall be used separately or out of context.

17.    Unless otherwise noted in the body of this report, this appraisal assumes that the subject property does not fall within the areas where mandatory flood insurance is effective. Unless otherwise noted, the appraiser has not completed, nor has the appraiser contracted to have completed an investigation to identify and/or quantify the presence of non-tidal wetland conditions on the subject property. Because the appraiser is not a surveyor, he or she makes no representations or guarantees, express or implied, regarding this determination.

18.    The flood maps are not site specific. The appraiser is not qualified to confirm the location of the subject property in relation to flood hazard areas based on the FEMA Flood Insurance Rate Maps or other surveying techniques. It is recommended that the Client obtain confirmation of the subject property's flood zone classification from a licensed surveyor.

19.    If the appraisal is for mortgage loan purposes 1) the appraiser assumes satisfactory completion of improvements if construction is not complete, 2) no consideration has been given for rent loss during rent-up unless noted in the body of this report, and 3) occupancy at levels consistent with our "Income and Expense Projection" are anticipated.



20.     It is assumed that there are no hidden or unapparent conditions of the property, subsoil, or structures which would render it more or less valuable. No representations are made, and no responsibility is assumed for such conditions or for engineering which may be required to discover them.

21.     The appraiser's inspection included an observation of the land and improvements thereon only. It was not possible to observe conditions beneath the soil or hidden structural components within the improvements. To the extent dictated by the scope of assignment, the appraiser inspected the buildings involved and reported open and obvious damage (if any) by termites, dry rot, wet rot, or other infestations as a matter of information, and no representation or guarantee of the amount or degree of damage (if any) is implied. The condition of heating, cooling, ventilation, electrical and plumbing equipment is considered to be commensurate with the condition of the balance of the improvements unless otherwise stated. Should the Client have concerns in these areas, it is the Client's responsibility to order the appropriate inspections. The appraiser is not a home inspector or pest control expert and does not have the skill or expertise to make such inspections, makes no representations regarding these items, and assumes no responsibility for these items.

22.     This appraisal does not guarantee compliance with the building code and life safety code requirements of the local jurisdiction. It is assumed that all required licenses, consents, certificates of occupancy or other legislative or administrative authority from any local, state or national governmental or private entity or organization have been or can be obtained or renewed for any use on which the value conclusion contained in this report is based unless specifically stated to the contrary.

23.     When possible, the appraiser relied upon building measurements provided by the Client, owner, or associated agents of these parties. In the absence of reliable public records or "as-built" plans provided, to the appraiser relied upon his/her own measurements of the subject improvements. The appraiser follows typical appraisal industry methods; however, the appraiser recognizes that some factors may limit the ability to obtain accurate measurements including, but not limited to, property access on the day of inspection, basements, fenced/gated areas, grade elevations, greenery/shrubbery, uneven surfaces, multiple story structures, obtuse or acute wall angles, immobile obstructions, etc. Professional building area measurements of the quality, level of detail, or accuracy of professional measurement services are beyond the scope of this appraisal assignment and the appraiser makes no representations concerning this information.

24.     The appraiser has attempted to reconcile sources of data discovered or provided during the appraisal process, including assessment department data. Ultimately, the measurements that are deemed by the appraiser to be the most accurate and/or reliable are used within this report. While the measurements and any accompanying sketches are considered to be reasonably accurate and reliable, the appraiser cannot guarantee and makes no representations regarding their accuracy. Should the Client desire more precise measurement, they are urged to retain the measurement services of a qualified professional (space planner, architect or building engineer) as an alternative source. If this alternative measurement source reflects or reveals substantial differences with the measurements used within the report, upon request of the Client, the appraiser will submit a revised report for an additional fee.

25.     In the absence of being provided with a detailed land survey, the appraiser used assessment department data to ascertain the physical dimensions and acreage of the property. Should a survey prove this information to be inaccurate, upon request of the Client, the appraiser will submit a revised report for an additional fee.



26. If only preliminary plans and specifications were available for use in the preparation of this appraisal, and a review of the final plans and specifications reveals substantial differences, upon request of the Client, the appraiser will submit a revised report for an additional fee.

27. Unless otherwise stated in this report, the value conclusion is predicated on the assumption that the property is free of contamination, environmental impairment or hazardous materials. Unless otherwise stated, the existence of hazardous material was not observed by the appraiser and the appraiser has no knowledge of the existence of such materials on or in the property. The appraiser, however, is not qualified to detect such substances. The presence of substances such as asbestos, urea-formaldehyde foam insulation or other potentially hazardous materials may affect the value of the property. No responsibility is assumed, and no representations are made regarding any such conditions, or for any expertise or engineering knowledge required for discovery. The Client is urged to retain an expert in this field, if desired.

28. The Americans with Disabilities Act ("ADA") became effective January 26, 1992. The appraiser has not made a specific compliance survey of the property to determine if it is in conformity with the various requirements of the ADA. It is possible that a compliance survey of the property, together with an analysis of the requirements of the ADA, could reveal that the property is not in compliance with one or more of the requirements of the Act. If so, this could have a negative effect on the value of the property. Since the appraiser has no direct evidence relating to this issue, the appraiser did not consider possible noncompliance with the requirements of ADA in developing an opinion of value. It is recommended that the Client hire an expert, such as an attorney or other qualified expert, if ADA compliance is an area of concern to the Client.

29. This appraisal applies to the land and building improvements only. The value of trade fixtures, furnishings, and other equipment, or subsurface rights (minerals, gas, and oil) were not considered in this appraisal unless specifically stated to the contrary.

30. No changes in any federal, state or local laws, regulations or codes (including, without limitation, the Internal Revenue Code) are anticipated, unless specifically stated to the contrary.

31. Any income and expense estimates contained in the appraisal report are used only for the purpose of estimating value and do not constitute prediction of future operating results. Furthermore, it is inevitable that some assumptions will not materialize and that unanticipated events may occur that will likely affect actual performance. As such, the appraiser makes no representations regarding such income or expense estimates and the intended user(s) of the appraisal may not rely on such estimates.

32. Any estimate of insurable value, if included within the scope of work and presented herein, is based upon figures developed consistent with industry practices. However, actual local and regional construction costs may vary significantly from our estimate and individual insurance policies and underwriters have varied specifications, exclusions, and non-insurable items. As such, the appraiser strongly recommends that the Client obtain estimates from professionals experienced in establishing insurance coverage. The appraiser makes no representations regarding such insurable value, and any analysis should not be relied upon to determine insurance coverage and the appraiser makes no representations regarding the accuracy of this estimate.



