# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN,
## GREEN BAY DIVISION

CITY OF MANITOWOC,

      Plaintiff,

      v.

NEWELL BRANDS INC. AND NEWELL OPERATING COMPANY

      Defendants

Case No. 26-cv-826-BBC

## ANSWER TO COMPLAINT

Defendants Newell Brands Inc. ("NBI") and Newell Operating Company ("NOC", and collectively, "Defendants"), by their attorneys, submit the following Answer to the Complaint filed by Plaintiff City of Manitowoc ("Plaintiff" or "the "City").

## PARTIES

1. The City is a municipal corporation organized and existing under the laws of the State of Wisconsin, with its principal offices located at 900 Quay Street, Manitowoc, Wisconsin 54220.

**ANSWER:** Defendants admit the allegations in Paragraph 1.

2. Defendant Newell Brands Inc. is a corporation organized and existing under the laws of the State of Delaware, with its global corporate headquarters and principal place of business located at 221 River Street, Hoboken, New Jersey 07030. Defendant Newell Operating Company is a Delaware corporation and an indirect, wholly owned subsidiary of Newell Brands Inc. (collectively, "Newell").

**ANSWER:** Defendants admit that NBI and NOC are incorporated in Delaware. Defendants deny the remaining allegations in Paragraph 2.

1

## JURISDICTION AND VENUE

3. This Court has personal jurisdiction over Newell pursuant to Wis. Stat. §§ 801.05(1)(c) and (d) due to its engagement in substantial and not isolated activities within the State of Wisconsin. Additionally, personal jurisdiction is conferred over Newell pursuant to Wis. Stat. § 801.05(3) because this action arises out of acts or omissions committed by Newell within the State of Wisconsin.

**ANSWER:** Defendants admit the Court has personal jurisdiction over them in this matter. Defendants deny the remaining allegations in Paragraph 3.

4. Venue is proper in Manitowoc County pursuant to Wis. Stat. §§ 801.50(2)(a) and (b) because the claim arose in Manitowoc County, the real property that is the subject of this action is located in Manitowoc County, and the environmental contamination and discharge of hazardous substances occurred in Manitowoc County.

**ANSWER:** Defendants admit that the real property that is the subject of this action is located in Manitowoc County. Defendants deny the remaining allegations in Paragraph 4.

## FACTUAL ALLEGATIONS

*Mirro Plant: 1898-2003*

5. Newell is the successor in interest to Mirro Aluminum Company. Mirro Aluminum Company operated its headquarters at the Former Mirro Plant 9, 1512 Washington St, Manitowoc, Wisconsin (the "Property") and was one of world's largest manufacturers of aluminum products.

**ANSWER:** Defendants deny that they are successors in interest to Mirro Aluminum Company. Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 5.

2

6.     The Property at one time encompassed approximately 980,000 square feet of manufacturing space and was comprised of approximately 17 buildings of various heights and ages, coupled together as one structure. The structures occupied an entire city block between Franklin Street, South 15th Street, Washington Street, and South 16th Street. Sidewalks and paved loading dock driveways made up the remainder of the Property.

**ANSWER:**     Defendants admit that at one time there were approximately 17 buildings of different heights and ages occupying most of the city block between Franklin Street, South 15th Street, Washington Street, and South 16th Street. Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 6.

7.     From 1898 to 2001, the Property operated as Mirro Aluminum Company ("Mirro"). Newell acquired the company in 1983.

**ANSWER:**     Defendants admit that Mirro Aluminum Company or predecessor companies operated at the Property beginning in or around 1898 and that Newell Companies, Inc. (now known as NBI) acquired Mirro Corporation in 1983.  Defendants deny the remaining allegations in Paragraph 7.

8.     From 1898 to 1986, the Property was used to manufacture various aluminum products including aluminum cookware. These operations necessarily involved metal smelting, casting, machining, degreasing, finishing, and waste handling activities typical of aluminum manufacturing during that era, including the use and on-site storage of fuels, solvents, oils, foundry sands, and other industrial materials. Such activities are widely recognized as resulting in releases of hazardous substances to soil and groundwater at legacy manufacturing sites. No other manufacturing occurred at the Property during this period or thereafter, and no other party

3

introduced or brought hazardous substances to the Property apart from Newell's predecessor in interest, Mirro.

**ANSWER:** Defendants admit that, for a period of time, aluminum products were manufactured at the Property. Defendants deny the remainder of the allegations in Paragraph 8.

9. Newell continued to maintain its corporate and engineering offices on the sixth and seventh floors of the structure until 2001, when the Property was fully vacated.

**ANSWER:** Defendants deny that they had corporate or engineering offices at the Property. Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 9.

10. For over a century, ending in 1986, Newell continuously operated at the Property and, during that time, caused and contributed to significant environmental impacts. These impacts arose solely from the historic operations of Newell's predecessor, Mirro, which exclusively manufactured at the Property and introduced hazardous substances in connection with those operations. As early as 2003, Newell retained environmental consultants to evaluate conditions at the Property, and those consultants provided reports confirming the existence of environmental impacts. Given the significant environmental issues with the Property, there are numerous reports commissioned by Newell and the City referenced from 2003 to present, including the reports discussed in the following sections.