33.    The data gathered in the course of this assignment (except data furnished by the Client) shall remain the property of the Appraiser. Subject to the Uniform Standards of Professional Appraisal Practice, the appraiser will not violate the confidential nature of the appraiser-client relationship by improperly disclosing any confidential information furnished to the appraiser. Notwithstanding the foregoing, the Appraiser is authorized by the Client to disclose all or any portion of the appraisal and related appraisal data to appropriate representatives of the Appraisal Institute if such disclosure is required to enable the appraiser to comply with the Bylaws and Regulations of such Institute now or hereafter in effect.

34.    The Client and Valbridge Property Advisors | Milwaukee both agree that any claim must be made within two years from the date of delivery of our work product. The Client and Valbridge Property Advisors | Milwaukee both agree that any dispute over matters in excess of $5,000 shall be submitted for resolution by mandatory arbitration pursuant to the rules of the American Arbitration Association. This includes fee disputes and any claim of malpractice. The parties agree to a sole arbitrator, who shall be mutually selected. The arbitration shall be held in Waukesha County, Wisconsin, unless otherwise expressly agreed to between the parties. Such arbitration shall be binding and final. In agreeing to arbitration, both parties acknowledge that, by agreeing to binding arbitration, each is giving up the right to have the dispute decided in a court of law before a judge or jury. In the event that the Client, or any other party, makes a claim against Valbridge Property Advisors | Milwaukee or any of its employees, agents, representatives, or independent contractors in connection with or in any way relating to this assignment, the maximum damages recoverable by such claimant shall be the amount actually received by Valbridge Property Advisors | Milwaukee for this assignment, and under no circumstances shall any claim for consequential, incidental, or punitive damages be made.

35.    Valbridge Property Advisors | Milwaukee shall have no obligation, liability, or accountability to any third party. Any party who is not the "Client" or intended user identified on the face of the appraisal is not entitled to rely upon the contents of the appraisal without the express written consent of Valbridge Property Advisors | Milwaukee. "Client" shall not include partners, members, stockholders, shareholders, affiliates, or relatives of the party identified as the Client in the appraisal. Client shall indemnify, defend (including the reimbursement of reasonable attorneys' fees), and hold Valbridge Property Advisors | Milwaukee and its employees, agents, representatives, and/or independent contractors harmless in the event of any lawsuit brought by any third party, lender, partner, or part-owner in any form of ownership or any other party as a result of this assignment, including claims that arise solely out of the negligence of the appraiser or Valbridge Property Advisors | Milwaukee. The Client also agrees that in case of lawsuit arising from or in any way involving these appraisal services, Client shall indemnify, defend (including the reimbursement of reasonable attorneys' fees) and hold Valbridge Property Advisors | Milwaukee and its employees, agents, representatives, and independent contractors harmless from and against any liability, loss, cost, or expense incurred or suffered by Valbridge Property Advisors | Milwaukee in such action, regardless of its outcome.

36.    The appraiser responsible for the preparation for the appraisal report is an employee and/or independent contractor of Vitale Realty Advisors, LLC dba Valbridge Property Advisors l Milwaukee . Neither Valbridge Property Advisors, Inc., nor any of its affiliates has been engaged to provide this report. Valbridge Property Advisors, Inc. does not provide valuation services and has taken no part in the preparation of this report.

37.    This report and any associated work files may be subject to evaluation by Valbridge Property Advisors, Inc., or its affiliates, for quality control purposes.

38.    Acceptance and/or use of this appraisal report constitutes acceptance of the foregoing general assumptions and limiting conditions.



# Certification

We certify that, to the best of our knowledge and belief:

1. The statements of fact contained in this report are true and correct.

2. The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions and are our personal, impartial, and unbiased professional analyses, opinions, and conclusions.

3. We have no present or prospective interest in the property that is the subject of this report and no personal interest with respect to the parties involved.

4. We have performed no other services, as an appraiser or in any other capacity, regarding the property that is the subject of the appraisal within the three-year period immediately preceding acceptance of this assignment.

5. We have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.

6. Our engagement in this assignment was not contingent upon developing or reporting predetermined results.

7. Our compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

8. Our analyses, opinions and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice.

9. Russell Cooper inspected the subject property on November 18, 2025. S. Steven Vitale, MAI, SGA inspected the subject property on November 28, 2025. Neither inspection was guided.

10. No one provided significant real property appraisal assistance to the person(s) signing this certification.

11. The reported analyses, opinions and conclusions were developed, and this report has been prepared, in conformity with the requirements of the Code of Professional Ethics and the Standards of Professional Appraisal Practice of the Appraisal Institute.

12. The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.



13.    As of the date of this report, I S. Steven Vitale, have completed the continuing education program for Designated Members of the Appraisal Institute.

S. Steven Vitale, MAI, SGA
Senior Managing Director
Wisconsin Certified General Appraiser
License #506-10, Expires 12-14-2027
svitale@valbridge.com

Russell Cooper
Appraiser
Wisconsin Certified General Appraiser
License #3100-10, Expires 12-14-2027
rcooper@valbridge.com



# Addenda

Additional Subject Photographs

Maritime Flats Plans

R-6 Zoning Ordinance

Glossary

Qualifications

- S. Steven Vitale, MAI, SGA

- Russell Cooper

Information on Valbridge Property Advisors

Office Locations



## Additional Subject Photographs



View south along S. 15th Street (subject at right)



View north along S. 15th Street (subject at left)



View west across subject from S. 15th Street



View northwest from east-central site



View southeast from central site



Rubble and unfilled lower level exposed along west side of site





View east from west-central area of site



View east from S. 16th Street



Remaining door façade on S. 16th Street



View north along S. 16th Street (subject at right)



View south from Franklin Street toward subject



View south along S. 15th Street (subject at right)



## Maritime Flats Plans





































## R-6 Zoning Ordinance

12/22/25, 10:58 AM                              Section 15.190 R-6, Multiple-Family District.

15.190 R-6, Multiple-Family District.

**(1) Intent.** This district is intended to provide for high density multiple housing of an apartment nature near the high service focal points of the City such as the Central Business District, industrial centers, shopping centers, or at any location where a limited amount of land is available and appropriate as a place of residence for a large number of persons.

**(2) Specific Uses Permitted.** Land shall be used and buildings shall be erected, altered, enlarged, or used for only one or more of the following uses subject to the provisions of this section and those of other applicable sections of the Zoning Ordinance:

   (a) Single- and two-family dwellings;

   (b) Multiple-family dwellings;

   (c) Rooming houses;

   (d) Adult day care facilities, and child day care centers for not more than 15 individuals;

   (e) Public parks, parkways, and other public recreational areas;

   (f) Community living arrangements for not more than 15 individuals;

   (g) Vacant lot residential garden; and

   (h) Bed and breakfasts and short-term rentals.