**ANSWER:** Defendants admit that, as early as 2003, NBI, then known as Newell Rubbermaid Inc., retained environmental consultants to evaluate the environmental conditions at the Property. Defendants further admit that several environmental reports exist related to the Property. Defendants deny the remaining allegations in Paragraph 10.

4

11. STS Consultants, Ltd. ("STS"), retained by Newell, performed a Phase I Environmental Site Assessment (the "STS Phase I"), dated June 20, 2003, for the Property. The objective was to identify recognized environmental conditions ("RECs") in connection with the Property.

**ANSWER:** Defendants admit that Newell Rubbermaid Inc., now NBI, retained STS to perform a Phase I Environmental Site Assessment, dated June 20, 2003. Defendants admit the objective of the STS Phase I was to identify recognized environmental conditions ("RECs") in connection with the Property. Defendants deny the remaining allegations in Paragraph 11.

12. The American Society for Testing and Materials (ASTM) Standard E1527-05 has defined a REC as:

> "The presence or likely presence of any hazardous substances or petroleum products on a property under conditions that indicate an existing release, a past release, or a material threat of a release of any hazardous substances or petroleum products into structures on the property or into the ground, groundwater or surface water of the property. The term includes hazardous substances or petroleum products even under conditions in compliance with laws. The term is not intended to include *de minimis* conditions that generally do not present a threat to human health or the environment and that generally would not be the subject of an enforcement action if brought to the attention of appropriate governmental agencies. Conditions determined to be *de minimis* are not recognized environmental conditions."

**ANSWER:** Defendants admit that the quotation in Paragraph 12 is from ASTM Standard E1527-05. Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 12 and footnote 1.

13. As set forth in the "Findings and Conclusions" section of the STS Phase I, Newell's environmental consultant identified RECs at the Property, including:

5

a. A steam outlet in one of the buildings was used to clean heavily soiled tools and equipment, resulting in the release of oils and other hazardous substances to the subsurface through the cracked concrete floor, with a floor drain historically connected to a storm sewer discharging to Sherman Creek. (AECOM Phase I Report, p. 86.)

b. Aluminum coils historically stored inside another building routinely dripped lubricating oil onto unpaved surfaces, resulting in petroleum and other hazardous substances impacting the subsurface in that area. (*Id.*)

c. An automatic anodizing room used chromic, phosphoric, sulfuric, nitric, and hydrochloric acids to treat aluminum products, and the stained, deteriorated floors and orange-discolored soil observed through subsurface access ports demonstrate that hazardous substances impacted the subsurface beneath the room. (*Id.*)

d. Petroleum products and other hazardous substances saturated the press room floors and subsurface areas, impacting the soil and compacted fill beneath the concrete slab. (*Id.* at 87.)

e. A former ethylene glycol heating coil system remained beneath the concrete walkway adjacent to the main entrance off Washington Street, and aging cast iron pipes containing residual ethylene glycol resulted in hazardous substances impacting the subsurface of the Property. (*Id.*)

f. Hydraulically operated elevators within the industrial structure exhibited standing water and an oil sheen in at least one shaft, indicating that petroleum products and other hazardous substances impacted the subsurface

6

adjacent to the elevators. (*Id.*) Hydraulic elevator systems of this type and vintage commonly utilize hydraulic fluids that historically contained polychlorinated biphenyls ("PCBs") or became commingled with PCB-containing oils, and releases from such systems are a well- documented source of PCB contamination to surrounding soils and groundwater. (*Id.*)

g.   Concrete press pits within the industrial structure were used to collect hydraulic oil leaking from manufacturing equipment, and historical use and employee reports of chronic leaks demonstrate that petroleum products and other hazardous substances impacted the subsurface in these areas. (*Id.*)

**ANSWER:** Defendants deny that the subparagraphs in Paragraph 13 accurately represent the referenced materials and otherwise deny the remaining allegations in Paragraph 13 and footnote 2.

***Earth Science & Technology, LLC Phase II Environmental Site Assessment: March 2005***

14.   The Property was purchased from Newell by Union Street Partners, LLC on March 26, 2004, who subsequently sold the property to Kenneth J. Lemberger, Sr., on November 18, 2005.

**ANSWER:**   Defendants deny the Property was purchased from Defendants by Union Street Partners, LLC on March 26, 2004.  Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 14.

15.   Mr. Lemberger retained Earth Science & Technology, LLC to complete a Phase II Environmental Site Assessment ("Earth Phase II"), dated March 10, 2005, with the objective of determining if the RECs identified in the STS Phase I, or subsequent recognized environmental conditions, represented releases to the environment. (AECOM Phase I Report, p. 126.)

7

**ANSWER:** Defendants deny the allegations in Paragraph 15.

16. Less than one year after Newell sold and finally vacated the former Mirro facility, and without any intervening manufacturing activity or disturbance of the building, the Earth Phase II investigation confirmed that volatile and semi-volatile organic compounds ("VOCs" and "SVOCs") and PCBs were released to and present in the subsurface at multiple locations within the northern two-thirds of the building complex. (*Id*.)

**ANSWER:** Defendants deny the allegations in Paragraph 16.

17. Because the buildings restricted access to subsurface areas, a full Phase II assessment could not be completed, and Earth Phase II concluded that contaminant concentrations at the tested locations likely underrepresent the full degree and extent of contamination. (*Id*. at 148.)