Accessory buildings and uses to the specific uses permitted shall also be permitted.

**(3) Conditional Uses Permitted.** The following uses are permitted subject to MMC 15.370(27):

   (a) Churches and other religious institutions;

   (b) Schools – public, private, and parochial;

   (c) Fraternal organizations, philanthropic, and eleemosynary institutions;

   (d) Private clubs and lodges;

   (e) Hospitals other than animal hospitals;

   (f) Homes for the elderly, nursing homes, and adult day care facilities, and child day care centers for 16 or more individuals;

   (g) Libraries, museums, art galleries, and concert halls;

   (h) Governmental buildings;

   (i) Community living arrangements for 16 or more individuals;

   (j) Residential buildings used in connection with the above conditional uses;

   (k) Mobile and manufactured home parks, subject to regulations of the City's mobile home ordinance (MMC 15.510);

   (l) *Repealed by Ord. 20-152;*

   (m) Domestic violence centers;

   (n) Expanded home occupations;

https://www.codepublishing.com/WI/Manitowoc/#!/Manitowoc15/Manitowoc15190.html#15.190                                                1/3



12/22/25, 10:58 AM                                    Section 15.190 R-6, Multiple-Family District.

(o) Any adaptive reuse authorized pursuant to MMC 15.370(29);

(p) Transitional housing;

(q) Continuing care communities, retirement housing, intergenerational housing, and other collaborative housing options developed pursuant to MMC 15.750; and

(r) Farmers' markets.

**(4) Area Regulations.**

(a) Front Yard. No principal or accessory building shall be closer than 25 feet to the street line as established by the Official Map. If said street line is not established by the Official Map, said 25 feet shall be measured from the existing street line. MMC 15.390(14) setbacks, if any, shall be maintained, however.

(b) Side Yard. For buildings under 35 feet in height there shall be two side yards of not less than 10 feet for each side yard, providing that on corner lots the side yard adjacent to the street shall be not less than 20 feet except as provided in MMC 15.390(14). For buildings over 35 feet in height there shall be two side yards of not less than 50 percent of the height of said building for each side yard. For accessory buildings located in the rear one-half or located more than 65 feet from the front lot line of any interior lot, the required side yard may be reduced to two feet except where easement widths are greater.

(c) Rear Yard. There shall be a rear yard not less than 25 feet in depth, except on corner lots the rear yard may be reduced to six feet, providing a minimum setback of 25 feet is maintained in the side yard adjacent to the street. For accessory buildings located in the rear one-half or located more than 65 feet from the front lot line of any interior lot the required rear yard may be reduced to two feet except where easement widths are greater.

(d) Lot Area. Single- and two-family dwellings are subject to the same yard and area requirements as the "R-3" District. There are no minimum requirements as to the width or depth of lots for multiple-family dwelling units. However, multiple-family dwellings having eight or fewer dwelling units shall provide a minimum of 2,000 square feet of lot area per dwelling unit. For multiple dwellings having nine or more units, the minimum requirements of lot area per family are as follows:

Efficiency and one-bedroom apartments: 1,100 square feet of lot area per dwelling unit; two-bedroom apartments: 1,300 square feet of lot area per dwelling unit; three-bedroom and over apartments: 1,500 square feet of lot area per dwelling unit. It is further provided that apartment houses having nine or more dwelling units and four stories or more in height shall provide a minimum of 1,000 square feet of lot area per family for a four-story building; 800 square feet of lot area per family for a five-story building; and 600 square feet of lot area per family for a building six or more stories in height. The City Plan Commission may modify the requirements as to the number of off-street parking spaces required in specific cases where desirable or warranted owing to types of use or character of use and with due regard to the protection of adjacent property in the Residential District and the public interest.

(e) Lot Occupancy. The ground area occupied by the principal and accessory buildings shall not exceed 50 percent of the total area of the lot.

(f) Dwelling Unit Size. All dwelling units shall be at least 14 feet wide and shall have a minimum area, excluding attached or detached accessory buildings, of 720 square feet.

**(5) Height Regulations.** No principal building shall exceed 60 feet in height. No accessory building shall exceed 20 feet in height, subject also to airport height provisions.

**(6) Vision Clearance.** The vision clearance of this district shall not be less than 15 feet, determined by measuring 15 feet each way from the lot corner at the street intersection on each street lot line, or, in the case of an alley, 10 feet, determined by measuring 10 feet along the street line and 10 feet along the alley line.

https://www.codepublishing.com/WI/Manitowoc/#!/Manitowoc15/Manitowoc15190.html#15.190                                    2/3



## Glossary

Definitions are taken from The Dictionary of Real Estate Appraisal, 7th Edition (Dictionary), the Uniform Standards of Professional Appraisal Practice (USPAP), and Building Owners and Managers Association International (BOMA).

### Absolute Net Lease

A lease in which the tenant pays all expenses including structural maintenance, building reserves, and management; often a long-term lease to a credit tenant. (Dictionary)

### Amortization

The process of retiring a debt or recovering a capital investment, typically through scheduled, systematic repayment of the principal; a program of periodic contributions to a sinking fund or debt retirement fund. (Dictionary)

### As Is Market Value

The estimate of the market value of real property in its current physical condition, use, and zoning as of the appraisal date. (Interagency Appraisal and Evaluation Guidelines) Note that the use of the "as is" phrase is specific to appraisal regulations pursuant to FIRREA applying to appraisals prepared for regulated lenders in the United States. The concept of an "as is" value is not included in the Standards of Valuation Practice of the Appraisal Institute, Uniform Standards of Professional Appraisal Practice, or International Valuation Standards. (Dictionary)

### Base Rent

The minimum rent stipulated in a lease. (Dictionary)

### Base Year

The year on which escalation clauses in a lease are based. (Dictionary)

### Building Common Area

In office buildings, the areas of the building that provide services to building tenants but that are not included in the office area or store area of any specific tenant. These areas may include, but shall not be limited to, main and auxiliary lobbies, atrium spaces at the level of the finished floor, concierge areas or security desks, conference rooms, lounges or vending areas, food service facilities, health or fitness centers, daycare facilities, locker or shower facilities, mail rooms, fire control rooms, fully enclosed courtyards outside the exterior walls, and building core and service areas such as fully enclosed mechanical or equipment rooms. Specifically excluded from building common area are floor common areas, parking space, portions of loading docks outside the building line, and major vertical penetrations. (BOMA)