**ANSWER:** Defendants deny the allegations in Paragraph 17.

18. Contamination extended beyond the building, as Wisconsin Department of Natural Resources ("WDNR") records document groundwater standard exceedances on both the east and west sides of the site, and a prior leaking underground diesel fuel tank case involved exceedances of soil standards. (*Id*.)

**ANSWER:** Defendants deny the allegations in Paragraph 18.

19. The Earth Phase II determined that the underground storage tank releases and interior areas of the block required further investigation to define the full extent of contamination. (*Id*.)

**ANSWER:** Defendants deny the allegations in Paragraph 19.

20. The Property was transferred to Mirro Building, LLC on March 23, 2006, and was then purchased by EJ Spirtas Manitowoc, LLC on June 2, 2006. (*Id*. at 6.)

**ANSWER:** Defendants admit that Kenneth J. Lemberger, Sr. entered into a quit claim deed with Mirro Building, LLC dated March 23, 2006, related to the Property, and that Mirro Building LLC entered into a quit claim deed with EJ Spirtas Manitowoc, LLC dated June 2, 2006, related to the Property. Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 20.

21. Given the Property's prominence and scale, the City was required to intervene to prevent further blight and to protect the future of its downtown district.

**ANSWER:** Defendants deny the allegations in Paragraph 21.

*AECOM Phase I Environmental Site Assessment: January 2009*

22. In late 2008, due to the blighted condition of the Property, the City retained AECOM, Inc. ("AECOM") to perform a Phase I Environmental Site Assessment (the "AECOM Phase I").

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 22.

23. The objective of the AECOM Phase I, dated January 19, 2009, was to identify RECs and historical RECs in connection with the Property. (AECOM Phase I Report, p. 2.)

**ANSWER:** Defendants admit that the cover letter of the AECOM Phase I Report states that the objective was to identify, "to the extent feasible, recognized environmental conditions (RECs) and historical RECs in connection with" the Property. Defendants deny any remaining allegations in Paragraph 23.

9

24. The AECOM Phase I, consistent with the STS Phase I and the Earth Phase II, confirmed earlier-identified RECs and added several additional RECs, including:

    a. Soil collected beneath the drainage channels in the building where the steam outlet was located contained VOCs and PCBs (*Id*. at 6);

    b. A soil sample collected beneath the anodizing room contained elevated levels of aluminum (*Id*.);

    c. Petroleum products and other hazardous substances contaminated the compacted fill and subsurface beneath the concrete slab in the press room (*Id*. at 6-7);

    d. AECOM concluded that further investigation was necessary to evaluate the former ethylene glycol heating coil system and potential subsurface releases (*Id*. at 7);

    e. Areas adjacent to the concrete press and air compressor pits exhibited potential subsurface impacts from petroleum products and other hazardous substances (*Id*.);

    f. Assessment of the two leaking underground storage tank ("LUST") sites detected cis-1,2-dichloroethene in groundwater on the east side of the Property and trichloroethylene ("TCE") on the west side, and the undefined extent of these chlorinated solvent impacts continued to contribute to ongoing subsurface contamination (*Id*.);

    g. A second-floor electrical transformer labeled as containing PCB oils was connected to two 55-gallon drums filled with oil requiring immediate

10

disposal, presenting an additional source of hazardous substances at the Property (*Id*. at 7-8); and

h. PCBs were detected in a sump beneath Building C, and because the extent of subsurface impacts and any drain discharge pathway were unknown, AECOM recommended cleaning the sump and conducting additional investigation. (*Id*. at 8.)

**ANSWER:** Defendants deny that the subparagraphs accurately reflect the content of AECOM Phase I and otherwise deny the remaining allegations in Paragraph 24.

***AECOM Phase II Subsurface Assessment: June 2009***

25. On behalf of the City, AECOM conducted a Phase II Subsurface Assessment (the "AECOM Phase II"), dated June 4, 2009, which provided results of environmental sampling completed at the Property. (AECOM Phase II Report, p. 2.)

**ANSWER:** Defendants admit the allegations in Paragraph 25 describe the cover letter to the AECOM Phase II. Defendants deny the remaining allegations in Paragraph 25 and footnote 3.

26. The objective of the AECOM Phase II was to assess and document soil and groundwater quality of the Property relative to the RECs and environmental issues identified during the AECOM Phase I. (*Id*.)

**ANSWER:** Defendants admit that the allegations in Paragraph 26 describe the objective stated in the cover letter to the AECOM Phase II. Defendants deny the remaining allegations in Paragraph 26.

27. PCBs, petroleum, and chlorinated compounds were detected in the subsurface of the Property at concentrations exceeding state standards. (*Id*.)

11

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 27.

28. In addition to the PCBs, petroleum, and chlorinated compounds that the AECOM Phase II detected, only five years after Newell sold and finally vacated the former Mirro facility, and without any intervening manufacturing activity that would have introduced hazardous substances to the property, the AECOM Phase II confirmed hazardous substance releases associated with the RECs identified in the Phase I and concluded as follows:

    a.    A monitoring well near the former hydraulic press exhibited a sheen of free product, likely hydraulic oil, and polyaromatic hydrocarbon compounds were detected above regulatory limits, requiring additional wells and sampling to delineate the contamination. (*Id*. at 16.)

    b.    Soil samples from the central portion of the Property contained tetrachloroethene (PCE) and TCE, indicating multiple solvent releases and necessitating further groundwater monitoring to define the extent of impacts. (*Id*.)

    c.    Groundwater sampling detected TCE above state standards at a downgradient location, indicating contamination that may extend off the Property and requiring further investigation to determine its full extent. (*Id*.)

    d.    PCBs exceeding EPA limits were identified in soils within the former PCB drum storage area, triggering remedial action and disposal requirements under the Toxic Substances Control Act. (*Id*.)