### Building Rentable Area

The sum of all floor rentable areas. Floor rentable area is the result of subtracting from the gross measured area of a floor the major vertical penetrations on that same floor. It is generally fixed for the life of the building and is rarely affected by changes in corridor size or configuration. (BOMA)

### Bulk Value

The value of multiple units, subdivided plots, or properties in a portfolio as though sold together in a single transaction. (Dictionary)

### Certificate of Occupancy (COO)

A formal written acknowledgment by an appropriate unit of local government that a new construction or renovation project is at the stage where it meets applicable health and safety codes and is ready for commercial or residential occupancy. (Dictionary)

### Common Area Maintenance (CAM)

The expense of operating and maintaining common areas; may or may not include management charges and usually does not include capital expenditures on tenant improvements or other improvements to the property. (Dictionary)

The amount of money charged to tenants for their shares of maintaining a [shopping] center's common area. The charge that a tenant pays for shared services and facilities such as electricity, security, and maintenance of parking lots. Items charged to common area maintenance may include cleaning services, parking lot sweeping and maintenance, snow removal, security, [amenities,] and upkeep. (ICSC – International Council of Shopping Centers, 4th Ed.)

### Condominium

An attached, detached, or stacked unit within or attached to a structure with common areas that are held as tenants in common (an undivided interest) with other owners in the project. The units can be residential, commercial, industrial, or parking spaces or boat docks. These units are commonly defined by state laws in their locations. Because units can be stacked on top of other units, these units can be defined both vertically and horizontally. (Dictionary)

### Conservation Easement

An interest in real estate restricting future land use to preservation, conservation, wildlife habitat, or some combination of those uses. A conservation easement may



permit farming, timber harvesting, or other uses of a rural nature as well as some types of conservation-oriented development to continue, subject to the easement. (Dictionary)

### Contributory Value

A type of value that reflects the amount a property or component of a property contributes to the value of another asset or to the property as a whole.

The change in the value of a property as a whole, whether positive or negative, resulting from the addition or deletion of a property component. Also called deprival value in some countries. (Dictionary)

### Debt Coverage Ratio (DCR)

The ratio of net operating income to annual debt service (DCR = $NOI \div I_m$), which measures the relative ability of a property to meet its debt service out of net operating income; also called *debt service coverage ratio (DSCR).* A larger *DCR* typically indicates a greater ability for a property to withstand a reduction of income, providing an improved safety margin for a lender. (Dictionary)

### Deed Restriction

A provision written into a deed that limits the use of land. Deed restrictions usually remain in effect when title passes to subsequent owners. (Dictionary)

### Depreciation

In appraisal, a loss in property value from any cause; the difference between the cost of an improvement on the effective date of the appraisal and the value of the improvement on the same date.

In accounting, an allocation of the original cost of an asset, amortizing the cost over the asset's life; calculated using a variety of standard techniques. (Dictionary)

### Disposition Value

The most probable price that a specified interest in property should bring under the following conditions:

1. Consummation of a sale within a specified time, which is shorter than the typical exposure time for such a property in that market.

2. The property is subjected to market conditions prevailing as of the date of valuation;

3. Both the buyer and seller are acting prudently and knowledgeably;

4. The seller is under compulsion to sell;

5. The buyer is typically motivated;

6. Both parties are acting in what they consider to be their best interests;

7. An adequate marketing effort will be made during the exposure time;

8. Payment will be made in cash in U.S. dollars (or the local currency) or in terms of financial arrangements comparable thereto; and

9. The price represents the normal consideration for the property sold, unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.

This definition can also be modified to provide for valuation with specified financing terms. (Dictionary)

### Double Net (Net Net) Lease

An alternative term for a type of net lease. In some markets, a net net lease is defined as a lease in which the tenant is responsible to pay both property taxes and premiums for insuring the building(s). (Valbridge)

(The market definition of a double net lease varies depending on the market)

### Easement

The right to use another's land for a stated purpose. (Dictionary)

### EIFS

Exterior Insulation Finishing System. This is a type of exterior wall cladding system. Sometimes referred to as dry-vit.

### Effective Date

1. The date on which the appraisal opinion applies. (SVP)

2. The date to which an appraiser's analyses, opinions, and conclusions apply; also referred to as date of value. (USPAP, 2020-2021 ed.)

3. The date that a lease goes into effect. (Dictionary)

### Effective Gross Income (EGI)

The anticipated income from all operations of the real estate after an allowance is made for vacancy and collection losses and an addition is made for any other income. (Dictionary)

### Effective Rent

Total base rent, or minimum rent stipulated in a lease, over the specified lease term minus rent concessions; the rent that is effectively paid by a tenant net of financial concessions provided by a landlord. (TIs). (Dictionary)

### EPDM

Ethylene Propylene Diene Monomer Rubber. A type of synthetic rubber typically used for roof coverings.

### Escalation Clause

A clause in an agreement that provides for the adjustment of a price or rent based on some event or



index. e.g., a provision to increase rent if operating expenses increase; also called *escalator clause, expense recovery clause or stop clause*. (Dictionary)

### Estoppel Certificate

A signed statement by a party (such as a tenant or a mortgagee) certifying, for another's benefit, that certain facts are correct, such as that a lease exists, that there are no defaults, and that rent is paid to a certain date. (Black's) In real estate, a buyer of rental property typically requests estoppel certificates from existing tenants. Sometimes referred to as an *estoppel letter*. (Dictionary)

### Excess Land

Land that is not needed to serve or support the existing use. The highest and best use of the excess land may or may not be the same as the highest and best use of the improved parcel. Excess land has the potential to be sold separately and is valued separately. (Dictionary)

### Excess Rent

The amount by which contract rent exceeds market rent at the time of the appraisal; created by a lease favorable to the landlord (lessor) and may reflect unusual management, unknowledgeable or unusually motivated parties, a lease execution in an earlier, stronger rental market, or an agreement of the parties. (Dictionary)

### Expense Stop

A clause in a lease that limits the landlord's expense obligation, which results in the lessee paying operating expenses above a stated level or amount. (Dictionary)

### Exposure Time

1. The time a property remains on the market.
2. An opinion, based on supporting market data, of the length of time that the property interest being appraised would have been offered on the market prior to the hypothetical consummation of a sale at market value on the effective date of the appraisal. (USPAP, 2020-2021 ed.)

### Extraordinary Assumption

An assignment-specific assumption as of the effective date regarding uncertain information used in an analysis which, if found to be false, could alter the appraiser's opinions or conclusions.