12

e.  Groundwater near the Heat Treat Room contained benzene at concentrations nearing enforcement standards, necessitating further sampling to determine the extent and persistence of contamination. (*Id.*)

**ANSWER:**  Defendants deny that the subparagraphs accurately reflect the content of AECOM Phase II and otherwise deny the remaining allegations in Paragraph 28.

***City Acquisition of the Property & Stantec Phase I Environmental Site Assessment: June 2016***

29.  In 2015, a Raze Order was issued for the Property. Under Manitowoc Municipal Code § 16.070, razing is authorized where building conditions create health and safety hazards, aggravate blight, diminish surrounding property values, and interfere with the safety and welfare of the public. The Raze Order was issued based on documented conditions at the Property that endangered human health and the environment, including structural deterioration and the presence of hazardous substances, and were necessary to protect the public and prevent further harm.

**ANSWER:**  Defendants admit that a Raze Order was issued for the Property in 2015. Defendants deny the allegations in the third sentence of Paragraph 29 and further state that the Raze Order was issued because the property had "become dilapidated and out of repair and consequently, dangerous, unsafe, unsanitary or otherwise unfit for human habitation." Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 29.

30.  In 2016, the City acquired the Property's city-block parcel through a Chapter 32 condemnation action and immediately began the clean-up and demolition tasks in preparation for future development.

**ANSWER:**  Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 30.

13

31. The City determined that the Property was blighted pursuant to Wis. Stat. § 66.1333, thereby exercising its redevelopment authority and qualifying as a "local governmental unit" under Wis. Stat. § 292.11(9)(e)1.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 31.

32. Environmental contamination and structural disrepair at the Property prevented redevelopment, requiring demolition costs, extensive lead and asbestos abatement, remediation of confirmed PCB contamination, and substantial on- and off-site environmental testing and monitoring.

**ANSWER:** Defendants deny that Paragraph 32 accurately describes the condition of the Property as of March 2004. Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 32.

33. The City retained Stantec Consulting Services Inc. ("Stantec") to complete a Phase I Environmental Site Assessment (the "Stantec Phase I"), dated June 28, 2016, with the objective of identifying RECs in connection with the Property. (Stantec Phase I Report, p. 7.) The Stantec Phase I identified RECs as follows:

    a. The Property was used for heavy industrial aluminum manufacturing beginning between 1894 and 1900, expanded significantly during the first quarter of the twentieth century, and continued operating through at least 1986. These operations constituted a REC and resulted in the Property being listed on multiple environmental databases associated with historic industrial activity. As a result, further investigation into potential source areas was required following demolition of the buildings. (*Id*.)

14

b. The Property contained residual hazardous substance contamination in soil, groundwater, and building materials—including two PCB release areas and light non-aqueous phase liquids-impacted soil—constituting RECs requiring further investigation and remedial action. (*Id*.)

c. Past tannery and metalworks operations left abandoned vats, pits, LUSTs, and other hazardous material storage features that had not been fully assessed, constituting a broad REC and warranting further evaluation, including geophysical survey and potential removal during demolition to assess possible releases. (*Id*. at 8.)

d. Lead-based paint and asbestos were likely released from building materials into the structures, soil, and surrounding areas, constituting a REC and requiring an updated hazardous materials inspection prior to demolition. (*Id*.)

e. Staining observed inside the buildings indicated petroleum and other hazardous substance releases to building materials, constituting an additional REC and requiring characterization and a materials management plan prior to demolition. (*Id*.)

f. The Property's subsurface utility tunnel network, associated with reported hazardous material and petroleum releases, constituted a REC due to its potential to serve as a source area and migration pathway, requiring geophysical mapping and further evaluation prior to demolition. (*Id*.)

g. Hazardous materials and petroleum were potentially discharged to the Property's sewer system, including a buried stream, leaving potentially

15

contaminated sludge in pipes and catch basins, constituting a REC and warranting evaluation and sludge characterization. (*Id*.)

**ANSWER:** Defendants deny that the subparagraphs accurately reflect the content of AECOM Phase I and otherwise deny the remaining allegations in Paragraph 33 and footnote 4.

### *Newell Responsible Party Letter*

34. On September 24, 2018, AECOM notified the WDNR that PFAS contamination had been detected at the Property, adding to the extensive hazardous substance contamination already present and significantly expanding the scope of investigation and remediation required. (*See* WDNR Responsible Party Letter (**Ex. A**).)

**ANSWER:** Defendants admit that Ex. A states that AECOM notified WDNR that PFAS contamination had been detected at the Property. Defendants deny the remainder of the allegations in Paragraph 34.

35. In its September 24, 2018, correspondence to Newell, the WDNR identified Newell as a responsible party for the discharge of hazardous substances, including PFAS, to the environment at the Property under Wis. Stat. ch. 292 and Wis. Admin. Code chs. NR 700–754 for investigating and restoring the environment at the Property. (*Id*., p. 1.)