**Comment:** Uncertain information might include physical, legal, or economic characteristics of the subject property; or conditions external to the property, such as market conditions or trends; or the integrity of data used in an analysis. (USPAP)

### Fee Simple Estate

Absolute ownership unencumbered by any other interest or estate, subject only to the limitations imposed by the governmental powers of taxation, eminent domain, police power, and escheat. (Dictionary)

### Floor Common Area

In an office building, the areas on a floor such as washrooms, janitorial closets, electrical rooms, telephone rooms, mechanical rooms, elevator lobbies, and public corridors which are available primarily for the use of tenants on that floor. In essence, floor common area represents all of the area on the floor that is common to that respective floor with the exception of those areas that penetrate through the floor, such as the elevator shaft and stairwell. The significant point to be made is that floor common area is not part of the tenant's usable area. (BOMA)

### Full Service (Gross) Lease

A lease in which the landlord receives stipulated rent and is obligated to pay all of the property's operating and fixed expenses; also called a *full service lease*. (Dictionary)

### Furniture, Fixtures, and Equipment (FF&E)

Business trade fixtures and personal property, exclusive of inventory. (Dictionary)

### Going-Concern Value

An outdated label for the market value of all the tangible and intangible assets of an established and operating business with an indefinite life, as if sold in aggregate; more accurately termed the *market value of the going concern* or *market value of the total assets of the business.* (Dictionary)

### Gross Building Area (GBA)

1. Total floor area of a building, excluding unenclosed areas, measured from the exterior of the walls of the above-grade area. This includes mezzanines and basements if and when typically included in the market area of the type of property involved.
2. Gross leasable area plus all common areas.
3. For residential space, the total area of all floor levels measured from the exterior of the walls and including the superstructure and substructure basement; typically does not include garage space. (Dictionary)

### Gross Measured Area

The total area of a building enclosed by the dominant portion (the portion of the inside finished surface of the permanent outer building wall which is 50 percent or more of the vertical floor-to-ceiling dimension, at the given point being measured as one moves horizontally along the wall), excluding parking areas and loading docks (or portions of same) outside the building line. It is generally not used for leasing purposes and is calculated on a floor by floor basis. (BOMA)



## Gross Up Method

A method of calculating variable operating expenses in income-producing properties when less than 100% occupancy is assumed. Expenses reimbursed based on the amount of occupied space, rather than on the total building area, are described as "grossed up." (Dictionary)

## Gross Sellout Value (Sum of the Retail Values)

The sum of the separate and distinct market value opinions for each of the units in a condominium, subdivision development, or portfolio of properties, as of the date of valuation. The aggregate of retail values does not represent the value of all the units as though sold together in a single transaction; it is simply the total of the individual market value conclusions. An appraisal has an effective date, but summing the sale prices of multiple units over an extended period of time will not be the value on that one day unless the prices are discounted to make the value equivalent to what another developer or investor would pay for the bulk purchase of the units. Also called the *aggregate of the retail values, aggregate retail selling price or sum of the retail values.* (Dictionary)

## Ground Lease

A lease that grants the right to use and occupy land. Improvements made by the ground lessee typically revert to the ground lessor at the end of the lease term. (Dictionary)

## Ground Rent

The rent paid for the right to use and occupy land according to the terms of a ground lease; the portion of the total rent allocated to the underlying land. (Dictionary)

## HVAC

Heating, ventilation, air conditioning (HVAC) system. A unit that regulates the temperature and distribution of heat and fresh air throughout a building. (Dictionary)

## Highest and Best Use

1. The reasonably probable use of property that results in the highest value. The four criteria that the highest and best use must meet are legal permissibility, physical possibility, financial feasibility, and maximum productivity.
2. The use of an asset that maximizes its potential and that is possible, legally permissible, and financially feasible. The highest and best use may be for continuation of an asset's existing use of for some alternative use. This is determined by the use that a market participant would have in mind for the asset when formulating the price that it would be willing to bid. (IVS)
3. [The] highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future. (Uniform

Appraisal Standards for Federal Land Acquisitions) (Dictionary)

## Hypothetical Condition

1. A condition that is presumed to be true when it is known to be false. (SVP)
2. A condition, directly related to a specific assignment, which is contrary to what is known by the appraiser to exist on the effective date of the assignment results, but is used for the purpose of analysis.

**Comment:** Hypothetical conditions are contrary to known facts about physical, legal, or economic characteristics of the subject property; or about conditions external to the property, such as market conditions or trends; or about the integrity of data used in an analysis. (USPAP)

## Insurable Value (Replacement Cost for Insurance Purposes)

The estimated cost, at current prices as of the effective date of valuation, of a substitute for the building being valued, using modern materials and current standards, design, and layout for insurance coverage purposes guaranteeing that damaged property is replaced with new property (i.e., depreciation is not deducted). (Dictionary)

## Investment Value

1. The value of a property to a particular investor or class of investors based on the investor's specific requirements. Investment value may be different from market value because it depends on a set of investment criteria that are not necessarily typical of the market. (Dictionary)
2. The value of an asset to the owner or a prospective owner given individual investment or operational objectives (may also be known as worth). (IVS)

## Just Compensation

In condemnation, the amount of loss for which a property owner is compensated when his or her property is taken. Just compensation should put the owner in as good a position pecuniarily as he or she would have been if the property had not been taken. (Dictionary)

## Leased Fee Interest

The ownership interest held by the lessor, which includes the right to receive the contract rent specified in the lease plus the reversionary right when the lease expires. (Dictionary)

## Leasehold Interest (Leasehold Estate)

The right held by the lessee to use and occupy real estate for a stated term and under the conditions specified in the lease. (Dictionary)



See also Positive Leasehold and Negative Leasehold.

### Lessee (Tenant)

One who has the right to occupancy and use of the property of another for a period of time according to a lease agreement. (Dictionary)

### Lessor (Landlord)

One who conveys the rights of occupancy and use to others under a lease agreement. (Dictionary)

### Liquidation Value

The most probable price that a specified interest in property should bring under the following conditions:

1. Consummation of a sale within a short time period.

2. The property is subjected to market conditions prevailing as of the date of valuation.

3. Both the buyer and seller are acting prudently and knowledgeably.

4. The seller is under extreme compulsion to sell.

5. The buyer is typically motivated.

6. Both parties are acting in what they consider to be their best interests.

7. A normal marketing effort is not possible due to the brief exposure time.

8. Payment will be made in cash in U.S. dollars (or the local currency) or in terms of financial arrangements comparable thereto.