**ANSWER:** Defendants admit that, in Ex. A, WDNR stated "we believe Newell Brands, Inc. (Newell) is responsible for investigating and restoring the environment at the above-described site as a responsible party…." Defendants deny the remaining allegations in Paragraph 35.

36. The WDNR's letter advised Newell of its legal responsibilities under Wisconsin law to investigate and remediate contamination at the Property and provided information regarding required cleanup obligations, use of environmental consultants, and potential financial assistance. (*Id*.)

16

**ANSWER:** Defendants admit that the allegations in Paragraph 36 accurately describe WDNR's message to NBI concerning NBI's responsibilities, as contained in the second paragraph of Ex. A. Defendants deny the remaining allegations in Paragraph 36.

37. The WDNR further advised that, because the City "acquired the Property through a method authorized under Wis. Stat. § 292.11(9)(e)(1m), the City is exempt from environmental liability *and may recover costs from responsible parties who possessed or controlled the hazardous substance that was discharged on the site or who caused the discharge of the hazardous substance on the site under Wis. Stat. § 292.33"* at the Property. (*Id*., p. 2 (emphasis added).)

**ANSWER:** Defendants admit that the quote in Paragraph 37, except for the first three words in the quote (i.e., "acquired the Property"), is from Ex. A. Defendants deny the remaining allegations in Paragraph 37.

38. The WDNR directed Newell to submit written verification, within 30 days of its September 24, 2018, letter, as to whether Newell would coordinate with the City and its consultant, Stantec. (*Id*.)

**ANSWER:** Defendants admit that Ex. A states that NBI "should submit written verification as to whether [NBI] will coordinate with the City and their current consultant, Stantec." Defendants deny the remaining allegations in Paragraph 38.

*WDNR Stepped Enforcement: Notice of Noncompliance and Notice of Violation*

39. On February 20, 2019, the WDNR issued a Notice of Noncompliance ("NON") to Newell for violating Wis. Stat. ch. 292 and Wis. Admin. Code chs. NR 700–754 ("Wisconsin cleanup laws") by failing to provide required information concerning solid waste handling and disposal at the Property and failing to timely coordinate investigation and cleanup efforts with the City. (*See* WDNR NON to Newell (**Ex. B**).)

17

**ANSWER:** Defendants admit that WDNR issued a Notice of Noncompliance to NBI. Defendants deny the remaining allegations in Paragraph 39.

40.     The letter noted that despite two granted extensions, WDNR had not received the requested Site Investigation Work Plan and therefore deemed Newell to be in noncompliance with Wisconsin cleanup laws. (*Id.*, p. 1.)

**ANSWER:** Defendants admit that DNR alleged in Ex. B that, despite two granted extensions "for [NBI] and the City to coordinate efforts to provide a Site Investigation Work Plan" WDNR had not received the requested Site Investigation Work Plan and, therefore, deemed NBI to be "in non-compliance." Defendants deny the remaining allegations in Paragraph 40.

41.     The WDNR further advised that, as a Responsible Party, Newell's obligations are governed by Wis. Stat. ch. 292, including Wis. Stat. § 292.11(3), which provides that "[a] person who possesses or controls a hazardous substance which is discharged or who causes the discharge of a hazardous substance shall take the actions necessary to restore the environment to the extent practicable and minimize the harmful effects from the discharge to the air, lands, or waters of the state." (*Id.*, p. 1-2.)

**ANSWER:** Defendants admit that the allegations in Paragraph 41 accurately describe WDNR's statements in Ex. B concerning NBI. Defendants deny the remaining allegations in Paragraph 41.

42.     The WDNR advised that Newell would remain in noncompliance with Wisconsin cleanup laws until it fulfilled all statutory requirements and that failure to take the required actions to address the contamination could result in enforcement proceedings. (*Id.*, p. 2.)

**ANSWER:** Defendants admit that Ex. B states, "Please understand that [NBI] is in noncompliance and will remain in noncompliance until [NBI] fulfills all requirements of the

18

statute. Failure to take the actions required by Wis. Stat. § 292.11 to address this contamination will cause the Department to review this case for enforcement actions." Defendants deny the remaining allegations in Paragraph 42.

43. On June 16, 2020, the WDNR took the next measure of "stepped enforcement" and issued a Notice of Violation ("NOV") letter to Newell informing it that it was in violation of state hazardous substance discharge laws at the Property. (*See* WDNR NOV to Newell (**Ex. C**).) These findings were based on a review of departmental records. (*Id*., p. 2.)

**ANSWER:** Defendants admit that the allegations in Paragraph 43 generally summarize statements in Ex. C concerning NBI. Defendants deny the remaining allegations in Paragraph 43.

44. WDNR determined that Newell violated: (a) Wis. Stat. § 292.11(3) by failing to take necessary actions to restore the environment and minimize the harmful effects of hazardous substance discharges; (b) Wis. Admin. Code § NR 700.11(1)(a) by failing to submit required progress reports summarizing completed and planned response actions; and (c) Wis. Admin. Code § NR 716.09(1) by failing to submit the required Site Investigation Work Plan. (*Id*.)

**ANSWER:** Defendants admit that Ex. C states that the "department allege[d]" NBI was in violation of certain cited statutory and regulatory provisions. Defendants deny the remaining allegations in Paragraph 44.