9. The price represents the normal consideration for the property sold, unaffected by special or creative financing or sales concessions granted by anyone associated with the sale. (Dictionary)

### Loan to Value Ratio (LTV)

The ratio between a mortgage loan and the value of the property pledged as security, usually expressed as a percentage. (Dictionary)

### Major Vertical Penetrations

Stairs, elevator shafts, flues, pipe shafts, vertical ducts, and the like, and their enclosing walls. Atria, lightwells and similar penetrations above the finished floor are included in this definition. Not included, however, are vertical penetrations built for the private use of a tenant occupying office areas on more than one floor. Structural columns, openings for vertical electric cable or telephone distribution, and openings for plumbing lines are not considered to be major vertical penetrations. (BOMA)

### Market Rent

The most probable rent that a property should bring in a competitive and open market under all the conditions requisite to a fair lease transaction, the lessee and the lessor each acting prudently and knowledgeably, and

assuming the rent is not affected by undue stimulus. Implicit in this definition is the execution of a lease as of a specified date under conditions whereby:

1. Lessee and lessor are typically motivated;

2. Both parties are well informed or well advised, and acting in what they consider their best interests;

3. Payment is made in terms of cash or in terms of financial arrangements comparable thereto; and

4. The rent reflects specified terms and conditions, such as permitted uses, use restrictions, expense obligations, duration, concessions, rental adjustments and revaluations, renewal and purchase options, and tenant improvements (TIs). (Appraisal Institute)

### Market Value

The following definition of market value is used by agencies that regulate federally insured financial institutions in the United States: The most probable price that a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

1. Buyer and seller are typically motivated;

2. Both parties are well informed or well advised, and acting in what they consider their own best interests;

3. A reasonable time is allowed for exposure in the open market;

4. Payment is made in terms of cash in United States dollars or in terms of financial arrangements comparable thereto; and

5. The price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale. (Dictionary; 12 C.F.R. Part 34.42(g); 55 Federal Register 34696, August 24, 1990, as amended at 57 Federal Register 12202, April 9, 1992; 59 Federal Register 29499, June 7, 1994)

### Marketing Time

An opinion of the amount of time it might take to sell a real or personal property interest at the concluded market value level during the period immediately after the effective date of an appraisal. Marketing time differs from exposure time, which is always presumed to precede the effective date of an appraisal. (Advisory Opinion 7 of the Appraisal Standards Board of the Appraisal Foundation)



### Master Lease

1. A lease in which a part or the entire property is leased to a single entity (the master lessee) in return for a stipulated rent. The master lessee then subleases the property to multiple tenants.
2. The first lease in a sandwich lease. (Dictionary)

### Modified Gross Lease

A lease in which the landlord receives stipulated rent and is obligated to pay some, but not all, of the property's operating and fixed expenses. Since assignment of expenses varies among modified gross leases, expense responsibility must always be specified. In some markets, a modified gross lease may be called a *double net lease, net net lease, partial net lease, or semi-gross le*ase. (Dictionary)

### Negative Leasehold

A lease situation in which the market rent is less than the contract rent. (Dictionary)

### Operating Expense Ratio

The ratio of total operating expenses to effective gross income (*TOE/EGI*); the complement of the net income ratio, i.e., *OER = 1 – NIR* (Dictionary)

### Option

A legal contract, typically purchased for a stated consideration, that permits but does not require the holder of the option (known as the *optionee*) to buy, sell, or lease real estate for a stipulated period of time in accordance with specified terms; a unilateral right to exercise a privilege. (Dictionary)

### Partial Interest

Divided or undivided rights in real estate that represent less than the whole, i.e., a fractional interest such as a tenancy in common or easement. (Dictionary)

### Pass Through

A tenant's portion of operating expenses that may be composed of common area maintenance (CAM), real property taxes, property insurance, and any other expenses determined in the lease agreement to be paid by the tenant. (Dictionary)

### Percentage Lease

A lease in which the rent or some portion of the rent represents a specified percentage of the volume of business, productivity, or use achieved by the tenant. (Dictionary)

### Positive Leasehold

A lease situation in which the market rent is greater than the contract rent. (Dictionary)

### Potential Gross Income (PGI)

The total income attributable to property at full occupancy before vacancy and operating expenses are deducted. (Dictionary)

### Prospective Opinion of Value

A value opinion effective as of a specified future date. The term does not define a type of value. Instead, it identifies a value opinion as being effective at some specific future date. An opinion of value as of a prospective date is frequently sought in connection with projects that are proposed, under construction, or under conversion to a new use, or those that have not yet achieved sellout or a stabilized level of long-term occupancy. (Dictionary)

### Replacement Cost

The estimated cost to construct, at current prices as of a specific date, a substitute for a building or other improvements, using modern materials and current standards, design, and layout. (Dictionary)

### Reproduction Cost

The estimated cost to construct, at current prices as of the effective date of the appraisal, an exact duplicate or replica of the building being appraised, using the same materials, construction standards, design, layout, and quality of workmanship and embodying all of the deficiencies, superadequacies, and obsolescence of the subject building. (Dictionary)

### Retrospective Value Opinion

A value opinion effective as of a specified historical date. The term *retrospective* does not define a type of value. Instead, it identifies a value opinion as being effective at some specific prior date. Value as of a historical date is frequently sought in connection with property tax appeals, damage models, lease renegotiation, deficiency judgments, estate tax, and condemnation. Inclusion of the type of value with this term is appropriate, e.g., "retrospective market value opinion." (Dictionary)

### Sandwich Leasehold Estate

The interest held by the sandwich leaseholder when the property is subleased to another party; a type of leasehold estate. (Dictionary)

### Sublease

An agreement in which the lessee in a prior lease conveys the right of use and occupancy of a property to another, the sublessee, for a specific period of time, which may or may not be coterminous with the underlying lease term. (Dictionary)

### Subordination

A contractual arrangement in which a party with a claim to certain assets agrees to make that claim junior, or subordinate, to the claims of another party. (Dictionary)

© 2025 VALBRIDGE PROPERTY ADVISORS | MILWAUKEE



### Surplus Land

Land that is not currently needed to support the existing use but cannot be separated from the property and sold off for another use. Surplus land does not have an independent highest and best use and may or may not contribute value to the improved parcel. (Dictionary)

### TPO

Thermoplastic polyolefin, a resilient synthetic roof covering.

### Triple Net (Net Net Net) Lease

An alternative term for a type of net lease. In some markets, a net net net lease is defined as a lease in which the tenant assumes all expenses (fixed and variable) of operating a property except that the landlord is responsible for structural maintenance, building reserves, and management; also called *NNN lease, net net net lease, or fully net lease*. (Dictionary)

(The market definition of a triple net lease varies; in some cases tenants pay for items such as roof repairs, parking lot repairs, and other similar items.)