45. The WDNR scheduled an enforcement conference for June 29, 2020, to discuss the alleged violations and requested Newell's attendance, emphasizing that failure to participate could result in enforcement action based on the available information. (*Id*., p. 3.)

**ANSWER:** Defendants admit that WDNR scheduled an enforcement conference for June 29, 2020, and requested NBI to attend to "discuss the circumstances surrounding the alleged violations and to learn [NBI's] perspective on this matter." Defendants further admit that Ex. C

19

states, "The department's enforcement decision will be based upon available information if you do not attend the enforcement conference." Defendants deny the remaining allegations in Paragraph 45.

46. Following WDNR's stepped enforcement actions, response activities at the Property continued under the oversight of the City and its environmental consultant, Stantec, which directed and implemented investigation and remediation efforts on behalf of the City. During this same period, Newell retained Ramboll Americas Engineering Solutions, Inc. to perform and address site response activities on Newell's behalf.

**ANSWER:** Defendants lack knowledge or information sufficient to form belief about the truth of the allegations in the first sentence of Paragraph 46. Defendants admit that NOC retained Ramboll Americas Engineering Solutions, Inc. to perform and address site response activities on NOC's behalf. Defendants deny the remaining allegations in Paragraph 46.

47. Despite its extensive operational history at the Property, Newell has not requested, proposed, nor performed any interim or remedial actions necessary to restore the environment to the extent practicable or to minimize the harmful effects of hazardous substance discharges caused by Mirro, as required under Wisconsin cleanup laws. Rather, the City alone has undertaken such response actions.

**ANSWER:** Defendants deny the allegations in Paragraph 47. Defendants further state that NOC has performed, and is currently performing, substantial investigatory actions under WDNR's oversight.

***Redeveloping Property for Housing Project***

48. The City has long planned for redevelopment of the property as mixed use residential housing. The Property has been zoned mixed use since 2009.

20

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 48.

49. In 2021, the City approved an offer to purchase the south half of the Property from a development group.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 49.

50. The developer presented the offer with the intent of redeveloping the Property into an affordable housing project ("Housing Project").

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 50.

51. In 2022, the developer applied for and, in 2023, received the Housing Tax Credit approval from the Wisconsin Housing and Economic Development Agency.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 51.

52. In 2024, the developer returned the Housing Tax Credit award due to the costs associated with the necessary cleanup of the site.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 52.

53. In 2024, the City applied for an EPA Cleanup Grant to support the Property preparation for the Housing Project. The grant was to address environmental contamination at the Property, including the hazardous substances caused by Newell operations, including metals, PAHs, VOCs, SVOCs, and PCBs. Grant funded activities included groundwater monitoring,

21

demolition of remaining structural elements, excavation and off-site disposal of contaminated soil, and other remedial actions necessary to make the Property suitable for residential redevelopment. The necessity of securing federal cleanup funding for these activities underscores the extent of contamination caused by historic industrial operations at the Property and the resulting burden placed on the City to undertake response actions.

**ANSWER:** Defendants admit that the City applied for an EPA Cleanup Grant related to the Property. Defendants deny that the Newell "caused" contamination that was meant to be addressed by the grant; that Plaintiff's activities were necessary to "make the Property suitable for residential redevelopment"; and all of the allegations in the last sentence of Paragraph 53. Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 53.

54. In 2025, the developer brought on a senior development partner with a background of working on brownfield properties.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 54.

55. In 2025, the City received the EPA Cleanup Grant to support the Property preparation for the Housing Project.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 55.

56. In 2025, the developers reapplied for and received a new Housing Tax Credit approval from the Wisconsin Housing and Economic Development Agency.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 56.

22

*Recoverable Costs*

57. As a local governmental unit authorized to undertake and recover response costs under Wis. Stat. §§ 292.11 and 292.33, and as recognized by the WDNR in its September 24, 2018, Responsible Party letter identifying Newell's obligations and the City's role in addressing contamination at the Property, the City is entitled to recover its necessary and reasonable response costs.

**ANSWER:** Defendants deny the allegations in Paragraph 57.

58. To date, the City has incurred **at least $5,899,904.89** in necessary and reasonable costs related to investigating contamination, planning and implementing remedial actions, conducting remediation to restore the Property for its intended future use, and engineering fees for administering these tasks. Since at least 2022, the City has made reasonable and repeated requests that Newell reimburse the City for these response costs, but Newell has failed and refused to reimburse any of the City's incurred costs.

**ANSWER:** Defendants admit that the City has incurred some costs related to the Property and that it has made demands that Newell reimburse the City for costs. Defendants lack knowledge or information sufficient to form a belief about the amount the City has incurred. Defendants deny the remaining allegations in Paragraph 58.

59. The City retained Valbridge Property Advisors to conduct an appraisal of the Property. As of December 22, 2025, the Appraisal Report states that the fair market value of the Property as vacant land is $190,000. (*See* Valbridge Appraisal Report (**Ex. D**).)

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 59.

60. From 2008 to 2010, the City contracted with AECOM/STS to conduct site assessments for the Property, incurring costs totaling $28,485.66.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 60.

61. From 2013 to 2016, the City contracted with Symbiont to perform site assessment and project administration for the Property, incurring costs totaling $109,583.09.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 61.

62. From 2015 to 2025, the City contracted with the WDNR to perform a review of fees associated with site assessment and remedial planning reports for the Property, incurring costs totaling $3,500.00.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 62.