### Usable Area

The measured area of an office area, store area, or building common area on a floor. The total of all the usable areas for a floor shall equal floor usable area of that same floor. (BOMA)

### Value-in-Use

1. The amount determined by discounting the future cash flows (including the ultimate proceeds of disposal) expected to be derived from the use of an asset at an appropriate rate that allows for the risk of the activities concerned. (FASB Accounting Standards Codification, Master Glossary)
2. Formerly used in valuation practice as a synonym for *contributory value* or *use value*. (Dictionary)

### VTAB (Value of the Total Assets of a Business)

The total amount that the real property, tangible personal property, and intangible property assets of a business would sell for in an asset-based transaction. (Dictionary)



## Qualifications

### Qualifications of S. Steven Vitale, MAI
### Senior Managing Director
Valbridge Property Advisors | Milwaukee

*Independent Valuations for a Variable World*

### State Certifications
State Certified General Appraiser
Wisconsin – License No. 506-10
Illinois – License No. 553.002620
Michigan - License No. 1201004914

### Education
University of Wisconsin – Madison: Masters of Science degree in Real Estate Appraisal and Investment Analysis. Graduated with distinction in May 1991.

University of Wisconsin – Milwaukee: Bachelor of Business Administration with majors in finance and real estate. Graduated in August 1988.

### Designations
MAI - Appraisal Institute, Member (1995)

### Organizations
Appraisal Institute
Commercial Association of Realtors WI
Univ. of WI Real Estate Alumni Assoc.
National Golf Foundation
WI Innkeepers Association
International Right of Way Association

### Contact Details
262-782-7990 (p)

Valbridge Property Advisors |
Milwaukee
12660 W. North Ave.
Brookfield, WI 53005

www.valbridge.com
svitale@valbridge.com

### Overview
Commercial real estate appraiser experienced in a wide variety of complex appraisal and consulting assignments in multiple property types and markets. Specialized in valuation of special purpose and investment property including hotels, motels, golf courses, mixed-use land developments, office, retail, industrial, senior housing, and multi-family properties. Experienced in condemnation and property tax appraisals and have testified as an expert in multiple cases. Working knowledge of multiple computer applications for real estate valuation analysis. Clients served include financial institutions, banks, insurance companies, corporations, government agencies, developers, attorneys and individuals.

### Experience
**2013 – Present**
Senior Managing Director
Valbridge Property Advisors | Milwaukee
Brookfield, Wisconsin

**1998 – Present**
Vitale Realty Advisors, LLC – President
Brookfield, Wisconsin

**1994 – 1998**
Moegenburg Research, Inc. – Appraiser
Elm Grove, Wisconsin

**1993 – 1994**
Gloodt Associates, Inc. – Associate
Chicago, Illinois and Elm Grove, Wisconsin

**1991 – 1992**
Arthur Andersen & Co. – Staff Appraiser
Chicago, Illinois



NO. 506 - 10

EXPIRES: 12/14/2027

# The State of Wisconsin
# Department of Safety and Professional Services
## REAL ESTATE APPRAISERS BOARD

*Hereby certifies that*

Salvatore Steven Vitale

*was granted a license to practice as a*

## APPRAISER, CERTIFIED GENERAL

*(551)*
*in the State of Wisconsin in accordance with Wisconsin Law*
*on the 15th day of December in the year 1993.*
*The authority granted herein must be renewed each biennium by the granting authority.*
*In witness thereof, the State of Wisconsin*
*Real Estate Appraisers Board*
*has caused this certificate to be issued under*
*the seal of the Department of Safety and Professional Services*



DSPS Secretary

*This certificate was printed on the 25th day of November in the year 2025*



## Qualifications of Russell Cooper
Appraiser
Valbridge Property Advisors | Milwaukee

*Independent Valuations for a Variable World*

### State Certifications
State Certified General Appraiser
Wisconsin – License No. 3100-10

### Education
University of Wisconsin – Madison: Bachelor of Business Administration with majors in Real Estate and Urban Land Economics and International Business. Graduated in May of 2021.

### Contact Details
262-754-8901 (office)
262-215-6670 (cell)

Valbridge Property Advisors | Milwaukee
12660 W. North Ave.
Brookfield, WI 53005

www.valbridge.com
rcooper@valbridge.com

### Overview
Commercial real estate appraiser experienced in a variety of appraisal, appraisal review and research assignments. Background includes exposure to varied property types and markets. Experience with vacant land, land conservation, federal and state land acquisitions, retail, office, multi-family, industrial and institutional properties. Clients served include banks, financial institutions, government agencies, corporations, attorneys, developers and individuals.

### Experience
**2023 – Present**
Appraiser
Valbridge Property Advisors | Milwaukee
Brookfield, Wisconsin

**2021 – 2023**
Real Estate Analyst
Valbridge Property Advisors | Milwaukee
Brookfield, Wisconsin

**2020 – 2021**
Business Consultant
Advantage Alarm Inc.
Lake Geneva, Wisconsin



NO. 3100 - 10

EXPIRES: 12/14/2027

## The State of Wisconsin
## Department of Safety and Professional Services
### REAL ESTATE APPRAISERS BOARD

*Hereby certifies that*

Russell Blake Cooper

*was granted a license to practice as a*

## APPRAISER, CERTIFIED GENERAL

(551)

*in the State of Wisconsin in accordance with Wisconsin Law*
*on the 27th day of November in the year 2023.*
*The authority granted herein must be renewed each biennium by the granting authority.*
*In witness thereof, the State of Wisconsin*
*Real Estate Appraisers Board*
*has caused this certificate to be issued under*
*the seal of the Department of Safety and Professional Services*



DSPS Secretary

*This certificate was printed on the 17th day of November in the year 2025*

© 2025 VALBRIDGE PROPERTY ADVISORS | MILWAUKEE

# Valbridge
## PROPERTY ADVISORS

# FAST FACTS
## COMPANY INFORMATION

- Valbridge is North America's largest independent commercial appraisal firm.

- Valbridge provides custom appraisal reports in the U.S., Canada, and Puerto Rico.

- Valbridge specializes in appraising all types of real property.

- Valbridge provides independent valuation services. We are NOT owned by a brokerage firm or investment company.

- Every Valbridge office is overseen by a Senior Managing Director who holds the MAI designation of the Appraisal Institute.

- Valbridge is owned by local offices.

- Valbridge welcomes single-property assignments as well as portfolio, multi-market, and other bulk-property engagements.