63. Since 2016, the City has engaged Stantec, the City's primary environmental consultant, to conduct site investigation activities, remedial action planning, and engineering fees administering those activities for the Property, incurring costs that currently total $1,056,299.83.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 63.

64. In 2016, the City engaged Schenck to perform the project administration task of conducting a financial audit for the Property, incurring costs totaling $350.00.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 64.

24

65. In 2016, the City engaged National Construction and incurred costs associated with fencing and site security as part of conducting and administering the remedial activities on the Property, totaling $5,563.08.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 65.

66. From 2016 to 2017, the City engaged E.F. Becker & Sons, Inc. and incurred costs associated with fencing and site security as part of conducting and administering the remedial activities on the Property, totaling $28,060.00.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 66.

67. From 2016 to 2017, the City engaged Holian Environmental Cleaning Company to perform remedial activities at the Property related to asbestos abatement, incurring costs totaling $586,224.52.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 67.

68. In 2017, the City contracted with Wisconsin Media to carry out the project administration task of publishing public notices related to the Property, incurring costs totaling $263.61.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 68.

69. From 2017 to 2022, the City engaged with Manitowoc Public Utilities for the remediation task of installing a hydrant for access to water during the asbestos abatement, incurring costs totaling $2,145.51.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 69.

70. In 2017, the City contracted with Camera Corner to perform the project administration task of installing security cameras at the Property, incurring costs totaling $912.00.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 70.

71. Since 2017, the City has engaged Waste Management of Wisconsin, Inc. for landfill tipping fees associated with proper disposal of excavated materials from the Property, as well as for remedial activities and project administration costs related to the transport and disposal of PCB-impacted soil removed from the Property, incurring costs totaling $1,824,618.38.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 71.

72. In 2017, the City contracted with Brandenburg Industrial Service Company for the removal of lead-painted demolition debris and removal of PCB waste associated with the remediation of the Property, incurring costs totaling $1,426,114.37.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 72.

73. From 2020 through 2021, the City contracted with Veolia for the removal of hazardous waste and lead-impacted soil associated with the remediation of the Property, incurring costs totaling $10,463.80.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 73.

26

74. In 2021, the City engaged American Engineering Testing, Inc. to conduct soil borings for a geotechnical study associated with the redevelopment of the Property, incurring costs totaling $21,054.20.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 74.

75. From 2025 to 2026, the City incurred $553,750.00 in remedial activity costs to retain Horizon to seal monitoring wells and remove PCB-impacted soil at the Property.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 75.

76. In addition, $242,516.84 remains available to the City under its brownfield cleanup grant for remediation work anticipated to be performed in the spring and summer, which ANS potential additional recoverable response costs.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 76.

## COUNT I: LOCAL GOVERNMENT COST RECOVERY CAUSE OF ACTION

77. The City realleges the allegations set forth in the paragraphs above as if fully set forth herein.

**ANSWER:** Defendants hereby reallege their answers to Paragraphs 1-76 above as if fully set forth herein.

78. The City is a "local governmental unit" as defined in Wis. Stat. § 292.11(9)(e)1.

**ANSWER:** Defendants admit the allegations in Paragraph 78.

27

79. None of the State of Wisconsin agencies with direct or possible oversight of the environmental conditions at the Property, including the Department of Natural Resources, the Department of Safety and Professional Services, and the Department of Agriculture, Trade and Consumer Protection has indicated that no further remedial activities are necessary on the Property or portion of the Property. *See* Wis. Stat. § 292.33(6).

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief about the allegations in Paragraph 79.

80. The City seeks to recover reasonable and necessary costs associated with investigating the environmental contamination on the Property, planning and conducting remedial activities to restore the Property for its intended future use as residential mixed-use property, administering these activities, as allowed under Wis. Stat. § 292.33.

**ANSWER:** Defendants admit that the City seeks to recover costs associated with the Property. Defendants deny the remaining allegations in Paragraph 80.

81. The City seeks to recover these costs from Newell, which caused the discharge of hazardous substances on the Property. Newell meets the definition of a "responsible person" in Wis. Stat. § 292.33(3)(a)2.

**ANSWER:** Defendants admit that the City seeks to recover costs associated with the Property from NBI and NOC. Defendants deny the remaining allegations in Paragraph 81.

82. As set forth in Wis. Stat. § 292.33(2), and as emphasized directly to Newell by the WDNR in its September 24, 2018 Responsible Party letter to Newell, because the City "acquired the Property through a method authorized under Wis. Stat. § 292.11(9)(e)(1m), the City is exempt from environmental liability and may recover costs from responsible parties who possessed or controlled the hazardous substance that was discharged on the site or who caused the discharge of

28

the hazardous substance on the site under Wis. Stat. § 292.33." The City is unable to recover costs from any other responsible parties who may have caused the discharge of hazardous substances or environmental pollution on the Property.

**ANSWER:** Defendants admit that the quotation in Paragraph 82 is from the cited letter. Defendants deny the remaining allegations in Paragraph 82.

83. These costs were incurred in connection with the Property, on which a hazardous substance had been discharged, and the Property was acquired by the City in a condemnation action, qualifying the City as an exempt local government unit as provided in Wis. Stat. § 292.11(9)(e)1m.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief about what costs were incurred in connection with the Property. Defendants deny the remaining allegations in Paragraph 83.