## INSIGHT. IMPACT. INTEGRITY.

**Valbridge Property Advisors, Inc.**
Phone: 888.981.2029
**valbridge.com**

  

# Valbridge
## PROPERTY ADVISORS

## VALBRIDGE PROPERTY ADVISORS OFFICE LOCATIONS

**ALABAMA**

26241 Equity Dr., Ste. 101
Daphne, AL 36526
(251) 929-9090

4245 Balmoral Dr. SW, Unit #201
Huntsville, AL 35801
(256) 210-1555

4732 Woodmere Blvd.
Montgomery, AL 36106
(334) 277-5077

**CALIFORNIA**

3160 Crow Canyon Pl.
San Ramon, CA 94583
(925) 327-1660

825 Colorado Blvd., Ste. 201
Los Angeles, CA 90041
(626) 486-9327

17822 17th St., Ste. 211
Tustin, CA 92780
(714) 449-0852

775 Sunrise Ave., Ste. 260
Roseville, CA 95661
(916) 361-2509

1530 The Alameda, Ste. 100
San Jose, CA 95126
(408) 279-1520

**COLORADO**

5345 Arapahoe Ave., Ste. 6
Boulder, CO 80303
(303) 867-1935

**FLORIDA**

301 Almeria Ave., Ste. 350
Coral Gables, FL 33134
(305) 639-8029

3780 Burns Rd., Ste. 4
Palm Beach Gardens, FL 33410
(561) 833-5331

3033 Riviera Dr., Ste. 106
Naples, FL 34103
(239) 514-4646

**IDAHO**

3910 S. Yellowstone Hwy., Ste. B5
Idaho Falls, ID 83402
(208) 534-5505

1875 N. Lakewood Dr., Ste. 100
Coeur d'Alene, ID 83814
(208) 292-2965

**INDIANA**

6801 Lake Plaza Dr., Ste. C-301
Indianapolis, IN 46220
(317) 687-2747

**KANSAS**

10990 Quivira Rd., Ste. 100
Overland Park, KS 66210
(913) 451-1451

**KENTUCKY**

1890 Star Shoot Pkwy.
Lexington, KY 40509
(502) 585-3651

9401 Williamsburg Plaza, Ste. 204
Louisville, KY 40222
(502) 585-3651

**MARYLAND**

2709 Hanson Ave., Ste. T2
Baltimore, MD 21209
(443) 333-5525

**MASSACHUSETTS**

260 Bear Hill Rd., Ste. 106
Waltham, MA 02451
(781) 790-5645

**MICHIGAN**

1420 Washington Blvd.
Detroit, MI 48226
(313) 986-3313

2127 University Park Dr.
Okemos, MI 48864
(517) 336-0001

**MINNESOTA**

1515 Central Pkwy., Ste. 120
Eagan, MN 55121
(651) 370-1475

**MISSISSIPPI**

1010 Ford St.
Gulfport, MS 39507
(228) 604-1900

224 Avalon Cir.
Brandon, MS 39047
(601) 853-0736

501 Highway 12 W., Ste. 150-M
Starkville, MS 39759
(662) 617-2350

**MISSOURI**

1118 Hampton Ave., Ste. 208
St. Louis, MO 63139
(314) 255-1323

**CORPORATE OFFICE**

1250 Fairmont Avenue, Mount Pleasant, SC 29464 | Phone: (239) 325-8234 | Fax: (239) 325-8356
Each Valbridge office is independently owned and operated.

**valbridge.com**
rev. 010625



**NEVADA**
3034 S. Durango Dr., Ste. 100
Las Vegas, NV 89117
(702) 242-9369

1575 Delucchi Ln., Ste. 209
Reno, NV 89502
(775) 204-4100

**NEW MEXICO**
7301 Indian School Rd. NE, Ste. A
Albuquerque, NM 87110
(505) 884-4721

**NORTH CAROLINA**
5950 Fairview Rd., Ste. 405
Charlotte, NC 28210
(704) 376-5400

**NORTH DAKOTA**
118 Broadway N., Ste. 509
Fargo, ND 58091
(701) 289-1676

**OHIO**
8298 Clough Pike, Ste. 1
Cincinnati, OH 45244
(513) 785-0820

**OKLAHOMA**
6666 S. Sheridan Rd., Ste. 104
Tulsa, OK 74133
(918) 712-9992

3121 Quail Springs Pkwy., Ste. 150
Oklahoma City, OK 73134
(405) 603-1553

**PENNSYLVANIA**
900 West Valley Rd., Ste. 503
Wayne, PA 19087
(215) 545-1900

4701 Baptist Rd., Ste. 304
Pittsburgh, PA 15227
(412) 881-6080

**SOUTH CAROLINA**
1250 Fairmont Ave.
Mt. Pleasant, SC 29464
(843) 884-1266

11 Cleveland Ct.
Greenville, SC 29607
(864) 233-6277

920 Bay St., Ste. 26
Beaufort, SC 29902
(843) 884-1266

**TENNESSEE**
3500 Ringgold Rd., Ste. 3
Chattanooga, TN 37412
(423) 206-2677

213 Fox Rd.
Knoxville, TN 37922
(865) 522-2424

756 Ridge Lake Blvd., Ste. 225
Memphis, TN 38120
(901) 753-6977

**TEXAS**
901 Mopac Expy. S., Bldg. 1, Ste. 300
Austin, TX 78746
(737) 242-8585

10210 North Central Expy., Ste. 115
Dallas, TX 75231
(214) 446-1611

974 Campbell Rd., Ste. 204
Houston, TX 77024
(713) 467-5858

2731 81st St.
Lubbock, TX 79423
(806) 744-1188

9901 IH-10 West, Ste. 1035
San Antonio, TX 78230
(210) 227-6229

**UTAH**
527 E. Pioneer Rd., Ste. 240
Draper, UT 84020
(801) 262-3388

20 North Main St.
St. George, UT 84770
(435) 773-6300

321 N. County Blvd., Ste. D
American Fork, UT 84003
(801) 492-0000

**VIRGINIA**
656 Independence Pkwy., Ste. 220
Chesapeake, VA 23320
(757) 410-1222

1231 Alverser Dr.
Midlothian, VA 23113
(757) 345-0010

5107 Center St., Ste. 2B
Williamsburg, VA 23188
(757) 345-0010

**WASHINGTON**
8378 W. Grandridge Blvd., Ste. 110-D
Kennewick, WA 99336
(509) 221-1540

324 N. Mullan Rd.
Spokane Valley, WA 99206
(509) 747-0999

**WISCONSIN**
12660 W. North Ave.
Brookfield, WI 53005
(262) 782-7990

**NORTH AMERICA'S LARGEST INDEPENDENT COMMERCIAL APPRAISAL FIRM**



Valbridge
PROPERTY ADVISORS



valbridge.com