84. The fair market value of the Property is $190,000 and the City's costs are ineligible for a fair market value reduction as contemplated in Wis. Stat. § 292.33(b).

**ANSWER:** Defendants deny the allegations in Paragraph 84.

85. On January 30, 2026, the City completed the activities under Wis. Stat. § 292.33(4)(a)1.-3., as identified herein, and has six years to commence this action.

**ANSWER:** Defendants deny the allegations in Paragraph 85.

## COUNT II: DECLARATORY JUDGMENT

86. An actual controversy exists between the City and Newell regarding Newell's responsibility for hazardous substance discharges at the Property and for response costs incurred and to be incurred by the City under Wis. Stat. ch. 292, including Wis. Stat. §§ 292.11 and 292.33.

29

**ANSWER:** Defendants admit that an actual controversy exists between Plaintiff and Defendants. Defendants deny the remaining allegations in Paragraph 86.

87. The City has incurred substantial response costs, including costs associated with ongoing investigation, remediation, monitoring, and vapor intrusion mitigation.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief about what costs the City has incurred related to the Property. Defendants deny the remaining allegations in Paragraph 87.

88. Pursuant to Wis. Stat. § 806.04, the City is entitled to a declaration that Newell is a responsible person under Wis. Stat. ch. 292 and is liable for all past and future response costs incurred by the City in connection with the investigation, remediation, and monitoring of hazardous substance discharges at the Property.

**ANSWER:** Defendants deny the allegations in Paragraph 88.

## RESPONSE TO PRAYER FOR RELIEF

The remainder of the Complaint consists of Plaintiff's Prayer for Relief, to which no response is required. To the extent a response is required, Defendants deny that Plaintiff is entitled to the relief requested, or to any relief whatsoever.

## DEFENSES

In disclosing these defenses, Defendants do not assume any burden of proof not otherwise required by law. Defendants reserve their rights to assert further defenses that may become apparent during the course of discovery.

## FIRST SEPARATE DEFENSE

Plaintiff's claims are barred, in whole or in part, by the applicable statutes of limitations and/or repose.

30

## SECOND SEPARATE DEFENSE

Plaintiff lacks standing to assert some or all of the claims and demands for relief in the Complaint.

## THIRD SEPARATE DEFENSE

Plaintiff's claims damages are barred, in whole or in part, by the doctrine of estoppel.

## FOURTH SEPARATE DEFENSE

Plaintiff's claims are barred, in whole or in part, by the doctrine of waiver.

## FIFTH SEPARATE DEFENSE

Plaintiff's claims are barred, in whole or in part, by the doctrine of laches.

## SIXTH SEPARATE DEFENSE

The claims are barred, in whole or in part, by Plaintiff's failure to mitigate Plaintiff's "necessary response costs," if any.

## SEVENTH SEPARATE DEFENSE

Plaintiff's claims are barred, in whole or in part, because neither Defendant can be held liable under Wis. Stat. § 292.33 for costs incurred related to contamination from a discharge of hazardous substances that Defendant did not cause.

## EIGHTH SEPARATE DEFENSE

Plaintiff's claims are barred, in whole or in part, to the extent that the alleged damages in the Complaint were proximately caused by persons or entities other than Defendants.

## NINTH SEPARATE DEFENSE

Plaintiff's claims are barred, in whole or in part, and the costs claimed should be limited, to the extent any fault, negligence, assumption of risk, or other culpable conduct by Plaintiff caused, proximately caused, and/or contributed to the alleged damages, or to the extent that the

31

doctrines of contributory negligence, comparative fault, avoidable consequences, and/or other applicable common-law or stator doctrines apply.

## TENTH SEPARATE DEFENSE

Neither Defendant is responsible or liable for any acts or omissions undertaken by or at the direction of any governmental authority or agency.

## ELEVENTH SEPARATE DEFENSE

Plaintiff's claims are barred, in whole or in part, because Plaintiff fails to meet the conditions precedent for the exemption from responsibility for a hazardous substance that Plaintiff possesses or controls as provided under Wis. Stat. § 292.11(9)(e).

## **PRAYER FOR RELIEF**

WHEREFORE, Defendants request that the Court dismiss the Complaint with prejudice, deny all relief requested by Plaintiff, award costs and attorneys' fees as appropriate, and for such other and further relief that the Court in its judgment deems appropriate.

32

Dated this 1st day of June, 2026.    /s/ *Ann H. MacDonald*

Ann H. MacDonald
Mariam Weber
**ARENTFOX SCHIFF LLP**
233 S. Wacker, Suite 7100
Chicago, Illinois 60606
ann.macdonald@afslaw.com
mariam.weber@afslaw.com
Telephone: 312.258.5500
Facsimile: 312.258.5600

Jodi Arndt Labs
**LAW FIRM OF CONWAY, OLEJNICZAK & JERRY, S.C.**
231 South Adams Street
Green Bay, Wisconsin 54305
Telephone: (920) 437-0476
Facsimile: (920) 437-2868
Email: jodi@lcojlaw.com

*Attorneys for Newell Brands Inc. and Newell Operating Company*

## CERTIFICATE OF SERVICE

I hereby certify that on June 1, 2026, I electronically filed a true and correct copy of the foregoing using the Court's e-filing system.

/s/ *Ann H. MacDonald*
Ann H. MacDonald